UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
THE BOARD OF TRUSTEES OF THE :    Civil Action No. 09-cv-09333-BSJ(DCF)
OPERATING ENGINEERS PENSION :
TRUST, on Behalf of Itself and All Others :    <u>CLASS ACTION</u>
Similarly Situated, :
:
                 Plaintiffs, :
:
    vs. :
:
JPMORGAN CHASE BANK, NATIONAL :
ASSOCIATION, :    *Contains Confidential Information*
:
                 Defendant. :
:
———————————————————— x


## <u>THIRD AMENDED CLASS ACTION COMPLAINT</u>

The Board of Trustees (the "Board"), on behalf of the Operating Engineers Pension Trust

(the "Plaintiff" or the "Plan"),[1] and a class of all other similarly situated securities lending program

("SLP") participants ("Class Plans") (the Plan and the Class Plans may collectively be referred to as

the "Plans"), brings this class action against JPMorgan Chase Bank, National Association

(hereinafter "JPMorgan" the "Bank" or "Defendant") and states as follows:

## I.    SUMMARY OF THE ACTION

1.     Defendant is a sophisticated financial institution that provides securities lending

services to its clients and represents that it is a "leading asset servicing provider and premier global

bank committed to helping asset managers and institutional investors of various sizes mitigate risk,

---

[1]     The Plan is the real party in interest to this action, and operates through the Board of
Trustees, its advisors, investment managers, and investment consultants. The Board of Trustees is
the nominal plaintiff in this action.

enhance revenue and increase efficiency."[2]  As part of its SLP, Defendant agreed to act as Plaintiff's agent to invest securities loaned by Plaintiff to approved third-party borrowers in return for cash collateral that it would prudently manage and invest while ensuring the safety of principal.

2.      Plaintiff entered into a Securities Lending Agreement (the "Agreement") with Defendant.[3]   Under the Agreement, Defendant provided investment management services to Plaintiff as its fiduciary under the Employee Retirement Income Security Act ("ERISA"). Defendant had *full discretion* to loan Plaintiff's securities to approved borrowers in return for cash collateral (the "Collateral").  Defendant also had *full discretion* to invest the Collateral.  Defendant had a duty to make prudent investment decisions as required by ERISA, the Agreement, the applicable investment guidelines executed by the parties, and Defendant's investment policies and procedures.  Under the Agreement, Defendant was paid 30-40% of any profit earned from Collateral investments but had no liability if the investments lost money, *except* due to its negligence, bad faith, or willful misconduct.

3.      As Plaintiff's Investment Manager, Defendant invested the Plans' Collateral in CashCo, which held two Lehman senior unsecured floating rate notes: (1) a Lehman floating rate note purchased on August 24, 2006 (extended for an additional two years in August 2007) with an Initial Maturity Date of August 22, 2008 and a Final Maturity Date of August 22, 2016 (CUSIP 524908SQ4); and (2) a Lehman floating rate note purchased on December 26, 2006 with a maturity date of December 23, 2008 (CUSIP 52517PQ61).  Additionally, Defendant purchased another

---

[2]      *Securities Lending: Enhanced portfolio returns through customized risk solutions*, JPMorgan, http://www.jpmorgan.com/tss/General/Securities_Lending/1114735415127 (last visited July 14, 2010).

[3]      A true and correct copy of the Agreement is attached hereto as **Exhibit A**.

Lehman floating rate note with the Class Plans' Collateral bearing CUSIP 52517PK83 (with a maturity date of August 21, 2009). All of these Lehman floating rate notes were held at the time of the bankruptcy and are at issue in this Action (together, the "Lehman Notes" or the "Investments").

4.     As a fiduciary to the Plans, Defendant had a duty of care to make prudent investments and perform ongoing financial analysis with respect to investments held in the Plans' securities lending portfolios, and was required to keep apprised of changing market conditions in order to mitigate any risks associated with the Investments held for the benefit of the Plans. Beginning in August 2007 and continuing into 2008, it became increasingly apparent, or should have became apparent to Defendant, that the Lehman Notes had become extremely risky, akin to junk bonds, and were no longer suitable for an ultra conservative investment program like Defendant's SLP, including CashCo, aimed at generating incremental income with minimal risk. In particular, Defendant knew or should have known that the Lehman Notes were unduly risky based on basic credit and financial analysis and available public information further described below. As such, Defendant was required to have taken action to mitigate the Plans risk of loss associated with the Lehman Notes such as not making the Investments or extending the investment in CUSIP 524908SQ4, selling the Lehman Notes, or hedging against the risk of a Lehman default. However, Defendant failed to act as a prudent fiduciary under the circumstances and took no such action.

5.     In fact, however, by February 2008, Defendant had grown so concerned about the increased risks associated with Lehman that Defendant began taking action to reduce its own financial exposure to a potential Lehman default. Thus, while taking action to minimize its own financial exposure to a potential Lehman default in a non-fiduciary capacity, Defendant took no action with respect to the Lehman Notes made on behalf of the Plans to which Defendant owed the highest duties of care, prudence and loyalty.

6.     In addition to all of the available public information that Defendant knew or should have known as alleged below, Defendant knew full well that the Lehman Notes were imprudent as a result of its overarching relationship with Lehman.  As Lehman's primary clearing bank, and in an attempt to protect itself from a possible Lehman default, Defendant, the same fiduciary to the Plans, began requiring Lehman to post collateral as a required condition to allow Lehman to continue its operations with Defendant.  As a result of Defendant's collateral demands, Lehman suffered severe liquidity problems.  Yet Defendant simultaneously supported Lehman's liquidity by investing the Plans' assets in Lehman.  Since Lehman needed capital in order to survive, Defendant, in effect, used the Plans' assets to give Lehman the liquidity it needed.  In such a way, Defendant took no action to protect the Plans and actually purposefully placed the Plans' Collateral in peril.  In doing so, Defendant took a risk with Plan assets that it was not even willing to take with its own assets to the severe detriment of the Plans.

7.     In fact, from February through September of 2008, Lehman pledged approximately ***$17.6 billion*** in collateral in response to JPMorgan's repeated collateral demands.  The additional collateral demands from Defendant actually ended up causing Lehman's bankruptcy.  Therefore, the action taken by JPMorgan to reduce its own exposure to Lehman caused Lehman to default on the Investments that Defendant continued to hold for the Plan and Class Plans.

8.     Additionally, at any point during late 2007 through 2008, Defendant could have divested the Lehman Notes or taken other mitigatory action and significantly minimized or eliminated any losses to the Plans.  However, Defendant took no action and held onto the Investments despite knowledge that the Lehman Notes had grown unduly risky.

9.     When Lehman declared bankruptcy on September 15, 2008, Plaintiff and the Class Plans suffered substantial losses.

10. Defendants' breach of the fiduciary duty of care occurred when it invested the Collateral in Lehman Notes when it knew or should have known beginning on or about August 1, 2007, that the Lehman Notes were unduly risky for the low risk / low volatility SLP, and specifically for CashCo. Defendant's breach of the fiduciary duty of loyalty occurred when Defendant made these unduly risky Investments in order to earn excessive profit without any corresponding risk of loss. Additionally, Defendant breached its duty of loyalty by using the Plans' Collateral to provide support to Lehman and to allow it to reduce its own financial exposure to a potential Lehman default. A loss was caused by Defendant's breaches when Lehman defaulted on the Investments and failed to make payments due under the Investments.

11. This action seeks to recover losses caused by Defendant's breaches of its fiduciary duties to the Plaintiff and the Class Plans. Defendant's misconduct caused the Plan and the Class Plans to lose both principal and profits that would have been earned but for Defendant's misconduct and resulted in substantial losses. Defendant is a fiduciary under ERISA as well as the various agreements between the Plans and JPMorgan. Defendant's acts and omissions, as herein described, are breaches of fiduciary duty under ERISA §404(a), which entitles the Plans, pursuant to ERISA §502(a)(2), to recover appropriate relief under ERISA §409 and, pursuant to ERISA §502(a)(3), to enjoin acts which violate ERISA. *See* 29 U.S.C. §§1104(2), 1106, 1132(a)(2)-(3) and 1109(2). As a second count, Plaintiff alleges that Defendant's investment of the Plans' Collateral in the Investments were prohibited transactions in violation of ERISA §406. *See Id*.

## II.    PARTIES

### A.    Plaintiff

12. The Plan was established on June 1, 1960 and is located at 100 E. Corson Street, Pasadena, California. The Board of Trustees is the trustee and administrator of the Plan.

**B.     Defendant**

13.     Defendant, JPMorgan, a national banking association with corporate headquarters located at 270 Park Avenue, New York, New York, is a leading financial services company providing investment banking and asset management as well as other financial services. JPMorgan has locations in more than 60 countries and assets of approximately $2 trillion.[4] Many of the assets managed by Defendant belong to pension and savings plans like the Plans, whose cash investments are at issue in this case.

**III.    JURISDICTION AND VENUE**

14.     Plaintiff seeks relief for the Plans under the civil enforcement remedies provided by ERISA against fiduciaries pursuant to ERISA §§404, 406, 409 and 502(a) (29 U.S.C. §§1104, 1106, 1109, 1132). This Court has exclusive jurisdiction over this action and the Defendant pursuant to 28 U.S.C. §§1331, 1332, and ERISA §§502(e)(1) and (2) (29 U.S.C. §§1132(e)(1) and (2)).

15.     Venue of this action in the Southern District of New York is proper pursuant to ERISA §502(e)(2) (29 U.S.C. §1132(e)(2)) and 28 U.S.C. §1391 because Defendant maintains its headquarters in the district, Defendant's breaches took place in the district, and because both Plaintiff and Defendant consented to venue in New York City, New York pursuant to the Securities Lending Agreement dated November 1, 2005.

---

[4]     http//www.jpmorganchase.com/cm/cs?=Chase/Href&urlname=jpmc/about (last visited July 9, 2010). Upon information and belief, JPMorgan has greatly expanded its operations, and as of October 2009, Defendant had $13.7 trillion in assets under custody and $5.1 trillion in assets under administration.   http//www.jpmorgan.com/tss/General/Securities_Lending/1114735359705(last visited October 19, 2009).

## IV.    FACTUAL ALLEGATIONS

### A.    JPMorgan's Securities Lending Program

16.    JPMorgan is a sophisticated financial institution that provides securities lending services to its clients and represents that it is a "leading asset servicing provider and premier global bank committed to helping asset managers and institutional investors of various sizes mitigate risk, enhance revenue and increase efficiency."[5]

17.    Securities Lending is an ultra conservative investment program that is utilized by pension plans like Plaintiff and the Class Plans across the country as a method to earn incremental income in order to offset custodial or investment management fees that are otherwise charged to the Plans to custody their securities portfolios.

18.    Securities lending refers to the lending of securities by one party to another.  The terms of the loan are governed by a "Securities Lending Agreement," which requires that the third-party approved borrower provide the lender (e.g., the Plans) with collateral in the form of cash, government securities or a letter of credit of value equal to or greater than the loaned securities.  The primary reasons for borrowing securities are market making, hedging, and arbitrage trading purposes.  As an intermediary between the lender and the borrower and as an agent on behalf of the Plans, JPMorgan invests the collateral provided by the borrower in accordance with specific investment guidelines agreed upon between JPMorgan and the Plans.  For Plans that had Collateral held in CashCo there were specific CashCo guidelines that governed and comported with ERISA, JPMorgan's policies and procedures and/or specific participant's guidelines.

---

[5]    *Securities Lending: Enhanced portfolio returns through customized risk solutions*, JPMorgan, http://www.jpmorgan.com/tss/General/Securities_Lending/1114735415127 (last visited July 14, 2010).

19.     In its capacity as a lending agent for the SLP participants, JPMorgan acknowledges its fiduciary responsibility to always put its client's interests first.[6] Fiduciary duties are the highest duties known under the law and require that Defendant always place the interests of SLP participants first, and above its own.

20.     Defendant, as agent and fiduciary for SLP participants, received the Collateral and would hold it in either a separately managed account ("SMA") or in a comingled collateral account like CashCo, where in the Collateral of multiple SLP participants would be held and invested together.

21.     The JPMorgan Chase Bank, N.A. Securities Lending Cash Collateral Fund ("CashCo") is a commingled investment vehicle for the investment of cash collateral for qualified benefit plans governed by ERISA. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

22.     The investment policy of CashCo is established by the Trust Investment Committee of JPMorgan, subject to the Declaration of Trust.  The investment guidelines for CashCo, titled "Fund Schedule for the JPMorgan Chase Bank, N.A. Securities Lending Cash Collateral Fund" ("CashCo Investment Guidelines"), herein attached as **Exhibit C**, state that the fund has the following objective: ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[6]     http//www.jpmorgan.com/pages/jpmorgan/am/mediaboxarticles/WhyJPMAM (last visited July 13, 2009).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████

23.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

24.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

25.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

26.     ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

**B.      Plaintiffs Entered Into JPMorgan's Securities Lending Program**

27.     On or about November 1, 2005, Plaintiff entered into the Agreement with JPMorgan. The Agreement delineates JPMorgan's standardized securities lending program.  The Agreement executed by and between the Plan and Defendant is materially similar to Securities Lending Agreements ("Agreements") executed by and between Defendant and the Class Plans.

28.     Under the terms of the Agreements, Defendant, as agent for the Plans, agreed to lend and loan securities owned by the Plans to creditworthy third-party approved borrowers pursuant to a securities borrowing agreement in accordance with the terms of the Agreements that were not inconsistent with ERISA.  Exhibit A, 2(a).

29.     In order to protect the Plans' securities from a borrower's default, the terms of the Agreements required borrowers to post collateral in the form of cash, securities issued by the US government or its agencies, or letters of credit, which, at all times, had a market value of not less than ***102% of the market value*** of the loaned securities as of the close of the preceding business day (the "Collateral Requirement").  If the market value of the Collateral received from the borrower fell below the 102% Collateral Requirement, JPMorgan was required to demand additional Collateral from the borrower in order to assure the market value of the Collateral was never less than the Collateral Requirement.   In the event of a borrower default, Defendant indemnified the Plans**.** Exhibit A.

30.     The Agreement empowered and authorized Defendant to execute all documents necessary to carry out its powers in Defendant's "***discretionary securities lending program***."[7]  *See* Exhibit A.  Moreover, pursuant to the Agreement, JPMorgan agreed to invest and reinvest the Collateral as an agent for the Plans without any further approval from the Plans.  Further, JPMorgan, in its ***sole discretion***, could liquidate any of the Plans' investments.  Accordingly, Defendant had complete authority or control over the management or disposition of Collateral, the Plans' assets, and was the sole investment fiduciary for investment of the Plans' Collateral.

---

[7]     Unless otherwise noted, all emphasis is added.

31.     Because Defendant, as agent for the Plans, was required to return the Collateral to borrowers upon termination of all loans of securities, Defendant had a duty to invest the Collateral conservatively to preserve capital such that the Collateral would be available to be returned.  To fulfill this duty, "Client Specific Guidelines", known as the "Securities Lending JPMorgan Chase Bank Cash Collateral Fund Investment Guidelines," specifically prescribed how Defendant was to invest the Plan's Collateral pursuant to the Agreement.  The Client Specific Guidelines, along with ERISA, governed Defendant's exercise of its fiduciary duties concerning investment of Plan Collateral. *See* Exhibit A, Appendix 1.  The Client Specific Guidelines are materially similar to and act in concert with the CashCo Investment Guidelines, and are herein collectively referred to as the "Guidelines."

32.     These Guidelines merely set forth the contractual obligations to which Defendant is bound.  In its performance of the contract however, Defendant still must comport with the fiduciary duties established under ERISA.  Thus, Defendant is not only bound by the Agreements, but must also at all times act as a prudent fiduciary as required by ERISA.

33.     The Guidelines are materially similar to guidelines executed by and between Defendant and Class Plans.

34.     █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████████

35.     █████████████████████████████████████████████
████████████████████████████████████████████████████████

36.     In order to ensure that the principal of CashCo be preserved, the Guidelines require that the Collateral be invested in short-term, high grade securities.  Specifically, all non-government securities had to be rated at least Upper Medium Investment Grade or better according to the ratings of Standard and Poor's, Moody's and Fitch.

37.     Moreover, the Guidelines provide that at the time of purchase, fixed rate instruments must have a final maturity date that does not exceed one year and floating rate notes must have a maturity that does not exceed two years.  Further, floating rate instruments which are Government Securities must have a final maturity date not exceeding five years.  Exhibit A, Appendix 1, Section F.1 and F.3.

38.     In order to further preserve principal, the Guidelines assured diversification of investment of the Collateral by including a requirement that "[n]o more than 5% of the Fund's total assets, measured at the time of purchase, may be invested in the securities of a single issuer (other than U.S. Government Securities and Repurchase Agreements and the commingled vehicles identified in Paragraph B.2., as to which there is no limitation)."  Exhibit A, Appendix 1, Section E.1.  In addition to the Guidelines, the Collateral was managed pursuant to Defendant's policies and

8

9

procedures. █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Defendant's objective of ensuring a $1

NAV for the CashCo is consistent with learned treatises typically relied upon by experts who

manage such investments. *The Handbook of Fixed Income Securities* 7th ed. by Frank J. Fabozzi,

2005, p. 481, provides:

**"Stable Value Portfolio Objectives"**

Consistent with the role of stable value as the safe option in most defined-contribution plans to day, the overriding objective in managing these portfolios is preservation of principal. Liquidity to meet participant withdrawals is an additional factor, as is earning a fairly stable return that exceeds that of shorter-maturity alternatives.  Portfolio management strategies should address these objectives and should guide the selection of individual issues.

39.   ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████

40.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

41.    Under the Agreement, JPMorgan would not share in any losses on Collateral investments.  Rather, "Authorized Investments are made for the account of, and at the sole risk of, Lender.  In that connection, Lender [the Plans] shall pay to Lending Agent [Defendant] on demand in cash an amount equal to any deficiency in the amount of Collateral available for return to a Borrower pursuant to the applicable MSLA."  *See* Exhibit A, Section 5(e)(ii).

42.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████

43.    Although JPMorgan does not share in any Collateral investment losses, under the terms of the Agreement, JPMorgan collects a fee equal to 30%-40% of earnings derived from the Collateral investment.  *See* Exhibit A, Section 8(i).  In other words, JPMorgan receives 30-40% of the profits from Collateral investments even though it bears none of the risk.

44.    Significantly, however, the Liabilities and Indemnification section of the Agreement provides that "Lending Agent shall not be liable for any costs, expenses, damages, losses, liabilities

or claims (including attorneys' and accountants' fees) (collectively "Losses") incurred by Lender, *except those costs, expenses, damages, liabilities and claims arising out of the negligence, bad faith or willful misconduct of Lending Agent." See* Exhibit A, Section 7(a).

45.     Plaintiff contends herein that their Losses are a result of Defendant's breach of ERISA fiduciary duties and "aris[e] out of the negligence, bad faith or willful misconduct" of Defendant.

**C.     JPMorgan's Ongoing Credit Analysis and Risk Management**

46.     JPMorgan is divided into six lines of business, each with their own divisions, products, personnel and responsibilities, including the Investment Bank, Treasury & Security Services, Asset & Wealth Management, Retail Financial Services, Card Services and Commercial Banking.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

12 [redacted]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

67.   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

68.    Despite the assignment of specific responsibilities to individual people, divisions, or committees as described above, the SLP operates through a collaborative effort amongst each of them.  Personnel in each division or committee regularly communicated about Lehman risk, with personnel in other divisions/committees, including, within the SLP.   Moreover, as detailed below various other JPMorgan committees set policy and provided oversight on all related issues including SLP investments, monitoring, governance, and risk.

> **1.    Securities Lending Specialists, in Conjunction with JPMAM, the Investment Bank, Broker/Dealer Services and Risk Management Personnel, Were Responsible for Operating the Securities Lending Program**

69.    Defendant had numerous employees that were responsible for operating, managing, monitoring and overseeing its Securities Lending Program.   Additionally, there were several

committees responsible for assessing monitoring and managing risk across all lines of Defendant's business, including the SLP.

70. [redacted]

---

13 [redacted] 

71. [redacted]

---

[redacted]



[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

74. ████████████████████████████████████████████

75. ████████████████████████████████████████████

[redacted]

78. [redacted]

[redacted]

80. [redacted]

---

[redacted]

81.   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

82.   Collectively, these committees and personnel had responsibility for or provided oversight to SLP activities including Collateral investment and/or lending.  Together, these committees along with personnel from the SLP, IB and B/D divisions, reached the conclusion to purchase the Lehman Notes on behalf of the Plan and Class Plans, and in the face of extreme risk and crisis, made the decision to not only hold these investments for the Plan and Class Plans, but to use these investments in order to facilitate JPMorgan's own interests with regard to continuing its profitable relationship with Lehman, and using the Plans' assets to support Lehman's need for liquidity.  In such a way, Defendant violated its fiduciary duties to the Plan and Class Plans.

---

████████████████████████████████████████████████

████████████████████████████████████████████

D.      **The Investments**

83.     Consistent with ERISA, JPMorgan, as a sophisticated fiduciary and the Plans' Investment Manager, had a duty to prudently invest and manage its Collateral.  In its capacity as a sophisticated fiduciary and Investment Manager of Plaintiff and the Class Plans' Collateral, Defendant purchased many types of securities purportedly for the benefit of the Plans.  Among these securities, Defendant purchased and held various floating rate notes ("FRNs").  A floating rate note is a bond with a variable coupon interest rate that varies with the market rate.  The coupon rate is typically equal to a money market reference rate (such as LIBOR[38] or the federal funds rate[39]) plus a fixed spread.  Additionally, floating rate notes eliminate "interest rate risk" so the true risk associated with a floating rate note is its "credit risk."

84.     In particular, Defendant invested the Plans' Collateral in CashCo, which held two Lehman senior unsecured floating rate notes: (1) a Lehman FRN purchased on August 24, 2006 (extended for an additional 2 years in August 2007) with an Initial Maturity Date of August 22, 2008 and a Final Maturity Date of August 22, 2016 (CUSIP 524908SQ4); and (2) a Lehman FRN purchased on December 26, 2006 with a maturity date of December 23, 2008 (CUSIP 52517PQ61). Additionally, Defendant purchased another Lehman FRN with the Class Plans' Collateral bearing

---

[38]     "LIBOR" refers to the London Interbank Offered Rate, which is derived from a filtered average of the world's most creditworthy banks' interbank deposit rates for larger loans with maturities between overnight and one full year.  As the rate at which the world's most preferred borrowers are able to borrow money, it represents the most widely used benchmark for short-term interest rates around the globe.

[39]     The Federal Funds rate is the interest rate at which banks that have balances at the Federal Reserve lend to other banks.  The Federal Reserve sets a target federal funds rate and uses tools to get the effective federal funds rate to conform to its target.

CUSIP 52517PK83 (with a maturity date of August 21, 2009).  All of these Lehman Notes were held at the time of the bankruptcy and are at issue in this Action.

85.    Beginning on or about August 1, 2007, the Investments had a significant credit risk. Credit risk is defined as the risk of loss of principal or loss of a financial reward stemming from a borrower's failure to repay a loan or otherwise meet a contractual obligation.[40]  "Credit risk is closely tied to the potential return of an investment, the most notable being that the yields on bonds correlate strongly to their perceived credit risk."  *Id.*  "The higher the perceived credit risk, the higher the rate of interest that investors will demand for lending their capital.  Credit risks are calculated based on the borrowers' overall ability to repay. This calculation includes the borrowers' collateral assets, revenue-generating ability and taxing authority (such as for government and municipal bonds)."  *Id.*

86.    There are two types of credit risk associated with bonds such as the Investments held for the benefit of the Plans.  One form of credit risk, default risk, is the risk that the issuer (in this case, Lehman), will default on its obligation.  Another form of risk associated with the Investments at issue is the risk that the bond's value would decline as a result of either a perceived increase in the risk that the issuer (Lehman) will default or a lowering of the credit rating (*i.e.*, downgrading).[41]

87.    As detailed below, the Investments were extremely risky, particularly for a low risk SLP, because beginning on or about August 2007 and throughout 2008, there was tremendous uncertainty as to Lehman's financial condition and its potential for default.  Moreover, the analysis

---

[40]    *See* Credit Risk, Investopedia, http://www.investopedia.com/terms/c/creditrisk.asp (last visited May 11, 2010).

[41]    *Fixed Income Analysis for the Chartered Financial Analyst,* second edition, by Frank J. Fabozzi, 2004, pp. 570.

described below that JPMorgan either knew about, conducted itself, or should have conducted as a reasonably prudent fiduciary, confirms that the Investments had become akin to junk bonds (*i.e.*, not investment grade) and were no longer appropriate for the SLP.   Despite this, Defendant imprudently held the Investments until Lehman declared bankruptcy on September 15, 2008, causing Plaintiff and the Class Plans to suffer substantial damages.

88.     Additionally, Defendant violated ERISA through its purchase of the Lehman Note (CUSIP 524908SQ4) that had a **Final Maturity of 10 years** at the time of purchase.[42]  This purchase was a *per se* violation of the Agreement and Guidelines, and in particular the maturity limits which specify that "all other floating rate instruments must have a **Final Maturity** not exceeding 2 years at the time of purchase. . . ." *See* Exhibit A, Appendix 1, Section F.   Moreover, as detailed herein, JPMorgan elected to extend the "Initial" maturity of this note in August 2007, at a time when Defendant knew or should have known that the Investment had become inappropriate for the SLP. As detailed below, no reasonably prudent investment manager would have extended the term of this note at a time when the investment had reach a level of risk associated with non-investment grade bonds.  Thus by extending the term of the note, Defendant failed to act as a prudent fiduciary under the circumstances, violated ERISA and caused substantial damages to the Plan and Class Plans.

---

[42]     *See*, Pricing Supplement Number 21 dated August 17, 2007, Lehman Brothers Holdings Inc. Medium-Term Notes, Series I, attached hereto as **Exhibit D**.

E.     **Defendant Knew or Should Have Known that the Investments Became Unduly Risky Throughout 2008[43]**

89.     As a fiduciary to the Plans, JPMorgan was required to perform continuous analysis of indicators of corporate and security risks associated with the Investments. Credit analysis of any entity involves the analysis of a multitude of quantitative and qualitative factors.   A reasonably prudent fiduciary would continually evaluate the factors detailed below to ensure that the Investments remained prudent at all times.  Defendant, as a sophisticated investment manager who constantly touted its credit analysis and risk management strategy, should have continuously evaluated a variety of factors to determine the level of risk associated with the Investments in order to ensure that the Investments remained at all times appropriate investments for its minimal risk SLP. Therefore, Defendant knew or should have known that the Investments had reached a level of riskiness associated with non-investment grade junk bonds, and were no longer appropriate for the Plan's or Class Plans' securities lending portfolios, including CashCo.

1.     **Fundamental Quantitative Analysis Confirms that the Lehman Notes Were "Junk" and Were Too Risky For the SLP**

90.     Plaintiff intends to present expert testimony demonstrating that, as a fiduciary to the Plans, JPMorgan should have performed continuous financial analysis of indicators of corporate and security risk, and that had Defendant properly performed this analysis, then, based on observable financial metrics described below, Defendants knew or should have know that the Lehman Notes

---

[43]     As alleged above, the issue concerning breach of the duty of prudence is not whether Lehman was headed for default.  Although, as alleged below, it is crystal clear that Lehman's circumstances were dire and it was potentially headed for default, the breach occurred at the moment Defendant knew or should have known that Lehman was too risky for an investment with the risk profile of the SLP, including CashCo. The loss occurred because Defendant imprudently and disloyally held the Lehman Notes and Lehman defaulted, which was the materialization of the risk created by Defendant.

had become unduly risky, and were no longer appropriate for the SLP, or CashCo. If evaluated, a number of financial metrics would have led a prudent investment manager to reach the conclusion that the Lehman Notes were no longer appropriate for the minimal risk SLP, and had become akin to junk (*i.e.*, not investment grade), thereby compelling Defendant to take action to mitigate the Plans' exposure to a Lehman default.

91.     Indicators of risk for floating rate notes like the Lehman Notes include: equity option implied volatility, Credit Default Swap ("CDS") prices, implied default probability based on CDS prices, default probabilities implied by the notes' prices and yields, as well as equity and bond prices. These are well known and widely used measures of risk derived from readily observable public data, which indicates extreme levels of risk associate with the Lehman Notes. A prudent fiduciary would have continuously evaluated these financial metrics for increased risk and reached the conclusion that the Lehman Notes had become akin to junk, and were certainly not appropriate for the SLP, or CashCo.

### a.     Option Implied Volatility Analysis

92.     Implied volatility is a forecast of the volatility of a company's stock returns that is derived from the observed prices of options on the company's stock.[44] Rising equity option implied volatility of a particular entity generally signals increased risk relating to the entire enterprise. Option implied volatility is used to measure the market's perception of risk inherent in a company's securities, including FRNs. Implied volatility is a statistical measure of the uncertainty around the forecasted annual return on a stock. Thus, the greater the implied volatility, the greater is the market's uncertainty regarding the future value of the investment. An upward spike in a company's

---

[44]     For a description of implied volatility, see, for example, *Options, Futures, and Other Derivatives,* fifth edition, by John C. Hull, 2003, pp. 250-251.

implied volatility informs sophisticated investment managers like Defendant, that the company and its securities have become riskier.

93.     The Black-Scholes option pricing formula is widely accepted and widely used as a model for valuing options.[45]   According to this formula, the value of an option on a stock is a function of six variables: stock price, strike price, time to expiration of the option, risk-free interest rate, dividend rate, and a forecast of the future volatility of the stock's returns. Among these, only the volatility forecast variable is not observable; but it can be inferred from the observed prices of exchange-traded options. The implied volatility is found by computationally inverting the Black-Scholes formula to arrive at the volatility forecast that is consistent with the observed option price. As applied to Lehman, the larger the volatility, the more uncertain the market is about Lehman's annual performance.

94.     While typical implied volatilities are in the 20%-35% range, Lehman broke above that range in July 2007 and steadily grew riskier from then on.  For example, from August 2007 through December 2007, Lehman's implied volatility ranged between 33.6% and 52.6%, with an average of 41.8%.  In 2008, implied volatility continued to rise, indicating progressively greater risk and uncertainty surrounding Lehman.  From January 2008 through August 2008, Lehman's implied volatility ranged between 40.4% and 125.0%.  Further, in the two weeks of September 2008, before its bankruptcy, Lehman's implied volatility soared, ranging between 81.2% and 150.0%.

95.     The data shows that the riskiness of Lehman's enterprise was rising over the full year prior to its bankruptcy and that the market judged Lehman to be a troubled company with an uncertain future and a far greater likelihood of defaulting. Therefore, the implied volatility analysis

---

[45]     For a description of the Black-Scholes model, see, for example, *Options, Futures, and Other Derivatives*, fifth edition, by John C. Hull, 2003, pp. 234-266.

should have indicated to a prudent investment manager, that as early as August 2007, the volatility of the Investments was so great as to be completely inappropriate for the low risk SLP, including CashCo.

### b.   Credit Default Swap Analysis

96.   Credit Default Swap ("CDS") prices, another indicator of risk, further indicated that the risk associated with the Lehman Notes had increased significantly to levels that should have signaled to Defendant that the Investments were no longer appropriate for its SLP, or CashCo.

97.   A credit default swap is essentially an insurance policy that pays off when a particular company defaults on its debt obligations.  In a CDS contract, the protection-buyer agrees to make quarterly premium payments to the protection-seller. In return, in the event the subject company defaults, the protection-seller pays to the protection-buyer the par value of a reference bond minus the post-default market value of that bond. The protection-buyer's payment amount is determined in the marketplace, depending on supply, demand, and all available information about the subject company. The annualized payment is called the CDS premium or CDS price ("CDS price"). Current and historical CDS prices are readily available to JPMorgan.

98.   The market's assessment of the likelihood of a company's default is a major determinant of the price of that company's CDS contracts.  The greater the risk of default, the higher the cost of CDS protection.  A prudent investment manager could readily monitor the market prices of Lehman CDS contracts to evaluate whether its bond risk had increased.

99.   The prices of 5-year Lehman senior debt CDS contracts rose significantly over the year full year prior to the bankruptcy.  These contracts are a strong indicator of default risk and are widely followed by prudent investment professionals.  From January 2006 through June 2007, the cost to insure $1,000 of Lehman senior debt ranged between $1.88 and $4.41 per year, averaging $2.60 per year. As was the case with the implied volatility, on or about August 2007, the CDS price

abruptly climbed and subsequently soared.  In fact, On August 3, 2007, the CDS price per $1,000 of par broke over $10.00 per year. Between 1 August 2007 and the end of year, the Lehman CDS price ranged between $5.97 and $17.06 per year, with an average price of $11.69 per year. The average Lehman CDS price over this period was 4.5 times greater than the average price over the earlier period.

100.     In 2008, the Lehman CDS price rose dramatically, indicating progressively greater risk of a Lehman default. Between January 2008 and August 2008, the Lehman CDS price ranged between $11.94 and $42.51 per year, with an average price of $24.84 per year. This mean price was 9.6 times greater than the mean price between January 2006 and June 2007.

101.     Additionally, in the two weeks in September 2008 prior to the bankruptcy, Lehman's CDS price continued to climb. Between September 1 and September 12, 2008, the Lehman CDS price per $1,000 of par value ranged between $31.07 and $64.19 per year, with an average of $41.04 per year.

102.     These CDS prices clearly indicate that the market assessed a Lehman default to be increasingly likely.  In fact, Lehman's CDC prices reached extreme levels.  Furthermore, the prices reflect extreme turmoil in the financial sector in which Lehman exists.  Therefore, the significantly elevated CDS prices should have signaled to a prudent investment manager that the Lehman Notes had become extremely risky, and were no longer appropriate for its SLP, including CashCo, compelling action by JPMorgan, the fiduciary of the Plans' assets, to mitigate the Plans' Lehman exposure.

### c.      Default Probability Implied by Credit Default Swap Prices

103.     Another indicator of risk of the Investments is the market's assessment of default probability implied by CDS prices.  A mathematical relationship between default probability and a

CDS price allows inference of the market's assessment of default probability based on a CDS price. The derivation of default probability estimates from CDS prices is a generally accepted and widely used analytical methodology, described in detail in the finance literature.[46] The quarterly probability of default, the probability the note defaults within the next quarter, is approximately proportional to the CDS price. For example, if the CDS price rises 10%, the more expensive insurance would indicate that the quarterly probability of default has increased approximately 10%.

104.    As described above, from January 2007 to June 2008, the price of Lehman's senior debt like the Lehman Notes CDS rose exponentially. Correspondingly, the probability of a Lehman default also rose exponentially. This jump in CDS price indicated that risk was evident to professional investment managers well before the September 2008 bankruptcy.

105.    The quarterly default probability is then converted into an annual default probability. An annual default probability implied by the CDS price is the market's assessment of the probability that Lehman would default on its senior unsecured debt like the Lehman Notes within the coming year.  According to Moody's, the historical average annual default rate based on a CDS price for "speculative" grade (*i.e.* junk) bonds – those rated "Ba" under Moody's guidelines – was 1.203%.[47] Junk bonds (*i.e.*, non-investment grade) are not permissible in the SLP.

---

[46]    See, for example, *Options, Futures, and Other Derivatives*, fifth edition, by John C. Hull, 2003, pp. 641-642.

[47]    "Confidence Intervals for Corporate Default Rates," by Richard Cantor, David Hamilton and Jennifer Tennant, *Moody's Investors Service*, April 2007.

106.    Lehman's implied annual default probability based on CDS price remained at elevated levels above 1.24% virtually every day from July 26, 2007 until its bankruptcy on September 15, 2008.  In fact, with the exception of November 28, 2007, Lehman's implied annual default probability based on CDS price remained above 2% from November 2, 2007 until its bankruptcy on September 15, 2008.  Further, from June 19, 2008, until its bankruptcy on September 15, 2008, Lehman's implied annual default probability based on CDS price remained above 4%. Additionally, from August 18, 2008, until its bankruptcy on September 15, 2008, Lehman's implied annual default probability based on a CDS price remained above 5%.   In fact, Lehman's implied annual default probability based on a CDS price was 8.75% on September 10, 2008, 9.43% on September 11, 2008, and 10.25% on September 12, 2008.



107.    As depicted in the chart above, the implied default probability for Lehman debt remained relatively constant and low until late July 2007, at which point it spiked upward and subsequently rose even further.

108.    Therefore, a sophisticated investment manager such as Defendant knew or should have known that the risk of default associated with the Investments substantially increased, such that the Investments had become the same as speculative grade bonds not allowed in or appropriate for the SLP or CashCo, compelling Defendant to take action to mitigate Plans' risk of loss.

### d.    Default Probability Implied by FRN Market Prices

109.    Additionally, the implied probability of default for a specific floating rate note may be derived from that note's market prices and yield spreads.  The drops in market price of the notes and concomitant rises in yield reflected the market's assessment of the Lehman notes' growing riskiness. For each note, the implied default probability is the cumulative probability that the note will default during its life.

110.    According to Moody's, the historical average cumulative default rate for A-rated (*i.e.*, investment grade) bonds allowed in the SLP and CashCo  with a two-year time horizon was 0.095%, while non-investment/speculative grade bonds had an average one-year default rate of 5.235%.[48]

111.    The market's perception of the riskiness of the Investments increased substantially on or about August 2007 and continued to climb leading up to the Lehman bankruptcy. From August 2007 through Lehman's bankruptcy in September 2008, the market prices of the Lehman Notes indicated that the implied default probabilities for the Investments rose to levels characteristic of risky, speculative, junk-rated investments.  By March 17, 2008, the implied default probability had reached extreme levels at or about 14.20% indicating that the Investments were extremely risky. Moreover, Lehman's implied default probability remained at these extremely elevated levels until Lehman's bankruptcy on September 15, 2008.

---

[48]    "Confidence Intervals for Corporate Default Rates," by Richard Cantor, David Hamilton and Jennifer Tennant, Moody's Investors Service, April 2007.

112.    For example, the default probability implied by the market prices of the investment bearing the CUSIP 52517PK83 was 6.06% on August 28, 2007, 14.20% on March 17, 2008, 9.07% April 10, 2008, 10.46% on July 18, 2008, 10.81% on August 19, 2008, and 12.78% on September 10, 2008.  On September 12, 2008, three days before Lehman filed for bankruptcy, the default probability reached an astronomical 27.88%.  At each point, the probability of default exceeded the .095% threshold established for investment grade FRNs.  The same analysis equally applies to the other Lehman Notes at issue.

113.    This pattern of a progressively increasing probability of default leading up to the Lehman bankruptcy is consistent with the CDS spread analysis, and the option implied volatility analysis above and indicated that the Investments had become so risky, that they were no longer appropriate for the SLP, or CashCo.  This is especially true in light of the fact that the SLP was marketed as, and was to be a minimal risk program.

### e.    Equity Pricing Analysis

114.    During late 2007 and throughout 2008, Lehman's equity prices also indicated substantially increased risk associated with the Investments.  In an efficient market, the price of a stock incorporates all available public information regarding the future of the company.  Equity prices are generally regarded as an accurate barometer for estimating a company's probability of default.  "Unfortunately, credit ratings are revised relatively infrequently. This has led some analyst to argue that equity prices can provide more up-to-date information for estimating default probabilities."[49]  Equity prices reflect market opinion and, a declining stock price indicates growing negativity with regard to the company.

---

[49]     *Options, Futures, and Other Derivatives*, fifth edition, by John C. Hull, 2003

115.   Lehman's stock price was declining faster than either the broad market index as measured by the S&P 500, as well as the S&P 500 Financials Index.  In fact, from the beginning of August 2007 to the end of August 2008, Lehman's stock price declined stock price declined nearly $76.00 per share, representing a decline of almost 80%.  On March 17, 2008, following the collapse of Bear Stearns, Lehman's shares fell 48% alone, as a result of market concern it would be the next institution to fail.[50]  Moreover, Lehman's stock price plunged 77% in the first week of September 2008,[51] amid rumors regarding whether Lehman would survive.  Lehman's stock plummeted another 45% on September 9, 2008 and 42% on September 11, 2008.[52]

116.   Additionally, Lehman's market capitalization fell over 75% from its peak of $45.5 billion on February 2, 2007 to $11.2 billion on September 5, 2008, ten days prior to bankruptcy.

117.   This data demonstrates that the market sentiment about Lehman was negative and became subsequently worse leading up to Lehman's bankruptcy.  Therefore, the market prices of Lehman's equity indicated the market's perception of deteriorating financial condition and increased risk, and should have indicated to a prudent investment manager that the Investments were no longer appropriate for the SLP, or CashCo.  The reduced market prices of Lehman equity should have compelled Defendant to take action to mitigate the participant's risk of loss.

### f.   Bond Price Analysis

118.   Lehman's bond prices are another observable indication that the Investments had grown substantially risky and were no longer suitable for the minimal risk SLP.  The bond price

---

[50]     http://www.investopedia.com/articles/economics/09/lehman-brothers collapse.asp#axzz1 tui1BTvj

[51]     *Id.*

[52]     *Id.*

represents the present value of expected future cash payments of its coupons and principal, discounted at an appropriate risk-adjusted rate of return.[53]   Bond prices incorporate market participants' beliefs regarding the issuer's ability to repay its obligation.  All else being equal, as the probability of a company's bankruptcy (*i.e.* default) increases, the prices of its bonds decline.

119.    Lehman's bond prices fell and riskiness rose over the year prior to the bankruptcy.  A low risk FRN will trade at, or virtually at, par at all times.  The Lehman Notes were at or close to par on July 1, 2007, but they subsequently fell substantially below par.  Lehman's largest bond issues declined, on average, close to 7 percent between one year preceding its bankruptcy filing and 10 days prior to its bankruptcy filing.  The Lehman Notes traded at or about 85 cents on the dollar one week prior to bankruptcy, and at or about 80 cents on the dollar for the two trading days prior to Lehman's bankruptcy.

120.    Specifically, the FRN bearing the CUSIP 52517PK83 traded at $100.02 on July 3, 2007.  Subsequently, the bond prices to fell to $96.49 on August 28, 2007.  By March 17, 2008, the bond was trading at $91.50 and reached a low of $82.00 on September 12, 2008, three days before Lehman's bankruptcy.  The same is true for the other Lehman Notes at issue.

121.    The substantial discount in bond prices reflects market participants' doubt regarding Lehman's ability to repay its obligations and an extremely elevated risk of a Lehman default.  In short, a risk tolerant investor could purchase the Lehman Notes at 82% of par and could gamble on making a 20% return (principal and interest).  No such investment was ever suitable for the SLP, or CashCo.  The risk/reward profile for such an investment is inconsistent with the SLP's minimally risky and capital preservation purpose.   Therefore, an evaluation of the Lehman Notes' prices

---

[53]    Brealey, R., Myers, S. and Allen, F., Principles of Corporate Finance, Tenth Edition, McGraw-Hill/Irwin, 2010, pp. 46-47.

should have indicated to Defendant that the uncertainty surrounding Lehman's financial future and its potential for default had grown so great, that the Investments were no longer appropriate for the Plans' securities lending portfolios, or CashCo.

### g.   Independent Public Credit Rating Analysis Demonstrated That Lehman Was Unduly Risky

122.    In addition to performing the fundamental quantitative analyses described above, Plaintiff intends to present expert testimony demonstrating that a reasonably prudent investment manager would have closely followed the credit analyses by the various credit agencies alleged below in order to evaluate the risks associated with the Investments and determined that Lehman was unduly risky for the SLP, including CashCo.

123.    Credit risks are a vital component of fixed-income investing, which is why ratings agencies such as S&P, Moody's and Fitch evaluate the credit risks of thousands of corporate issuers and municipalities on an ongoing basis.  A credit rating is a formal opinion given by a rating agency of the default risk faced by investing in a particular security.[54]  Once a credit rating is assigned, the rating agency continually monitors the credit quality of the issuer and "upgrades" the rating when there is an improvement in the credit quality of an issuer, and "downgrades" the rating when there is deterioration in the credit quality of an issue.  However, rating agencies are often slow to "upgrade" or "downgrade" its ratings, so before a rating is changed, the rating agency will often review the rating for the potential for upgrade or downgrade and place the issue on a "rating watch" or "credit watch."  Additionally, rating agencies will issue rating outlooks, a projection of whether an issue in

---

[54]    *Fixed Income Analysis for the Chartered Financial Analyst,* second edition, by Frank J. Fabozzi, 2004, pp. 570-571.

the long term is likely to be upgraded (positive outlook), downgraded (negative), or maintain its current rating (stable).[55]

124.    Therefore, the information regarding credit risk available from rating agencies include: (1) credit ratings, (2) rating or credit watches, and (3) rating outlooks.  Indeed, Moody's has stated that its ratings combined with rating watches and rating outlooks provide a better gauge for default risk than merely relying on ratings alone.[56]

125.    As such, a prudent fiduciary would monitor all information available from credit agencies in its credit analysis.  Therefore, Defendant, as a fiduciary to the Plan and Class Plans, should have followed credit ratings, watches and outlooks for signs of increased risk associated with the Investments, and as a result, knew or should have known that the Investments had become increasingly risky and were no longer appropriate for its SLP, including CashCo.[57]

126.    Moreover, Moody's makes the following suggestions as to how a credit analyst like JPMorgan can interpret the information contained in rating watches and outlooks to adjust the senior unsecured rating of a corporate bond such as the Investments at issue:

| *For Issues on:* | *Suggestion:* |
|---|---|
| Downgrade watch | reduce current rating by two notches |

---

[55]    *Id. at* 571.

[56]    *Id.*

[57]    The information described below was widely available to any sophisticated/reasonably prudent investment manager.  While the following information was necessarily selected after-the-fact for inclusion in this Complaint, as a fiduciary to the Plan and Class Plans, Defendant had access to and should have been reviewing this information in real time.  A review of this information should have caused Defendant to conclude that the Investments were inappropriate for the SLP, or CashCo/

Negative Outlook                reduce current rating by one notch[58]

127.    In fact, credit rating agencies issued several warnings regarding the increasing risks associated with Lehman beginning in August 2007. Defendant tracked and monitored the credit ratings of Lehman, but despite signaling dramatically increasing risk associated with the Investments, Defendant failed to mitigate the Plans' exposure to these risky Investments as it was required to do.

128.    For example, on August 2, 2007, *Reuters News* published an article entitled "RESEARCH ALERT-S&P equity analysts downgrade lehman to 'sell,'" which stated in pertinent part:

> Standard & Poor's Equity Research cut its rating on shares of Lehman Brothers Holdings Inc. to 'sell' from 'hold,' citing concerns about the value of the firm's mortgage-related positions and the deteriorating merger environment.

129.    Additionally, on March 17, 2008, the *Dow Jones Business News* published an article entitled "UPDATE: Moody's Cautions On Outlook For Lehman; Shares Poised To Fall," which stated in pertinent part:

> Earlier Monday, Moody's said that it affirmed its A1 rating on the senior long-term debt of Lehman Brothers (LEH) but lowered its outlook on Lehman ratings to stable from positive.
>
> *              *              *
>
> However, these conditions have decreased the upward pressure on Lehman's rating, and therefore a positive outlook is no longer warranted," the ratings agency said.

130.    By lowering its outlook for Lehman, the rating agency indicated that Lehman's credit rating was not likely to improve in the next six months to two years,[59] and indicated to a

---

[58]    *Fixed Income Analysis for the Chartered Financial Analyst,* second edition, by Frank J. Fabozzi, 2004, pp. 572.

sophisticated investment manager such as Defendant, that the Investments had grown increasingly risky.

131.   



132.    As described above, a negative outlook indicates to a sophisticated investment manager like Defendant, that the current Lehman credit rating should be reduced by one notch, and that the Investments became unduly risky, particularly for the SLP.

133.    Additionally, on June 2, 2008, the *Dow Jones Newswires* published an article entitled "2nd UPDATE: S&P Cuts Rating On Lehman, Merrill, M Stanley," which stated in pertinent part:

> NEW YORK (Dow Jones)--Standard & Poor's Corp. rattled investors' confidence in three big investment banks on Monday, cutting the ratings of Lehman Brothers Holdings Inc. (LEH), Merrill Lynch & Co. Inc. (MER) and Morgan Stanley (MS) by a notch.
>
> **The credit-rating agency was most critical of Lehman, whose business profile is closest to that of the recently collapsed Bear Stearns Cos., saying its operating performance is under pressure.**
>
> **We expect a relatively meaningful deterioration in Lehman's second-quarter performance, owing to a generally slower business environment, additional writedowns on certain troubled exposures and the negative effects of hedges**, the rating agency said as it sliced the firm's long-term ratings to A from A+ and kept a "negative outlook" on Lehman.  A negative outlook implies a one-in-three likelihood of another downgrade within about two years.

134.

---

[59]    *Id.*

██████████████████████████████████████████████████████████

████████████████████   Additionally, the fact that Lehman's outlook remained negative following the downgrade indicated to a sophisticated investment manager that Lehman's true rating was a notch lower.  Therefore, a prudent fiduciary would have concluded that the Lehman Notes were inappropriate for the SLP, including CashCo.

████████In fact, in response to the rating downgrade, Defendant reduced its own internal rating of Lehman, thus indicating that Defendant understood that the Investments had become extremely risky. ████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████

136.     Additionally, on June 9, 2008, the *Dow Jones Newswires* published a story entitled "MOODY'S CUTS LEHMAN OUTLOOK TO NEGATIVE," which stated that **"*Moody's says its outlook for credit ratings at Lehman is now negative, as an unexpectedly deep 2Q loss has raised***

_____

██████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████

***questions about the investment bank's risk management.  Outlook change means Moody's thinks***

***Lehman's credit ratings could deteriorate over the long term."***

137.    That same day, *Reuters News* published an article entitled "UPDATE 1-Fitch cuts

Lehman credit rating," which stated in pertinent part:

> Fitch Ratings on Monday cut its credit ratings on Lehman Brothers Holdings Inc and
> Moody's Investors Service changed its outlook to negative, indicating a rating cut is
> likely after the investment bank said it expected a large second-quarter loss.



139.    Moreover, on September 9, 2008, the *Dow Jones Newswires* published an article

entitled "Lehman Brothers To Report Expected 3Q Earnings Wed A.M.," which stated in pertinent

part:

> Lehman's stock is down more than 85% so far this year as investors have worried
> that Lehman might succumb to problems in its mortgage holdings.

*        *        *

*Also Tuesday, Standard & Poor's said it had placed Lehman's single-A credit rating on CreditWatch with "negative implications."  The rating agency cited "heightened uncertainty about Lehman's ability to raise additional capital, based on the precipitous decline in its share price in recent days."*

140.    Based on the issuance of a negative "credit watch" by a rating agency, Defendant knew or should have known that, as described above, the current Lehman rating should be reduced by two rating notches.  As such, Defendant knew or should have know that the Investments were no longer appropriate for the SLP, including CashCo, and should have taken action to mitigate the risks to the Plan and Class Plans that were associated with the Investments.

141.    Additionally, on September 11, 2008, the *Wall Street Journal* published an article entitled "Lehman's Revamp Plan Draws Doubters --- Analysts Wonder If Fixes Can Occur In Time to Be of Help," stating that "Moody's Investors Service put Lehman's credit rating on review, saying it would be lowered from its current A2 level unless Lehman can negotiate "a strategic transaction with a stronger financial partner."

142.    In light of the credit rating analysis above, Defendant failed to act as a reasonably prudent investment manager and determine that the Investments were too risky for the SLP, including CashCo, or to act to mitigate the Plan's and Class Plans' exposure to these risky Investments.

### 2.    JPMorgan Knew or Should Have Known of the Tremendous Uncertainty Surrounding Lehman's Financial Stability and Potential for Default Based on Other Available Information

143.    In addition to the various observable financial metrics described above indicating increased risk associated with Lehman, numerous major news and business publications, SEC filings, and analyst commentary chronicling the troubled financial condition of Lehman should have put a sophisticated investment manager such as Defendant on notice that the Investments were no longer suitable for its SLP. The information detailed below confirm the results of the quantitative

analyses described above. A prudent fiduciary was required to know in real time not only the articles, but the data on Lehman reported therein.

144.    Plaintiff intends to present expert testimony demonstrating that, as a sophisticated investment manager and fiduciary to the Plan, Defendant should have kept apprised of this information and determined in real time that the Investments had grown too risky for the SLP, including CashCo.

> **a.    Falling Share Price and Increased Costs of Credit Protection Reflect Market Concerns Regarding Lehman's Subprime Mortgage Exposure**

145.    Many articles and analysts discussed the increasing costs of credit protection in the form of CDS contracts, and how these elevated prices indicated to the market that the Investments had become akin to junk.

146.    For example on July 31, 2007, the *Dow Jones Newswires* published an article entitled "Investors Still Wary Of Wall Street's Credit Risk," which stated in pertinent part:

> Investors are still on guard when it comes to the credit risk of Wall Street, seen by many to be at the epicenter of the collective storm created by faulty home loans and tepid demand for risky corporate debt.
>
> Though the cost of credit protection for such banks as Bear Stearns Cos. (BSC), Lehman Brothers Holding Inc. (LEH), Merrill Lynch & Co. (MER) and Goldman Sachs Group Inc. (GS) has fallen from unprecedented heights last week, levels indicate that investors are still wary.
>
> \*      \*      \*
>
> . . . **Last week, Lehman Brothers' cost of credit protection also reflected a Ba1 junk rating even though it is rated A1 by Moody's.**
>
> Lehman's cost of five-year credit protection for $10 million of bonds was quoted Tuesday afternoon at $86,000 a year, according to GFI. It reached as high as $100,000 last week.

147.     This conclusion is precisely what the fundamental quantitative analysis described above showed. Defendant was responsible for assessing Lehman's credit risk, and therefore knew or ignored the conclusion of the extreme riskiness associated with the Investments.

148.     Additionally, on July 31, 2007, *Bloomberg News* published an article entitled "Bear, Lehman, Merrill Trade as Junk, Derivatives Show (Update1)," which stated in pertinent part:

> On Wall Street, Bear Stearns Cos., Lehman Brothers Holdings Inc., Merrill Lynch & Co. and Goldman Sachs Group Inc., **are as good as junk**.
>
> *                *                *
>
> Prices of credit-default swaps for Goldman, the biggest investment bank by market value, Merrill, the third largest, and **Lehman, the No. 1 mortgage bond underwriter, also equate to a Ba1 rating**, data from Moody's credit strategy group show.

149.     On August 14, 2007, the *Dow Jones Newswires* published an article entitled "Lehman Keeps Out Of Headlines, But Stays In Market's Crosshairs," which stated in pertinent part:

> Bear Stearns and Goldman are getting all the ink, but it's Lehman Brothers that's quietly taking the biggest hit.
>
> Shares in Lehman Brothers Holdings (LEH) fell sharply Tuesday, maintaining their status as the worst performing of all big brokerage stocks since the mortgage securities crisis exploded in mid-June. Lehman's shares are off more than 32% since June 15, worse than the 29% drop at Bear Stearns Cos. (BSC), which sparked the crisis when it confirmed that two of its subprime mortgage securities-loaded hedge funds were collapsing.
>
> Lehman and Bear Stearns tend to be twinned in investors' minds, because they are smaller and less diversified than Wall Street giants Goldman Sachs Group (GS), Merrill Lynch & Co. (MER) and Morgan Stanley (MS). Yet Lehman is seen as taking more risk than Bear Stearns. And in the current environment, Lehman may be paying a price for its relative silence about its exposure to troubled mortgages and high-risk debt.

150.     On August 14, 2007, *Reuters News* published an article entitled "Shares of U.S. investment banks drop," which stated in pertinent part:

> Shares of U.S. investment banks dropped on Tuesday, led by Lehman Brothers Holdings Inc, as investors fretted about mounting risks in product lines ranging from hedge funds to commercial paper.

151.    On August 22, 2007, *Reuters News* published an article entitled "Lehman to shut

down subprime unit, record charge," which stated in pertinent part:

> Lehman Brothers Holdings on Wednesday said it is shutting down subprime
> mortgage unit BNC Mortgage Corp., affecting the jobs of 1,200 employees in 23
> cities and resulting in a $25 million charge.

152.    On August 23, 2007, nabCapital published an analyst report entitled "At a glance –

Lehman Brothers - The Fixed Income Specialist getting out of Subprime," which stated in pertinent

part:

> Lehman Brothers has announced plans to close its subprime mortgage origination
> business BNC Mortgage.
>
> *              *              *
>
> We reiterate what we said back on the 10th of August, that S&P's reasons for going
> Negative on Bear Stearns "could also apply to Lehman Brothers and S&P could have
> them in their sights". While today's announcement is not material from an absolute
> capital or earnings perspective, it does potentially load another bullet into the gun,
> which if S&P is going to fire it will probably be after the company releases what we
> expect to be a particularly weak 3Q result (applies sector wide).
>
> *              *              *
>
> From a trading perspective we think that as a result of having smaller and less
> diversified revenues, ***Bear Stearns and Lehman's will continue to be more
> susceptible than the larger brokers are to the subprime related events which are
> expected to remain an issue for at least the remainder of 2007. We also think that
> from a credit ratings perspective (though we acknowledge it hardly matters at the
> moment) it's fair to state that Bear's and Lehman's ratings will come under
> greater pressure as their overall revenues are also are more reliant on the fixed
> income markets.*** Therefore, while liquidity remains as tight as it is, the 40bps-50ps
> CDS differential between the larger brokers and the smaller ones (Bears and
> Lehmans) should be respected and in the short term if it is going to change, its likely
> to widen rather than narrow, particularly relative to the broader market.

153.    On August 28, 2007, the *Associated Press Newswires* published an article entitled

"Merrill Lynch analyst downgrades Citigroup, Lehman Brothers, Bear Stearns," which stated in

pertinent part:

A Merrill Lynch analyst downgraded Citigroup Inc., Lehman Brothers Holdings Inc. and Bear Stearns Cos. because of the damage the market's newfound fear of risk is doing to some of these investment banks' best sources of profit….

Merrill Lynch analyst Guy Moszkowski downgraded the three Wall Street brokerages to 'Neutral' from 'Buy,' the report said. These banks rely heavily on the debt markets, where they sell investments like bonds backed by mortgages.

154.    On August 29, 2007, *Reuters News* published an article entitled "Wall Street credit, loan losses may crush revenue," which stated in pertinent part:

Mounting losses from exposure to mortgages and loans intended to fund buyouts will damage results at the biggest U.S. investment banks, and could lead to pressures resembling those in the 1998 liquidity crisis that brought Wall Street to its knees.

155.    These articles reflect the market's growing concerns related to Lehman, and confirmed the market sentiment that the Investments were "as good as junk."

156.    Indeed, Defendant was keenly aware that the market viewed Lehman investments akin to junk in light of the dramatically increased costs of credit protection.

157.    ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

**b.     Fears Regarding Turmoil in Financial Sector Continued
to Grow as a Result of the Mounting Credit Crisis**

158.     As the year went on, market concerns regarding the turmoil in the financial sector

continued to grow. The turmoil in the financial sector related to the credit crisis caused the market to

remain extremely concerned about the future of Lehman.  As reflected in the articles below,

Lehman's stock price continued to plunge and investors increasingly divested themselves of their

Lehman shares.

159.     For example, on September 3, 2007, the *Financial Times (FT.com)* published an

article entitled "FT.com site: Bear and Lehman hardest hit by credit crunch," which stated in

pertinent part:

> Investment banks are expected to report sharp drops in quarterly profit when they
> report results in the week starting September 17.  Those most reliant on fixed-income
> sales and trading, such as Bear Stearns and Lehman Brothers, are likely to take the
> biggest hits from the credit crunch.

160.     On September 4, 2007, the *Wall Street Journal* published an article entitled "It's

Deja Vu for Lehman Stock—Earnings Outlook Is Behind the Selloff This Year," which stated in

pertinent part:

> The reason for the selloff is Lehman's earnings outlook. Despite expanding its
> nonbond businesses, Lehman is more dependent on the bond market than most of its
> investment-banking rivals. With the mortgage market in turmoil and the buyout
> boom stalled, there is no doubt Lehman's profit is going to fall. The question is, how
> far and for how long.

161.     On September 14, 2007, *Reuters News* published an article entitled "Before the Bell-

Banks, Mortgage-finance shares fall," which stated in pertinent part:

> Shares of several mortgage-related stocks fell before the opening bell on Friday after
> British mortgage lender Northern Rock Plc had to seek emergency funds from the
> Bank of England, stoking worries about the credit climate.

> Shares of Lehman Brothers Holdings Inc were down 2 percent to $58.50 and Bear
> Stearns Cos Inc stock lost 1.1 percent to $113.53. Both investment banks are major
> mortgage-bond underwriters.

162.     On September 16, 2007, the *Financial Times (FT.com)* published an article entitled

"FT.com site: Lehman earnings first real signal of credit hit," which stated in pertinent part:

> Because of its heavy exposure to US mortgage-backed securities, Lehman is
> expected to be among the hardest hit although the blow may have been significantly
> softened by hedging.

163.     On September 18, 2007, Lehman reported its 3Q 2007 results, noting that market

conditions had substantially deteriorated over the June- August 2007 time period.  That same day,

Lehman Brothers Holdings Inc. hosted a conference call with securities analyst and investors to

discuss the company's financial results:

> ### *Chris O'Meara- Lehman Brothers Holdings Inc.- CFO*
>
> Market conditions were very challenging during the quarter, as what began as a
> broadbased [sic] reassessment of credit risk, morphed into heightened liquidity and
> market risk over the course of the summer.
>
> Valid concerns regarding the underlying credit quality of subprime mortgages and
> related CDOs became more systemic, as risk premiums became elevated, and
> liquidity became scarce across asset classes, extending across rating categories into
> AA and AAA rated assets. Spreads widened out accordingly, with high grade and
> high yield spreads essentially doubling over the period, representing approximately a
> 5 standard deviation move in percentage terms.
>
> *             *             *
>
> Revenues in our securitized products business were down versus both benchmark
> periods due to continued weakness in the mortgage industry, particularly in the U.S.
> Secondary trading activity remained active, however we saw significant credit spread
> widening across the capital structure, including AA and AAA rated traunches,
> resulting in negative marks even after considering hedges.

164.     The company's third quarter results and corresponding conference call increased the

market's concerns over Lehman.  The market sentiment regarding the deteriorating financial

condition of Lehman is reflected in numerous articles that were available to Defendant.  As such,

Defendant knew or should have known that the Investments had grown too risky for its SLP, which

was marketed to participants as involving little to no risk.  Therefore, a prudent fiduciary under these circumstances would have taken action to mitigate its SLP participants' exposure to Lehman.

165.    An example of the market's continuing concerns regarding Lehman can be seen from an article entitled "UPDATE: Lehman Brothers 3Q Net Falls 3.2% Amid Mortgage Woes," published on September 18, 2007, in the *Dow Jones Newswires*, which stated in pertinent part:

> Lehman said it 'recorded very substantial valuation reductions, most significantly on leveraged loan commitments and residential mortgage-related positions.' They were partially offset by 'large valuation gains on economic hedges and other liabilities.' In total, the impact was a reduction in some $700 million to fixed income's net revenue.

166.    Lehman suffered as the credit crisis continued to mount.  Credit markets began to seize and as a result, investment banks were forced to write down assets.  Defendant knew or should have known of the growing market concerns related to the financial sector, which were confirmed by various news articles and analyst publications.

167.    On December 13, 2007, Lehman Brothers Holdings Inc. hosted a conference call with securities analyst and investors to discuss the company's fourth quarter 2007 financial results. Lehman described how the poor credit market conditions at the end of 2007 were causing a flight to quality among investors:

> **Chris O'Meara- Lehman Brothers Holdings Inc- Global Head of Risk Management**
>
> In Fixed Income, U.S. credit spreads hit multi-year wides with investment grade spreads at their widest level since December 2002, and high yield spreads at their highest level since July 2003. As a result, November was the single worst month on record for U.S. investment grade corporate and asset backed securities, tallying negative excess returns ranging from negative 300 to 338 basis points. This dramatic spread widening load [sic] to a flight to quality as the two year treasury rallied over 100 basis points and the yield curve steepened.
>
> Volatility rose dramatically. In fact, it was the most volatile November for the S& P 500 since 1987.

*        *        *

- 56 -

As we saw in this quarter, the credit spread widening extended out. It really affected more products this time and went up the capital structure. So we saw big credit spread widening in Alt A products, in prime products and CMBS type products, which is really more of a supply demand imbalance we think than anything else.

<div align="center">*        *        *</div>

***Mike Mayo- Deutsche Bank- Analyst***

You don't expect the $830 million of net charges to reoccur but you had $700 million last quarter, net and probably didn't think that would recur either. Conditions can get worse. The question really is how much have you written down your exposures in leveraged loans of that 10 billion, how much of that has been written down. In terms of the subprime, the $5.3 billion, how much has that been written down, in terms of the CDOs, the $1 billion, how much has that been written down?

168.    That same day, *Reuters News* published an article entitled "UPDATE 4—Lehman Q4 earnings fall amid $830 mln writedown," which stated in pertinent part:

Lehman Brothers Holdings Inc said on Thursday fourth-quarter earnings fell 11 percent, as the credit market crisis triggered write-downs, and the company said further write-downs were possible.

169.    Also on December 13, 2007, *Reuters News* published an article entitled "Lehman says had gross writedowns of $3.5 bln in Q4," which stated in pertinent part:

"Lehman Brothers Holdings said on Thursday it had gross writedowns of $3.5 billion in the fourth quarter, including $2.2 billion from mortgages."

170.    On December 14, 2007, Punk Ziegel & Company published an analyst report entitled "Competitive Benefits; Reducing Target," which stated in pertinent part:

In its conference call with investors, Lehman spent a great deal of time explaining its rationale for writing down certain of its assets. There were questions about sub-prime loans, CDOs, commercial mortgage backed securities and a variety of other constructs. The company indicated that some were written down, and that there may be other write-downs but they should be less in the future than in the past. Moreover, management pointed to its skill in hedging as an offset to the write downs.

It is possible that this is not where the focus of the discussion should have been. Investors are well aware of the fact that there have been write downs, and that there may be more write downs. They are aware that Lehman can hedge. **All of this verbiage suggests that the company is a hedge fund and not an operating entity.**

The impression that is created is that the drivers to Lehman's earnings are how well the company manages its balance sheet.

*         *         *

I have raised the Lehman estimates slightly but they are still well below street consensus. Moreover, I do not expect 2009 earnings to be as high as 2007 earnings for this company.

The target price on the stock has been lowered despite this adjustment in the estimate to reflect the fact that the multiple on this stock is declining in response to a murkier outlook. Balance sheet re-engineering is not the core of this company. Operating businesses are.

***The outlook for these businesses is not positive. Therefore, even though this is one of the most impressive companies in the financial sector, its stock should be avoided.***

171.    These articles and analyst reports illustrate the market sentiment regarding the ever increasing risk associated with companies in the financial sector as a result of the mounting credit crisis including Lehman in particular. These articles also confirm that the ramifications and consequences were widespread.   As a fiduciary to the Plans, Defendant should have known that an analysis of Lehman would have signaled that the Investments had grown too risky for the SLP, including CashCo, and that Defendant should have taken action to mitigate the risks associated with the Investments held by SLP participants.

### c.    Investor Concerns Regarding Lehman Continue to Mount with the Collapse of Bear Stearns

172.    From the beginning of 2008, the market continued to closely follow the financial woes of companies in the financial sector as well as the demise of Bear Stearns, a company often compared to Lehman.   A prudent fiduciary under the circumstances would have seen the glaring warning given by the collapse of Bear Stearns and the shortcomings of relying on rating agencies as an indicator of corporate and security risk. A plethora of news articles and other publications illustrate the market's negative sentiment regarding companies in the financial sector including

Lehman and Bear Stearns.  Moreover, investor concerns over Lehman continued to mount.  Fears regarding Lehman's bond default risk were widespread and widely reported.

173.    For example, on February 15, 2008, the *Financial Times* published an article entitled "Fears grow of double whammy," which stated in pertinent part:

> Traders in credit derivatives markets are betting that banks including Goldman Sachs and Lehman Brothers are more likely to default than non-financial companies with lower credit ratings.
>
> The cost of protecting banks' debt against defaults has soared in recent weeks as fears grow of a double whammy of new writedowns and weakening earnings.

174.    As the credit crisis deepened, so did investors' concerns over Lehman's large portfolio of real estate assets.

175.    For example, on February 19, 2008, the *Wall Street Journal* published an article entitled "Now, Lehman Gets Pelted — Firm Seemed to Outrun Fallout of Credit Crisis, Until One Market Slid," which stated in pertinent part:

> Many investors have been surprised at the ability of Lehman Brothers Holdings Inc. to navigate the credit crunch, given the size of its exposure to potential land mines.
>
> But there are growing signs that the New York investment bank's latest quarter will be the rockiest since the mortgage crisis began. Behind the worry: Lehman is sitting on a big pile of commercial real-estate loans, and that market is deteriorating, potentially causing bigger-than-expected write-downs.
>
> In recent weeks, credit markets have worsened, and Lehman believes it is now facing a write-down in the $1.3 billion range, according to people familiar with the matter.

176.    On March 14, 2008, the Federal Reserve Bank of New York and JPMorgan stepped up in attempt to rescue Bear Stearns.  Lehman, long considered most like Bear Stearns among investment banks, was feared to be in similar trouble.

177.    For example, on March 14, 2008, *Reuters News* published an article entitled "Lehman default swaps Up after Bear Capital injection," which stated in pertinent part:

The cost to insure the debt of Lehman Brothers jumped on Friday after Bear Stearns Cos said it received new funding as its liquidity position had significantly deteriorated.

178.    That same day, the *Dow Jones Newswires* published an article entitled "OPTIONS REPORT: Traders Position For Drop In Lehman," which stated in pertinent part:

Bear Stearns' troubles have raised concerns about the entire financial-services sector, but trading in the options market signals particular concern over the fate of Lehman Brothers.

179.    On March 14, 2008, the *Associated Press Newswires* published an article entitled "Bear Stearns' S.O.S. to Fed raises worries about which bank might be next," which provided answers to questions posed by investors, including the following:

Q: Is this going to happen to other investment banks?

A: Nobody knows for sure, but it could. Until proven otherwise, the market will probably act as if there are more near-collapses to come -- just as it did on Friday, when investors sold off their bank holdings and sent the Dow Jones industrial average down 200 points.

"Even though Bear was probably on the fringe, pushing the envelope anyway, traders are saying that because it happened, it could happen to somebody else," said Brandon Thomas, chief investment officer for Portfolio Management Consultants, the investment arm of Envestnet.

Q: Which other institutions might need funding?

A: Bear Stearns has been the weakling among the five reigning Wall Street investment banks: Bear, Merrill Lynch, Morgan Stanley, Lehman Brothers and Goldman Sachs. Many market watchers will recall that last spring, Bear was the first of these institutions to reveal big problems with mortgage-linked debt when it had to pump cash into two hemorrhaging hedge funds.

Also, Bear is the smallest of the five big investment banks, the least diversified, and the biggest issuer of mortgage-backed securities.

***But Lehman Brothers Holdings Inc. appears to be an investment bank that investors are very worried about right now -- mainly because it is the investment bank that is most similar to Bear in structure and exposure. Its stock dropped more than 14 percent on Friday.***

180. On March 16, 2008 Bear Stearns collapsed, and it was announced that JPMorgan would acquire the company for a fire sale price.

181. Like Lehman, just days before the collapse, Bear Stearns had been rated favorably by the Ratings Agencies. In fact, until March 14, 2008, Bear Stearns was rated A+ by Fitch and A2 by Moody's for its senior unsecured debt. On that date, Fitch downgraded Bear Stearns to BBB, and Moody's lowered its rating to Baa1.

182. While the Investments maintained investment grade ratings from rating agencies, as detailed above, the actual rating is just one part of the analysis, not the conclusion. Moreover, the collapse of Bear Stearns illustrated to sophisticated and prudent investment managers, the deficiency of relying on credit ratings to draw conclusions regarding an issuer's credit risk. As a result, Defendant knew or should have known that relying on credit agencies was suspect, however, as detailed above, even the rating agencies were sending strong signals regarding Lehman's riskiness despite maintaining investment grade ratings.

183. Moreover, Lehman had more exposure to subprime mortgages than Bear Stearns, making it even more vulnerable to default. Therefore, the collapse of Bear Stearns should have put Defendant on notice of increased risk with respect to Investments in Lehman, and compelled Defendant to take action to protect the Plan's and the Class Plans' assets from the risk of a similar Lehman default.

184. Additionally, the market constantly compared Lehman to Bear Stearns, signaling to Defendant that Lehman was at risk to reach a similar fate. In fact, as detailed below, JPMorgan often compare the two companies internally as well.

185. As Lehman was viewed by the market, as well as by JPMorgan, as being similar to Bear Stearns, Defendant knew or should have known that the Lehman Notes had grown too risky for

its "minimal risk" SLP. As such, the collapse of Bear Stearns served as a warning to Defendant to take action to mitigate SLP participant's exposure to a possible Lehman default. Defendant's failure to act in the best interest of the Plan and Class Plans was a breach of its fiduciary duties.

> **d.** **Market Concerns Regarding Lehman Increased in the Wake of the Collapse of Bear Stearns as Investors Feared Lehman Would Meet a Similar Fate**

186. The dramatic collapse of Bear Stearns increased investor concerns about Lehman as the market feared that Lehman would meet a similar fate. Comparisons of the two financial institutions swirled around the market.

187. For example, On March 17, 2008, the *Dow Jones Newswires* published an article entitled "OPTIONS REPORT: Traders Brace For Dips In LEH, MF Global," which stated in pertinent part:

> In the wake of Bear Stearns' quick and dramatic fall, options traders Monday made bets that Lehman Brothers and other financial-service companies would suffer big declines this week.
>
> Options traders pounced on Lehman Brothers, just as they had in Friday's session, buying and selling large volumes of contracts that become profitable only if Lehman dips 24% in the next four days. Lehman is trading around $28.

188. That same day, the *Dow Jones Business News* published an article entitled "UPDATE: Moody's Cautions On Outlook For Lehman; Shares Poised To Fall," which stated in pertinent part:

> Earlier Monday, Moody's said that it affirmed its A1 rating on the senior long-term debt of Lehman Brothers (LEH) but lowered its outlook on Lehman ratings to stable from positive.
>
> *          *          *
>
> However, these conditions have decreased the upward pressure on Lehman's rating, and therefore a positive outlook is no longer warranted," the ratings agency said.

189.    Also on March 17, 2008, *The Huffington Post* published an article entitled "Is Lehman Next?" which questioned the "possibility that Lehman will face a run like the one that brought down Bear Stearns" and reported that the market's "concerns were intensified when UBS downgraded Lehman stock to neutral from buy…, and analysts at ING speculated that Lehman may not play a big enough role in the markets to justify a Fed-backed bailout like the one at Bear Stearns."

190.    Also on March 17, 2008, the *Dow Jones Newswires* published a column entitled "IN THE MONEY: Why Lehman May Or May Not Be The Next Bear," which stated in pertinent part:

> NEW YORK (Dow Jones)--There are a number of reasons to think Lehman Brothers Holdings Inc. (LEH) won't be the next Bear Stearns Cos. (BSC) – but at least one big reason to think it might.
>
> **Lehman's stock tumbled 19% Monday to its lowest level in years, on investor concern that the liquidity crisis that nearly wiped out Bear might strike Lehman or another big investment bank next.**   The firm roundly denied it had anything resembling a liquidity problem, but then so did Bear, just days before it almost collapsed and was forced to accept a takeover by JPMorgan Chase & Co. (JPM) at a tiny fraction of its book value.
>
> <div align="center">*      *      *</div>
>
> **But there's at least one reason for concern: Lehman has sizable exposure to dicey mortgage securities and other hard-to-value instruments that could be a drag on its liquidity.   That same issue contributed to the problems at Bear.**

191.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

192.     Trouble for Lehman continued in March 2008.  In fact, on March 18, 2008, Lehman Brothers Holdings Inc. hosted a conference call with securities analyst and investors to discuss the company's first quarter 2008 financial results.   During the conference call, Lehman reported continued financial troubles and a dramatically declining stock price:

> **Erin Callan, Lehman Brothers Holdings Inc.- CFO**
>
> There's no question the last few days have seen unprecedented volatility, not only in our sector but across the whole marketplace. The acquisition of a major investment bank and the fed's newly created funding facility to the industry, the design to address dislocations in a secured lending market. Additionally, we have witnessed our own stock price decline by 31% over the past two trading days.

193.     This conference call did little to ease investor concerns over the future and stability over Lehman. Lehman shares continued to fall as the market continually discussed the company's liquidity problems. The market remained focused on the unstable market conditions following the collapse of Bear Stearns, and negative implications for Lehman.

194.     For example, on March 18, 2008, *Bloomberg Business Week* published an article entitled "Is Lehman Liquid Enough?" the article stated that the takeover of Bear Stearns by JPMorgan Chase was "for the investment-banking equivalent of pocket change" and was causing Wall Street to worry "that the high-stakes game of dice the big firms were playing with asset-backed securities of dubious quality may force more players to exit the table"; the article also stated in pertinent part:

> As more hedge funds are forced to liquidate in the course of this year, . . . broker-dealers such as Lehman will get hit again because hedge funds won't be able to make good on the credit-default swaps they have with broker-dealers.  And that could make an already difficult year for Lehman even more unpleasant.

195.     On March 25, 2008, Fox-Pitt Kelton Cochran Caronia Waller, published an analyst report entitled "LEH: Lowering Ests. As Tough Conditions Subsist," which stated in pertinent part:

On balance, the name of the game for Lehman is to avoid a 'run-on-the-bank' confidence problem, and secondarily to avoid the big loss landmines that inflicted some of its peers.

196.    On March 27, 2008, *Reuters News* published an article entitled "Lehman's stock drops amid rumors," which stated in pertinent part:

Shares of Lehman Brothers fell by nearly 10 percent in early New York trading on Thursday on rumors that the fourth largest U.S. investment bank could see a run on the bank similar to what happened to Bear Stearns, traders said.

197.    On March 28, 2008, the *Dow Jones Newswires* published an article entitled "OPTIONS REPORT: Traders Still Bearish On Merrill, Lehman," which stated in pertinent part:

Options traders have taken bearish positions in Lehman Brothers and Merrill Lynch for several days, running on speculation that both firms **could succumb to financial troubles**.

198.    Pressure on Lehman's share price persisted and its viability remained uncertain to the market.  News articled continued to reflect investor concerns regarding the future of Lehman.

199.    For example, on April 1, 2008, Punk Ziegel & Company published an analyst report entitled "Drive for More Capital," which stated in pertinent part:

Lehman remains under significant stress as **investors question its long-term viability**. The short position on the stock is currently 47 million shares, or 8.4% of the outstanding. The company's balance sheet continues to raise concerns.

200.    Financial troubles for Lehman continued, and it was reported that Lehman's first quarter 2008 10-Q disclosed that the company had to liquidate three of its investment funds.

201.    For example, on April 10, 2008, the *Wall Street Journal* published an article entitled "Lehman Liquidates 3 Struggling Funds—Company Takes $1 Billion in Assets onto Balance Sheet," which stated in pertinent part:

Lehman Brothers Holdings Inc. liquidated three investment funds after stressed markets caused the funds' assets to decline in value, according to a quarterly financial filing Lehman made Wednesday with the Securities and Exchange Commission.

202.   ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

### e.   Market Sentiment Toward Lehman was Increasingly Pessimistic

203.   The market turmoil in the financial sector continued to take a toll on Lehman. Lehman's share prices continued to fall and the cost of insuring Lehman debt increased. Additionally, analysts were cutting their earnings outlook for the company.  This was widely reported in the market and reflected investors growing concerns regarding the financial stability and future of Lehman.

204.   For example, on May 12, 2008, the *Dow Jones Newswires* published an article entitled "Lehman CFO: Co. Has Been Slogging Through 2Q," which stated in pertinent part:

> Lehman Brothers Holdings Inc. (LEH), which had a profit in its first quarter, is struggling in the current three-month period, its chief financial officer said Monday.

205.   On May 16, 2008, *Associated Press Newswires* published an article entitled "Lehman Brothers set to cut 5 percent of staff," which stated in pertinent part:

> Lehman Brothers Holdings Inc. will begin to cut about 5 percent of its staff on Monday as part of an overall plan to streamline its balance sheet.

206.   On May 21, 2008, *Reuters News* published an article entitled "UPDATE 2-Lehman shares fall as brokerages cut estimates," which stated in pertinent part:

> Lehman Brothers Holdings Inc shares fell nearly 6 percent on Wednesday after brokerages Credit Suisse and Merrill Lynch both slashed their second-quarter forecasts for the investment bank.

207.    Also on May 22, 2008, *Reuters* published an article entitled "Lehman should raise

more capital — Einhorn" which stated in pertinent part:

> Lehman Brothers Holdings Inc has not written down bad assets enough, and should
> raise large amounts of capital to support its assets, short-seller David Einhorn said in
> a presentation to investors.

208.    On May 27, 2008, *Reuters News* published an article entitled "Before the Bell -

Lehman shares down on brokerage EPS view," which stated in pertinent part:

> Shares of Lehman Brothers Holdings Inc fell before the opening bell on Tuesday
> after Bernstein and Bank of America both cut their earnings outlooks for Lehman.

209.    Also on May 27, 2008, *Reuters News* published an article entitled "US CORP

BONDS-Spreads widen as financials weigh," which stated in pertinent part:

> U.S. corporate spreads widened on Tuesday as financials dragged down the market
> after analysts changed their outlooks on a number of brokers, including Lehman
> Brothers Holdings.

*       *       *

> The cost to insure the debt of Lehman Brothers Holdings Inc against default widened
> 40 basis points to 295 basis points, or $295,000 per year for five years to insure $10
> million in debt, according to broker Phoenix Partners Group.

> Lehman's debt also cheapened.  The spread on Lehman's 6.875 percent notes due in
> 2018 widened by 14 basis points to 340 basis points over U.S. Treasuries, according
> to MarketAxess.

210.    This article confirms the results of the fundamental quantitative analysis described

above, and signaled to Defendant that Investments had grown extremely risky.

211.    Moreover, on June 2, 2008, *Reuters News* published an article entitled "Before the

Bell - Lehman falls after broker downgrade," which stated in pertinent part:

> Shares of Lehman Brothers fell 1.7 percent on Monday to $36.18 after Merrill Lynch
> cut the U.S. investment bank to underperform from neutral, according to
> flyonthewall.com.

212.    Additionally, on June 2, 2008, the *Dow Jones Newswires* published an article entitled

"Shares in Lehman, Merrill Drop After S&P Cuts Ratings," which stated in pertinent part:

> Standard & Poor's cut its ratings on Lehman Brothers Holdings Inc. (LEH), Merrill Lynch & Co. Inc. (MER) and Morgan Stanley (MS) as the credit rater called attention to the risks in how they typically finance their operations and warned that the firms have overused hybrid securities as a means of raising capital.

213.    Also on June 2, 2008, the *Dow Jones Newswires* published an article entitled "2nd

UPDATE: S&P Cuts Rating On Lehman, Merrill, M Stanley," which stated in pertinent part:

> NEW YORK (Dow Jones)--Standard & Poor's Corp. rattled investors' confidence in three big investment banks on Monday, cutting the ratings of Lehman Brothers Holdings Inc. (LEH), Merrill Lynch & Co. Inc. (MER) and Morgan Stanley (MS) by a notch.
>
> ***The credit-rating agency was most critical of Lehman, whose business profile is closest to that of the recently collapsed Bear Stearns Cos., saying its operating performance is under pressure.***
>
> ***We expect a relatively meaningful deterioration in Lehman's second-quarter performance, owing to a generally slower business environment, additional writedowns on certain troubled exposures and the negative effects of hedges***, the rating agency said as it sliced the firm's long-term ratings to A from A+ and kept a "negative outlook" on Lehman.  A negative outlook implies a one-in-three likelihood of another downgrade within about two years.

214.    On June 3, 2008, *Reuters News* published an article entitled "US STOCKS - Wall St

sinks to session lows as Lehman tumbles," which stated in pertinent part:

> U.S. stocks sank to session lows in mid-afternoon trade on Tuesday as shares of Lehman Brothers Holdings Inc extended losses, falling more than 12 percent, as investors feared financial institutions may have to raise more capital.

215.    On June 3, 2008, *Reuters News* published an article entitled "Option bears circle

Lehman puts," which stated in pertinent part:

> Option bears came out in force in Lehman Brothers Holdings Inc on Tuesday, with speculators snapping up put options on a bet that shares of the brokerage could suffer more losses.

216.    On June 3, 2008, *Financial Times (FT.com)* published an article entitled "Lehman loses $600m on hedging position," which stated in pertinent part:

> Lehman Brothers lost [sic]about $600m on a single hedging position in the second quarter, adding to what is expected to be a larger than anticipated loss that may lead the bank to raise more capital by selling a stake to an outside investor.

217.    On June 4, 2008, *The New York Post* reported that "[t]raders are betting that Lehman Brothers could face Bear Stearns-style trouble" and that its "***perception of risk is three times higher than [Lehman's] peers and is approaching the same level as when Bear Stearns collapsed.***"

218.    All of this should have indicated to a sophisticated investment manager such as Defendant that the uncertainty surrounding Lehman was so great, that the Investments were not prudent for the SLP, or CashCo.  Therefore, Defendant should have taken immediate action to reduce SLP participants' Lehman exposure.

219.    Problems for Lehman worsened.  On June 9, 2008, Lehman pre-announced its second quarter 2008 earnings, citing "challenging market conditions" as the cause of an expected net loss of approximately $2.8 billion.  The market responded by selling off its Lehman securities and cutting its credit ratings.

220.    That same day, the *Dow Jones Newswires* published an article entitled "5th UPDATE: Lehman To Raise $6B After Deep $2.8B Loss," which stated in pertinent part:

> Moody's Investors Service lowered its outlook for the bank's credit ratings to negative, expressing concerns about Lehman's ability to manage the risks in its still large exposures to commercial and residential mortgages and signaling the market may not have much tolerance for further losses.

> The rating action also reflects Moody's concerns over risk management decisions that resulted in elevated real estate exposures and the subsequent ineffectiveness of hedges to mitigate these exposures in the recent quarter, Moody's wrote in a release. ***Any additional net valuation marks that result in firm-wide losses in coming quarters would raise serious concerns about the effectiveness of Lehman's risk management and may create additional market unease about the firm, potentially weakening its franchise.***

Fitch Ratings cut its grade one notch to A+, noting Lehman's increased earnings volatility," the lack of securitizations and "the level of risky assets exposing earnings to challenges in hedge effectiveness.

221.    Also on June 9, 2008, *Reuters News* published an article entitled "Before the Bell-

Lehman drops after loss forecast, capital plan," which stated in pertinent part:

> Lehman Brothers shares slid about 10 percent before the bell on Monday after the investment bank forecast a $2.8 billion quarterly loss and set plans to raise $6 billion in capital.

222.    On June 9, 2008, JPMorgan, published an analyst report entitled "$4.9B in Write-

downs; Reality Bites," which stated in pertinent part:

> LEH told investors that the weakness in the fixed income markets may continue over the next several quarters. The lack of liquidity continues to hinder a recovery, and we don't think we'll see an end to write-downs until the ratio of Level 1, 2, and 3 assets normalizes.

223.    On June 10, 2008, Credit Suisse published an analyst report entitled "Recalibrating

Expectations," which stated in pertinent part:

> Yesterday, Lehman Brothers pre-announced a 2Q net loss of $5.14 per share--far in excess of expectations (CS: -$0.60, FC: -$0.22), and raised an additional $6 billion in common equity and convertible preferreds. There's not much more to say to sum this up than disappointing and disconcerting.

224.    On June 11, 2008, HSBC published an analyst report entitled "Lehman Brothers: One

day at a time," which stated in pertinent part:

> Lehman Brothers moved up its earnings release date a week in order to answer questions which have been circling the company largely since Greenlight Capital's David Einhorn raised questions about the quality of its balance sheet and its accounting disclosure in a speech given May 21. Since that date, LEH stock is off 30% and its 5-year CDS was as much as 125bp wider.

225.    On June 13, 2008, the *Wall Street Journal* published an article entitled "Lehman's

Holders in Pain – Shares May Not Get A Lift as Firm Seeks To Exit Rough Patch," which stated in

pertinent part:

So Lehman may have some breathing room, perhaps even enough to allow Chief Executive Richard Fuld to continue fighting against a sale of the firm.  But, with the credit crunch continuing to bite, it is tough to see how Lehman can earn its way out of its current predicament.

*          *          *

There also is the continued threat that Lehman's capital won't prove sufficient in the face of losses that could still hit its books.  When it releases second-quarter results Monday, Lehman is expected to report, for example, that it still has about $30 billion in residential-mortgage assets and about $35 billion in commercial-real-estate assets.

*          *          *

A strong board of directors could have helped steer Lehman Brothers away from the worst of the credit storm that has crushed the firm's stock and **led some to question its survival.**

226.     On June 13, 2008, the *Wall Street Journal* published an article entitled "The Morning

Brief: 'A Delicate Balance of Governance,'" which stated in pertinent part:

The question is what Lehman Brothers Holdings will do next.  Judging by the stock market's reaction, the removal of Erin Callan as finance chief and Joseph Gregory as chief operating officer sure didn't restore Wall Street's confidence in the firm. Lehman Chief Executive Richard S. Fuld Jr. replaced them, only six months after Ms. Callan was appointed to the role, as The Wall Street Journal notes.  Ms. Callan took on the high-profile role of trying to reassure investors that Lehman was weathering the credit crunch and wider banking and economic woes.  "But instead of mollifying short sellers -- investors betting that Lehman's stock would fall," the paper says, "her actions appeared to be fanning the flames by giving some on Wall Street the impression that the fight was distracting her from the challenge of helping to pull Lehman through the continuing credit crisis."  ***The surprise news of a $2.8 billion loss, made public by Lehman on Monday, may have been the last straw.***

The executive changes seemed aimed at restoring Lehman's credibility and saving Mr. Fuld's own job, the New York Times says.  But the removal of Ms. Callan and Mr. Gregory -- who will take on other jobs at Lehman, "may not erase doubts about the future of the bank and of Mr. Fuld, one of the longest-serving chief executives on Wall Street," the Times says.  ***"While Lehman is unlikely to founder* [sic]*, partly because it has access to a government lending program put in place after Bear's collapse, some analysts doubt that Lehman can thrive as an independent firm."*** Lehman's shares ended the day down 4.4%, and are off 26% since the close of regular trading Monday and 64% this year.

227.   ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████

228.   On June 16, 2008, Lehman reported its final second quarter results.  The company suffered a loss, and the market anticipated further Lehman losses going forward.

229.   For example, on June 17, 2008, *Reuters News* published an article entitled "UPDATE 3-Analysts see increased losses at Lehman this year," which stated in pertinent part:

> Lehman Brothers Holdings Inc may face growing losses this year, after the fourth-largest U.S. investment bank posted its first quarterly loss as a public company, several analysts said.

### f.   Lehman Nears Its End

230.   By the end of June 2008, the market was swirling with rumors that Lehman might go bankrupt or, like Bear Stearns, be subject to a forced sale.  The mounting uncertainty regarding the viability of Lehman caused Lehman's share price to plummet and investor concerns to intensify.

231.   For example, June 30, 2008, *Reuters News* published an article entitled "Lehman shares sink on multiple rumors-traders," which stated in pertinent part:

> Lehman Brothers shares fell nearly 11 percent on Monday on rumors THAT the investment bank would be bought for $15 a share, a price well below current market levels, as well as rumors of discouraging remarks from the bank's chief executive.

232.   On July 7, 2008, *Barron's* published an article entitled "A Sampling of Advisory Opinion," which detailed "Twenty-Five Reasons We Remain Cautious," in which the Number 17 reason was the following: "Companies from GM to Ford to ***Lehman are technically insolvent.***"

233.    Additionally, on July 10, 2008, *Associated Press Newswires* published an article entitled "Investment bank Lehman Brothers tumbles to new low on more credit fears," which stated in pertinent part:

> Lehman Brothers Holdings Inc. shares plunged as much as 19 percent Thursday morning as continued credit fears shook Wall Street, and government officials again reiterated that no bank is too big to fail.

234.    On July 11, 2008, IndyMac Bank, the nation's ninth-largest lender in 2007, failed and was taken over by the Federal Deposit Insurance Corporation.  Concerns regarding the future of Lehman increased as the market absorbed statements that no bank is too big to fail.

235.    For example, on July 11, 2008, the *New York Times* published an article entitled "Shares of Lehman Take a Beating as Anxiety Builds in the Mortgage Market," which stated in pertinent part:

> Lehman Brothers, Wall Street's favorite punching bag, took another beating on Thursday as jittery investors fretted over problems at home-loan giants Fannie Mae and Freddie Mac and absorbed regulators' statements that they would not bail out all financial institutions.

236.    Also on July 11, 2008, *Reuters News* published an article entitled "Lehman debt protection costs jump as shares dive," which stated in pertinent part:

> The cost to insure Lehman Brothers debt against default surged on Friday, as its stock price plunged for the second day.

237.    In light of the ever increasing market concerns regarding the future of Lehman and risks associated with Lehman investments, Defendant knew or should have know that the Investments were not appropriate for its SLP.  Additionally, in light of the statements by regulators that the government would not bail out all financial institutions, and that  no bank was too big to fail, Defendant knew or should have known that is was imprudent to hold the Investments under the faulty assumption that the government would not allow Lehman to fail.  A prudent fiduciary under the circumstances would have known of the severe risk of maintaining the Investments in light of the

growing concerns about Lehman, and would have taken action to mitigate its SLP participants' Lehman exposure.

238.    In fact, Defendant even highlighted its recognition regarding the importance of mitigating risks in its marketing materials.  Defendant however, took no such mitigating action, and held the extremely risky investments despite repeatedly marketing the SLP as a minimal risk program.  In such a way, Defendant breached its fiduciary duties to the Plan and Class Plans, and improperly and imprudently relied on the assumption that Lehman was too big to fail.

239.    Speculation regarding whether Lehman would survive was widespread in the market. Market commentary presented a severely negative outlook for Lehman, and indicated that drastic action would be needed for Lehman to survive.

240.    For example, on July 14, 2008, *Reuters News* published an article entitled "Lehman mulls strategic alliance, other options - WSJ," which stated in pertinent part:

> Lehman Brothers' executives, seeking to shore up the brokerage's share price, is [sic] mulling options including a strategic alliance with a partner, the Wall Street Journal reported on Monday.

241.    On July 22, 2008, *Bloomberg* published an articled entitled "Lehman Fault-Finding Points to Last Man Fuld as Shares Languish," which stated in pertinent part:

> Last year, as the market collapsed, Lehman underwrote more mortgage-backed securities than any other firm, accumulating an $85 billion portfolio, 44 percent more than Morgan Stanley's and almost four times the $22.5 billion of shareholder equity Lehman had as a buffer against losses.  Lehman saw trouble in the mortgage market in late 2006 and still didn't move fast enough to reverse course, according to people familiar with the firm's internal workings.

242.    On August 5, 2008, the *Dow Jones Newswires* published an article entitled "Lehman Weighs Sale Of Investment Management Unit – CNBC," which stated in pertinent part:

> Lehman Brothers (LEH) is considering selling its entire investment management unit, including its Neuberger & Berman asset management unit, CNBC reported on its Web site.

243.     On August 6, 2008, the *Dow Jones Newswires* published an article entitled "Analyst Bove Cuts Earnings Estimates, Price Target On Lehman," which stated in pertinent part:

> Ladenburg Thalmann analyst Richard Bove cut his earnings estimates and price target for Lehman Brothers Holdings Inc. (LEH) on Wednesday, saying he expects the company to dump assets, cut its dividend and raise capital in an attempt to put its troubles behind it.

244.     On August 11, 2008, the *Wall Street Journal (WSJ.com)* published an article entitled "Just How Far Behind the Pack Is Lehman Brothers?" which contained stated the following:

> Fretting about the future of investment banks has become something of a cottage industry on Wall Street, ***most of the hand-wringing of late has been about Lehman Brothers Holdings,*** with seemingly daily reports speculating about its options for raising capital: a sale of all or part of Neuberger Berman, a sale of its entire investment-management division, a capital-markets offering of some kind.

245.     On August 12, 2008, the *Associate Press Newswires* published an article entitled "Lehman Brothers falls 12 pct as investors continue to worry about credit market dislocation," which stated in pertinent part:

> Lehman Brothers Holdings Inc. shares fell more than 12 percent in trading Tuesday as investors continued to worry about further credit related losses in the financial sector.

246.     Lehman's condition worsened.  On August 19, 2008, the *Associated Press Newswires* published an article entitled "Lehman Brothers fall again, analysts concerned about more write-downs," which stated in pertinent part:

> Lehman Brothers Holdings Inc. shares fell Tuesday after an analyst said the investment bank could rack up $4 billion of write-downs during the third quarter because of exposure to troubled mortgage securities.

247.     On August 22, 2008, the *Wall Street Journal* published an article entitled "Pitfalls of a Lehman Sale – How Much of Unit Is Shed May Shape Benefit for Parent," which stated in pertinent part:

*Doubts about Lehman have deepened in recent days. The cost of insuring Lehman's debt against default has climbed back to the levels seen before the collapse of Bear Stearns.*

248.    On September 4, 2008, *Associated Press Newswires* published an article entitled

"Lehman Brothers is among biggest decliners in financials; investors fret over mortgage debt,"

which stated in pertinent part:

> Lehman Brothers Holdings Inc. was among the hardest hit stocks in the financial
> sector Thursday as investors who are worried about the fallout from bad mortgage
> debt focused on the company.

249.    On September 5, 2008, Deutsche Bank published an analyst report entitled "Govt

GSE Action Can Help," which stated in pertinent part:

> To a degree, our thought is that perceptions of Lehman's health have now impacted
> reality. About a month ago, we lowered our Lehman estimates to reflect declining
> values in real estate assets. Since this time real estate assets have deteriorated further
> and at quarter end the ABX was down 10-30%, depending on vintage, and spreads on
> the CMBX were roughly 50% wider since the start of June across all classes, which,
> in turn, seem to necessitate that Lehman take more dramatic action to more fully
> clean up its real estate risk.

250.    On September 7, 2008, *The Sunday Times* published an article entitled "Plan to split

Lehman as sale stalls," which stated in pertinent part:

> LEHMAN Brothers is preparing to split into two separately listed companies, as
> rescue talks between the beleaguered $11 billion (Pounds 6.2 billion) investment
> bank and the Korea Development Bank appear to be running out of time.

251.    On September 8, 2008, the *Associated Press Newswires* published an article entitled

"Lehman Brothers shares plunge as investors ponder firm's next move," which stated in pertinent

part:

> Lehman Brothers Holdings Inc. shares tumbled Monday amid investor uncertainty
> about how the nation's fourth-largest brokerage will find much-needed capital to
> help shore up its balance sheet.

252.    On September 9, 2008, *Reuters News* published an article entitled "Lehman's credit

default swaps widen 125 bps - Phoenix," which stated in pertinent part:

The cost of protecting Lehman Brothers' debt with credit default swaps rose by 125 basis points on Tuesday as concerns that it may be unable to raise needed capital battered its shares.

253.     That same day, Fox- Pitt Kelton Cochran Caronia Waller, published an analyst report entitled "Final Options For Saving the Company," which stated in pertinent part:

LEH has fallen precipitously over the past two trading days to sub-$8/shr. This increases the counterparty-panic risk meaningfully, and at least one credit ratings agency put Lehman's counterparty ratings on neg. watch. As a result, mgmt now may have to act quickly to avoid a panic, and a subsequent Bear Stearns-like fate.

254.     Also on September 9, 2008, the *Dow Jones Newswires* published an article entitled "Lehman Brothers To Report Expected 3Q Earnings Wed A.M.," which stated in pertinent part:

Lehman's stock is down more than 85% so far this year as investors have worried that Lehman might succumb to problems in its mortgage holdings.

\*       \*       \*

***Also Tuesday, Standard & Poor's said it had placed Lehman's single-A credit rating on CreditWatch with "negative implications."*** The rating agency cited ***"heightened uncertainty about Lehman's ability to raise additional capital, based on the precipitous decline in its share price in recent days."***

255.     On September 9, 2008, the *Dow Jones Newswires* published an article entitled "S&P Mulls Cutting Lehman Ratings On Uncertainty For Cap Raise," which stated in pertinent part:

Standard & Poor's Ratings Services is considering cutting its credit ratings on struggling investment bank Lehman Brothers Holdings Inc. (LEH), citing "heightened uncertainty" about the firm's ability to raise additional capital based on the sharp drop in its stock price.

\*       \*       \*

The ratings on watch for a potential one-notch downgrade include Lehman's long and short-term counterparty credit ratings, currently at A and A-1 respectively. An A rating denotes satisfactory credit quality.

In July, rival ratings firm Moody's Investors Service cut its ratings on Lehman – the smallest of the four big U.S. investment banks - reflecting expectations for additional mark-to-market losses on its residential and commercial mortgage portfolios. Fitch Ratings affirmed Lehman's ratings in July.

256.     On September 10, 2008, *Citywire* published an article entitled "Lehman Brothers to restructure after $4 billion loss," which stated in pertinent part:

> Lehman Brothers, the fourth largest USinvestment [sic] banking group, has announced plans to restructure its business as it reported a massivethird [sic] quarter netloss [sic[ of nearly $4 billion and slashed its dividend.

257.     On September 10, 2008, the *Dow Jones Newswires* published an article entitled "AT A GALANCE: Lehman Announces Strategic Plans, Big 3Q Loss," which stated in pertinent part:

> THE EVENT: Lehman Brothers Holdings Inc. (LEH) announced plans to slash its exposure to commercial real estate and residential mortgages and raise additional capital. ***The struggling investment bank also said it expects a third-quarter loss of $3.9 billion and cut its dividend.***
>
> MARKET REACTION: Lehman swung between positive and negative territory Wednesday.  They closed down 54 cents, or 6.9%, to $7.25.  The announcement didn't include a capital infusion from outside investors, which disappointed some market watchers.
>
> ***On Tuesday, the stock dropped 45% after hopes for an investment deal with a Korean bank faded.***  That sentiment contributed to big losses in the broader market Tuesday.  On Wednesday, major U.S. stock indexes were up slightly.
>
> \*          \*          \*
>
> Although Lehman and Merrill Lynch & Co. are reducing their exposure to problematic credit instruments, ***they remain the most vulnerable firms on Wall Street to future credit woes, say market observers.***  To read more, see "Lehman And Merrill Find It Tough To Reduce Scrutiny," under symbol LEH.
>
> \*          \*          \*
>
> ***Lehman's kitchen-sink effort to put its financial house in order left plenty of room for doubts and risks regarding the firm's future - especially for its beleaguered common shareholders, who've already seen their shares plunge 89% this year.***  To read more, see "IN THE MONEY: Some Thoughts On Lehman's Remaining Risks," under symbol LEH.

258.     On September 10, 2008, the *Wall Street Journal* published an article entitled "Lehman Faces Mounting Pressures --- Stock Drops 45% as Capital-Raising Talks Falter; Firm Discusses Sale of Assets," which stated in pertinent part:

Lehman Brothers Holdings Inc. came under mounting pressure Tuesday after hopes faded for an investment deal with a Korean bank, ***helping to trigger a 45% fall in the firm's shares.***

<p style="text-align:center">*       *       *</p>

The drop in Lehman shares highlights the continuing nervousness in markets as the company attempts to raise fresh capital to offset sharp declines in the value of its assets.  ***Shares of Lehman, which is heavily exposed to troubled real-estate investments, have been under pressure for months and were down about 80% this year before Tuesday's drop.***  Investors have been frustrated as Lehman has taken months to pull together a plan to raise capital to absorb expected losses.

On Tuesday, credit-rating services Standard & Poor's and Fitch Ratings placed their ratings on Lehman on review for downgrades. S&P cited uncertainty about the firm's ability to raise capital, "based on the precipitous decline in its share price in previous days."

<p style="text-align:center">*       *       *</p>

S&P, in placing its single-A rating on Lehman on review for a downgrade, said it might end up affirming the ratings but could also downgrade them by more than one notch.  Lehman's short-term credit ratings could also be cut, which could affect its ability to tap money-market funds for cash in the short-term debt and overnight repurchase agreement markets.

This article contained the following charts:



- 79 -



[redacted]

[redacted]

[redacted]

[redacted]

262. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████

263. This was not news to Defendant however, because Defendant not only knew, but also disseminated the same conclusion over a year prior. Amazingly, Defendant took no action to protect the Plans. Worse yet, as described below, Defendant actually conspired to keep Lehman's dire condition from the Plans.

264. Additionally, on September 11, 2008, *Reuters News* published an article entitled "US CORP BONDS - Lehman bonds distressed as concerns mount," which stated in pertinent part:

> Concerns about Lehman Brothers' future sent some of its bonds to distressed territory on Thursday, while the broader corporate bond market was unchanged to modestly weaker, strategists said.

265. On September 11, 2008, the *Wall Street Journal* published an article entitled "Lehman's Revamp Plan Draws Doubters --- Voicing Support, Clients Still Move To Pare Back Risks," which stated in pertinent part:

> ***Chief on some traders' minds was Lehman's credit rating, which is in increasing danger of a downgrade as its shares continue to slump. Lehman's current ratings are already at the threshold of what most trading partners and clients will tolerate for an investment bank, at single-A.***
>
> \*       \*       \*
>
> ***Meanwhile, some firms that face Lehman in credit-default swaps are trying to unwind their trades or get other investment banks to take over their positions, say people familiar with the matter. Others are seeking safety by buying credit protection against a Lehman default.*** On Wednesday, the annual cost of insuring

$10 million of Lehman debt for five years rose to a high of $610,000, versus $475,000 late Tuesday, according to Phoenix Partners Group.

266.    On September 11, 2008, the *Wall Street Journal Online* published an article entitled

"The Afternoon Report: Lehman's News," which stated in pertinent part:

> Since Monday, Lehman shares have plunged by more than 50%, largely on dashed hopes that government-owned Korea Development Bank would make an investment in the New York company. Some analysts and investors said Wednesday it is a bad sign that Lehman didn't announce a capital infusion from any outside investors. While the announcement seemed to quiet the frenzy that sent Lehman shares into a freefall Tuesday and forced the company to report quarterly results a week earlier than planned, it still isn't clear how Lehman can thrive in a Wall Street environment that has been turned upside down by the credit crisis.

267.    On September 11, 2008, the *Wall Street Journal Online* published an article entitled

"The Evening Wrap: Lehman Shops Itself," which stated in pertinent part:

> Lehman Brothers Holdings Inc. is actively shopping itself to potential buyers, including Bank of America Corp., people familiar with the matter said Thursday.

> *                *                *

> The need for a sale intensified as Lehman's shares dropped 42% in Thursday trading, creating new doubts about its ability to trade with other Wall Street firms while keeping its best talent.

268.    On September 12, 2008, the *Dow Jones Newswires* published an article entitled

"UPDATE: US Stks Close Slightly Up As Energy Cos Offset Fincls," which stated in pertinent part:

> NEW YORK (Dow Jones)--A back-and-forth week - dominated by worries about Lehman Brothers and other large financials - ended with another big sell-off in banks, though it was offset by a surge in energy stocks.

> *                *                *

> . . .But all of that positive sentiment waned over the course of the week as concern escalated that Lehman Brothers could be the next domino to fall in the credit crisis.

> Lehman closed Friday down 57 cents, or 14%, at 3.65.

> *                *                *

> ***What the markets are saying on these financials is it's not an understandable situation.  So, when in doubt, get your tail out***, said Stephen Wood, senior portfolio strategist at Russell Investments.

269.    On September 13, 2008, the *Wall Street Journal* published an article entitled "Large

Stock Focus: Week Ends With Selloff of Financials --- Lehman and AIG Weigh on Market; Tesoro a

Bright Spot" which stated in pertinent part:

> But all of that positive sentiment waned over the course of the week as concern escalated that Lehman Brothers could be the next domino to fall in the credit crisis.
>
> Lehman closed Friday down 57 cents, or 14%, at $3.65, and fell 77% on the week.
>
> *        *        *
>
> What the markets are saying on these financials is it's not an understandable situation.  So, when in doubt, get your tail out, said Stephen Wood, senior portfolio strategist at Russell Investments.

270.    On September 13, 2008, the *Wall Street Journal* published an article entitled "Dow

Gains 1.8% for Week Despite Banking Tumult" which stated in pertinent part:

> ***Investors' mood was damped by worries about the fate of Lehman Brothers Holdings.***  According to people familiar with the matter, the government won't use any money to assist the Wall Street firm beyond the liquidity facilities already available to the struggling investment bank.  ***Lehman shares were off 13.5%, leaving them down 77% for the week.***

271.    On September 13, 2008, the *Wall Street Journal* published an article entitled

"Uncaged Bears Hit Lehman Stock Hard --- As SEC Restrictions Come to an End, Short Selling

Rises" which stated in pertinent part:

> Investors stepped up their bets against Lehman Brothers Holdings Inc.'s stock as its shares tumbled, ***possibly accelerating the week's 77% decline.***
>
> *        *        *
>
> Then the bears came out in droves.  Short interest in Lehman rose to 11.9% on Sep. 8, a day that the stock fell almost 13% to $14.15. Sep. 9, the short interest climbed to 15.5% and the shares fell 45%. Short interest rose to 16.8% on Sep. 10, as the stock fell about 7%. Data for Thursday and Friday's trading haven't yet been released..

272.    On September 13, 2008, the *Wall Street Journal* published an article in the Business

and Finance Section which stated in pertinent part:

Talks about a sale of Lehman or many of its parts were taking place in other forums and were likely to continue through the weekend.

Investors stepped up their bets against Lehman as its shares tumbled, less than a month after SEC rules restricting short-selling expired.

273.    On September 14, 2008, Oppenheimer published an analyst report entitled "LEH

Likely Forced Into Liquidation," which stated in pertinent part:

After exhaustive efforts, no solution was reached to save Lehman Brothers as no buyers stepped up to bail out the company. As a result, it appears that Lehman Brothers will be forced into the process of liquidation and Lehman's $600 billion asset base will be in the process of being sold.

### g.    Lehman Files For Bankruptcy

274.    After failed negotiations to secure a buyer or a U.S. government bailout, Lehman

Brothers filed for Chapter 11 bankruptcy on September 15, 2008.

275.    On September 23, 2008, Ben Bernanke, Chairman of the Board of Governors of the

Federal Reserve System, testified before the Senate's Committee on Banking, Housing, and Urban

Affairs:

**[T]he troubles at Lehman had been well known for some time**, and **investors clearly recognized**--as evidenced, for example, by the **high cost of insuring Lehman's debt** in the market for credit default swaps--that **the failure of the firm was a significant possibility**.  Thus, we judged that **investors and counterparties had had time to take precautionary measures.**

276.    The above information reflects the increasingly negative market sentiment regarding

Lehman and its potential for default, and indicates what a sophisticated investment manager knew or

should have known at the time.  As market concerns regarding the uncertainty of Lehman increased,

Defendant knew or should have known that the Investments had grown extremely risky and had

become akin to junk.  Since the SLP was repeatedly marketed as a low risk program with an

extensive risk management process, and participants' Agreements required investments to be

investment grade, Defendant should have taken action to mitigate the Plans' risk of loss associated with these imprudent Investments.

277.    Additionally, this information confirms the results of the quantitative analysis described above that would have indicated to a sophisticated investment manager such as Defendant, the extreme risk associated with these Investments.  In light of such knowledge, Defendant failed to act as a prudent fiduciary under the circumstances and took no action whatsoever to mitigate the risk of loss to the Plans. Numerous mitigation strategies were available to Defendant, however, Defendant failed to take any such action, and instead imprudently relied on the faulty assumption that the government would not allow Lehman to fail.   As a result of Defendant's failure to act as a prudent fiduciary under the circumstances, Plaintiffs suffered significant losses when Lehman filed for bankruptcy on September 15, 2008.

278.    Defendant invested approximately $1.8 million of the Plan's Collateral in the Lehman Notes.  Today, the Collateral is worth approximately $432,000 a loss of over 76%.  Collectively, the Lehman Notes cost the Plans approximately $499 million and are currently worth approximately $120 million.

### 3.    Defendant Had Knowledge and Concern of Lehman's Risk of Default

279.    Defendant's relationship with Lehman extended way beyond its relationship as an Approved Issuer and Approved Borrower in Defendant's SLP.  To be clear, this is the same entity that served as a fiduciary to the Plan and Class Plans.

280.    For example, in order to broker the numerous trades that comprised its daily operations, Lehman relied upon intraday credit advanced by at least six clearing banks, including primarily JPMorgan, which it used to facilitate these trades.  Lehman's clearing banks were key to

its viability.  They served as intermediaries between Lehman and all of the counterparties to its various securities trades, essentially playing matchmaker between buyer and seller.

281.    Details surrounding Defendant's unparalleled access to critical information about Lehman's perilous financial state in the weeks leading up to Lehman's bankruptcy were revealed, as was the true nature and extent of the relationship between JPMorgan and Lehman.  According to the Complaint filed in *Lehman Bros. Holdings, Inc. v. JPMorgan Chase Bank, N.A.*, No. 10-03266-jmp (Bankr. S.D.N.Y. May 26, 2010) (the "Lehman Complaint"):

> Prior to its bankruptcy, Lehman was the fourth largest investment bank in the United States.  [In addition to other services, Lehman] also provided prime broker services to professional investors and hedge funds, allowing them to borrow securities and cash to be able to invest on a leveraged basis using borrowed funds, or debt, to increase the returns on equity.  In order for Lehman to provide its services, especially the prime broker services, it needed the ability to buy and sell billions of dollars of securities each day for itself and its customers.

> During all relevant periods, JPMorgan was Lehman's primary bank.  It provided secured and unsecured intra-day credit advances for Lehman's clearing activities.  It was the lending credit provider to Lehman, including acting as lead arranger and administrative agent for [Lehman's] $2 billion unsecured revolving credit facility.  JPMorgan was also Lehman's main depository bank for deposit accounts, one of Lehman's largest global counterparties for derivates activity in terms of numbers of trades and aggregate notional amounts, Lehman's first overall counterparty among the United States banks for fixed income and equity securities transactions, and the agent for securities clearing activities for Lehman worldwide.

> Overall, Lehman entities paid fees exceeding $180 million to JPMorgan and its affiliates from the beginning of 2005 through the first six months of 2008.

282.    The Lehman Complaint alleges that during this critical time period, JPMorgan was invited into Lehman's strategic planning and was given access to Lehman's most confidential information, including its financial results, plans and outlook.  Defendant was also invited into the United States government's inner circle to help address the issues relating to Lehman's financial distress.  Armed with this breadth of inside information, JPMorgan was uniquely aware of Lehman's doomed fate.

283.    Moreover, the Lehman Complaint reveals how JPMorgan repeatedly met with Lehman's senior management under a friendly façade, only to use Lehman's confidential information as means of securing Defendant's own position.

284.    While JPMorgan used this knowledge to protect itself and limit its own exposure to Lehman, it failed to do anything to reduce Plaintiff's and the Class Plans' exposure to Lehman.

285.    As described above, JPMorgan leveraged its position and took slow, but calculated steps to reduce its own exposure by extracting the billions of dollars in collateral outlined above.  In fact, according to the Lehman Complaint, JPMorgan's collateral demands were actually based on internal risk models that *assumed* a future Lehman bankruptcy.

286.     Critically, Defendant, as the primary clearing bank to Lehman and fiduciary to the Plan, used the information it had about Lehman to protect itself.  Defendant could, and often did share this information with other personnel and divisions within the bank, including the SLP. Defendant however, sought to utilize the Plans' assets to provide liquidity to Lehman that allowed it to secure or eliminate Defendant's own Lehman exposure.  In such a way, Defendant not only breached its duty of care by failing to act in the best interest of the Plan, but breached its duty of loyalty as well.

287.    Defendant recognized the uncertainty surrounding the financial stability of Lehman, and was deeply concerned.  Defendant knew, and internally discussed that Lehman had become akin to junk.  In fact, Defendant was so concerned, that as early as February 2008 Defendant began taking action to minimize its Lehman exposure.

288.    As detailed in the Report of Anton R. Valukas, Examiner ("Examiner's Report"),[65] who had access to information not yet produced in discovery, as well as internal documents, beginning in early 2008, counterparties and clearing banks such as JPMorgan, became increasingly skeptical of Lehman's ability to maintain the *status quo* of its operations.  The firm was widely-considered particularly vulnerable due to its large leverage ratios and real-estate heavy balance sheet/subprime mortgage exposure.  By February 2008, JPMorgan informed Lehman that it would begin demanding collateral deposits in order to secure intraday credit risk as part of its clearing bank relationship.  Up to this point, JPMorgan had simply executed Lehman's trades on credit without fear of Lehman faltering on its obligations.  But in light of Lehman's worsening financial condition, along with the market's obvious concerns, JPMorgan required Lehman to make these collateral deposits in order to protect JPMorgan in the event of a Lehman default.

289.    By requiring this collateral, Defendant put its own interests first to obtain priority over unsecured creditors, including the Plans.  Lehman initially responded to JPMorgan's demand by posting approximately *$5.7 billion* in securities on June 19, 2008.  Lehman continued to transfer more collateral to JPMorgan throughout the summer, and by the beginning of August, Lehman had posted approximately *$9 billion* of collateral at JPMorgan.

290.    Moreover, on August 29, 2008, JPMorgan and Lehman entered into new clearance, security and guaranty agreements.  The amended clearance agreement established a JPMorgan lien on specific Lehman accounts at JPMorgan in order to secure Lehman's obligations under the

---

[65]    The nine volumes of the Examiner's Report filed in the Chapter 11 proceedings of Lehman Brothers Holdings Inc. can be accessed at http://www.jenner.com/lehman, and are incorporated herein by reference.

agreement.  However, while JPMorgan took steps to secure its own claims, it obtained no such security for the Plans' Collateral investments.

291.  Only days later, on September 9, 2008, JPMorgan sought yet another round of security documentation to be executed before Lehman's earnings call scheduled for the following day.  JPMorgan sought expanded rights over the Lehman collateral already held in JPMorgan accounts.  In addition, JPMorgan also requested an additional *$5 billion* in collateral.  Lehman agreed to post $3 billion immediately: $1 billion in cash and $1.7 billion in money market funds on September 9th, and another $300 million in cash the following day.  An additional $600 million cash deposit followed on September 11th, bringing JPMorgan's new collateral to *$3.6 billion* over the course of 3 days.

292.  Despite this, Defendant was still deeply concerned about its exposure to Lehman.  That same day, on September 11, 2008, JPMorgan demanded *$5 billion more* in cash collateral.  Lehman obliged by the following afternoon, September 12, 2008.  Thus, pursuant to these September agreements, Lehman had now provided JPMorgan with *$8.6 billion* in collateral *above and beyond the $9 billion that had been originally deposited from June to August*.  Accordingly, while JPMorgan demanded approximately *$17.6 billion* from Lehman between June and September, Defendant took no steps to protect the Plans or minimize the Plans' losses, but instead focused on protecting its own financial interest.

293.  In fact, it was JPMorgan's relationship as Lehman's primary clearing bank that permitted JPMorgan to demand approximately $8.6 billion in collateral in the weeks leading up to Lehman's bankruptcy.

294.    Because of this "straw that broke the camel's back" demand, Lehman was forced into bankruptcy and, in connection with the bankruptcy proceeding, filed an adversary proceeding against "the ultimate insider," JPMorgan on May 26, 2010.

295.    In addition to demanding additional collateral from Lehman, JPMorgan was so concerned that it internally discussed and ultimately took more steps to reduce its exposure to a possible Lehman default.  Defendant accomplished this by eliminating or limiting various lines of credit it had ordinarily extended to Lehman.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

66

████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████





















[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

> [redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

351.

**F.      Defendants placed Its Own Interests Ahead of the Interests of the Plan**

352.      In light of Defendant's extensive and profitable relationship with Lehman and the actions it took to further that business and to use the Plans' assets to enable it to reduce its own Lehman exposure, Defendant placed its own interests as well as the interests of Lehman ahead of the interests of the Plans to whom Defendant owed the highest duties of care and loyalty.  Rather than informing Plaintiff and Class Plans of its Lehman concerns, its own precautionary measures, and taking action to reduce participants' exposure, Defendant sacrificed the Plans' assets in order

facilitate its profitable relationship with Lehman and to give itself the ability to take action to protect itself.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████

████████████████████████████

████████████████████████████████

360.    Thus, while Defendant was taking action to reduce its own exposure, Defendant attempted to do so in a way that would not disrupt its profitable relationship with the company or alert the public that it had concerns about Lehman.

361.    Therefore, in order to keep Lehman happy and liquid, Defendant maintained the Investments made on behalf of the Plan and Class Plans. In effect, Defendant used Plan assets in order to give itself the ability to reduce its own exposure to Lehman without heavily impacting its profitable business with Lehman.  In such a way, and in violation of its fiduciary duties under ERISA, Defendant placed its own interests as well as the interests of Lehman ahead of the interests of the Plan and Class Plans.

362.    By maintaining the extremely risky Investments, Defendant used Plan assets to support the liquidity Lehman needed to post the additional collateral demanded by JPMorgan. In doing so, Defendant failed to act as a prudent fiduciary under the circumstances.  In such a way, Defendant dealt with Plan assets in an imprudent manner, and breached the duties of loyalty and care that it owed to Plaintiff and Class Plans.

363.    When Lehman filed for bankruptcy on September 15, 2008, Plaintiff and the Class Plans were left holding the bag of millions of dollars of worthless Lehman Notes.  Defendant failed to take the action to reduce the Plan and Class Plans' exposure to Lehman, and as such, failed to act as a prudent fiduciary under the circumstances.  Moreover, at anytime prior to Lehman's bankruptcy, Defendant could have minimized the Plan's exposure to Lehman or taken action to mitigate the Plan's risk of loss in the case of a Lehman default.  That is what a prudent fiduciary would have done.

**G.    Defendant Could Have Significantly Minimized Participants' Losses Any Time Prior to September 15, 2008**

364.    Plaintiff intends to present expert testimony demonstrating that, as a sophisticated investment manager and fiduciary to the Plan and Class Plans, Defendant could and should have taken many steps to ensure that the Plan's and Class Plans' assets were properly managed as described below.

**1.    Defendant Failed to Inform Plaintiff and other Class Members of its Growing Lehman Concerns**

365.    Although Defendant internally discussed and acted on its concern regarding the future and riskiness of Lehman, Defendant failed to relay its concerns or actions to securities lending participants even though a Lehman default could have a negative impact on their securities lending

portfolios.  In such a way, Defendant failed to convey accurate information to Plaintiffs regarding the Investments.[97]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

---

[97]     As alleged above, Defendant had substantial information demonstrating that Lehman was not a prudent Collateral investment that could have been disclosed without violating securities laws.  In part, Defendant regularly shared information on Lehman, including information gathered through its clearing bank relationship, across many lines of its business, including the SLP.

████████████████████████████████████████████████████

████████████████████████████████████████████████████



[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

    ████████████████████████████

    ███████████████████████████████████████████

    ██████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████████████████████████████████

    ███████████████████████████████████████████

████████████████████████████

371.   Notably absent, however, is any indication of the numerous steps Defendant had taken to reduce its own exposure to Lehman or that the Lehman Notes had become extremely risky and akin to junk and imprudent for Collateral investment.

372.   These talking points highlight Defendant's concern only with their own risk – that any outstanding loans would be indemnified by JPMorgan in the event of a borrower default – while ignoring the risk of the lender with respect to any investments made with its Collateral.

373.   ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████

374.    Thus, despite numerous internal discussions regarding Lehman concerns, knowledge that the Investments had become extremely risky, and taking drastic actions to reduce its own exposure to Lehman, Defendant failed to even inform securities lending participants of its concerns. In such a way, Defendant failed to act as a prudent fiduciary under the circumstances.

###    2.    Defendant Failed to Take Action to Reduce the Plans Exposure

375.    In the wake of mounting evidence demonstrating that the Lehman Notes were not prudent investments for Collateral investment, including the credit risk associated with investments in Lehman, Defendant could and, (in the exercise of the care of a reasonably prudent investment manager, should) have mitigated and ultimately eliminated the Plans' and Class Plans' exposure to a Lehman default.

376.    By way of example, Defendant could have purchased insurance on the Investments *via* CDS contracts, for which there was an active market during the relevant time period. When Lehman defaulted, the CDS contract would have covered the difference between the note's par value and its post-default market value, thus insulating Plaintiffs and other Class Members from any potential loss.

377.    Additionally, Defendant could have sold the Investments anytime prior to Lehman's bankruptcy and minimized investor losses. Indeed, the Lehman Notes, and materially similar Lehman senior unsecured debt was routinely sold on the open market during August 2007 through September 11, 2008 to risk tolerant investors. Moreover, JPMorgan had one year to liquidate the Investments and could have done so in a manner that would not have disrupted the market, or "crashed" Lehman.

378. Indeed, from January of 2008 through September 2, 2008, the Investments traded at all times above $82.50 per $100 of par. Thus, Defendant could have sold the Investments during this period and significantly minimized Plaintiff's losses.

379. For example, in February 2008, when JPMorgan first informed Lehman that it would begin demanding intraday collateral deposits as a way to protect itself, the Investments were trading at and could have been sold in the range of $96.25 per $100 of par and $99.921 per $100 of par. Likewise, in mid-June of 2008, when Lehman posted approximately $5.7 billion in securities to JPMorgan at its behest, the Investments were trading at or about $95.82 per $100 of par.

380. On September 10, 2008, the day after JPMorgan demanded an additional $5 billion in collateral, the Investments traded at and could have been sold at or about $92.142 per $100 of par. Thereafter, on September 11, 2008, the day on which JPMorgan demanded *an additional* $5 billion in collateral from Lehman, the Investments traded at and could have been sold at or about $91.50 per $100 of par. Finally, on September 12, 2008, the last trading day before Lehman went into bankruptcy, the market price for the Investments was at or about $82.50 per $100 of par.

381. Again, while from a risk perspective the reduced bond prices described above indicated the market's strong concern over Lehman's potential for default and the Investments associated high level of risk, Defendant could have mitigated Plaintiff's losses by selling the Investments to more risk tolerant investors that were in the market making the bet that Lehman would pull through, or get bailed out by the Fed.

382. Accordingly, at any point prior to Lehman's bankruptcy on September 15, 2008, Defendant could and should have minimized the Plans' losses by informing clients of its growing Lehman concerns, purchasing CDS contracts, or by selling the Investments. Instead, in the wake of mounting uncertainty as to Lehman's financial stability, including the credit risk associated with the

Investments, Defendant continued to hold the Investments, risking significant losses to Plaintiff's and the Class Plans' Collateral.  If Defendant had taken the prudent action of divesting its capital preservation accounts of the Investments, as Defendant took numerous steps to protect its own interest against a Lehman default, Plaintiff's and the Class Plans' losses would have been significantly minimized.  Instead, while Defendant protected itself, it took a gamble with the Plans' Collateral to further its own purposes, and imprudently maintained the Investments.

383.    On September 15, 2008, when Lehman declared bankruptcy, the market price for the Investments declined by approximately 85%.  Currently, the Lehman Notes are worth only approximately 24% of par.

### H.    Defendant Breached Its Fiduciary Duties Under ERISA

#### 1.    Defendant's Fiduciary Duties

384.    JPMorgan is a fiduciary with respect to all claims alleged herein in that it exercised authority or control over the management or disposition of the assets of the Plan, the Collateral, and, upon information and belief, the assets of the Class Plans. ERISA §3 (21) (29 U.S.C. §1102 (21)).

385.    Defendant is also a fiduciary with respect to all claims alleged herein in its capacity as an Investment Manager of Plaintiff and the Class Plans' assets under the SLP, as defined by ERISA. 29 U.S.C. § 1002(38).    Defendant managed, acquired, and disposed of Plan assets in its administration of Plaintiff's securities lending portfolio.  Additionally, JPMorgan qualifies as a banking institution organized under the laws of the United States in accordance with the Investment Advisers Act of 1940.[104]

---

[104]    As Defendant was hired by the Board as an Investment Manager to its SLP, under ERISA, the Board is not liable for any acts or omissions of JPMorgan in its administration of the securities lending portfolio.  29 U.S.C. §1105(d)(1).  Likewise, the Board is not required to invest or otherwise manage the Plan's securities lending assets that were subject to JPMorgan's management.

386.   Pursuant to ERISA §404(a)(1) (29 U.S.C. §1104(a)(1)), Defendant had the following

duties:

[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and

(ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent wit the provisions of this title and title IV.

387.   Defendant also had the duty to refrain from engaging in prohibited transactions.

Section 406(b)(1) of ERISA (29 U.S.C. §1106(b)(1)) provides, in pertinent part, that

(b)   Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not-

(1)  deal with the assets of the plan in his own interest or for his own account,

. . .

388.   Under this statute, Defendant has a duty to act prudently by employing proper

methods to investigate, evaluate and structure investments made with Plaintiff's and the Class Plans'

Collateral.  Defendant is required to act in a manner as would others who have a capacity and

familiarity with such matters.  Furthermore, Defendant's responsibilities with respect to the

investments made with Plaintiff's and the Class Plans' Collateral do not terminate upon the decision to invest. Defendant's fiduciary duties under ERISA are continuous, and, accordingly, Defendant has an ongoing duty to monitor the investments made with Plaintiff's and the Class Plans' Collateral with reasonable diligence and to dispose of any imprudent investments.

> ### 2. Defendant Imprudently Made and Maintained Investments in Lehman as the Lehman Notes Were Unduly Risky

389. As alleged above, beginning in 2007 and throughout 2008, it became apparent or, in the exercise of reasonable care, should have become apparent to Defendant that Lehman's creditworthiness and potential for default were too great for a Collateral investment with the agreed investment and risk profile of the SLP. As alleged above, Defendant had access to substantial information which detailed the growing uncertainty surrounding Lehman. Moreover, as further alleged above, the basic financial analysis that should have been performed by a reasonably prudent manager of retirement plan assets compelled the conclusion that the Investments were too risky. Finally, as a result of its substantial business dealings with Lehman, Defendant had specific knowledge of the risks of the Investments as evidenced by, among other things, its demand for its own collateral and its focus on reducing its own Lehman exposure. Yet, Defendant continued to maintain its investments of Plaintiff's and the Class Plans' Collateral in Lehman until it defaulted, causing Plaintiff and the Class Plans to suffer substantial losses. As detailed above, a reasonably prudent fiduciary would, and Defendant could, have significantly minimized losses at any time prior to September 15, 2008. Defendant's failure to do so in light of the mounting uncertainty as to Lehman's riskiness was imprudent and violated ERISA.

390. It was or should have been evident to Defendant, *a sophisticated investment manager acting in a fiduciary capacity,* that the Collateral was at a sufficient risk of loss and in significant danger of losing principal or becoming illiquid to be an unduly risky investment for the

Cash Collateral Fund and/or the Collateral. Under these circumstances, when a primary goal was to preserve principal and maintain adequate liquidity to be able to return Collateral to borrowers – an expected and inevitable requirement in any securities lending program – a reasonably prudent fiduciary would not have made the hazardous investment decisions made by JPMorgan. A reasonably prudent fiduciary would have taken affirmative steps to monitor the Investments to meet the stated and expected goal of preserving the Collateral to protect the Plans. Indeed, in the face of Lehman's uncertainty, a reasonably prudent fiduciary would have sold the Investments or otherwise mitigated against the risk of loss as described above. Moreover, a reasonably prudent fiduciary would have ensured that liquidity standards were maintained to further reduce the potential downside exposure to the Plans. Since Defendant at all times had a duty to act as a reasonably prudent fiduciary, it knew, or at the very least should have known, that its investment decisions concerning the Investments were unduly hazardous and risky, that it should not continue to maintain the Investments, that it should have maintained proper liquidity standards, and that it should have at all times acted as a reasonably prudent fiduciary. Defendant did not take any such steps. Rather, while Defendant took actions to protect its own interests such as demanding collateral deposits from Lehman, it continued to hold the Investments until Lehman's default against Plaintiff's and the Class Plans' interests.

391. Accordingly, Defendant violated its express duty to use expertise in investing, as it was required to do as a sophisticated investor acting in a fiduciary capacity, in direct violation of Defendant's duty of care under ERISA, and directly harmed the Plan and, upon information and belief, the Class Plans, in that the Collateral not only earned less than it would have earned if invested by a reasonably prudent fiduciary, but also lost principal.

### 3. Defendant Violated ERISA by Acting In Its Own Interests and Not Plaintiff's or the Class Plans'

392.    As a fiduciary under ERISA, Defendant was required to "discharge [its] duties with respect to a plan solely in the interest of the participants and beneficiaries . . ." and is not allowed to "deal with the assets of the plan in his own interest or for his own account."

393.    As alleged above, Defendant violated this provision of ERISA by acting in its own interests and not Plaintiff's and the Class Plans'.  JPMorgan knew that under the Agreement, it had no risk of loss but was paid 30-40% of any profit. Moreover, higher risk investments, if successful, yield higher returns than low risk investments.  Defendant gambled to earn its higher returns by investing the Collateral in the unduly risky Investments instead of acting to reduce the Plans' Lehman exposure.   Instead, JPMorgan took no action to protect Plaintiff's and the Class Plans' Collateral.  Instead, it used the Investments to prop up Lehman while at the same time dramatically reducing its own exposure to Lehman.  This is a clear demonstration of it acting in its own interest over the Plans' and constitutes a breach of the duty of loyalty under ERISA.

### 4. Defendant Violated ERISA by Violating the Maturity Guidelines

394.    Additionally, Defendant violated ERISA through its purchase of the Lehman Note (CUSIP 524908SQ4) that had a Final Maturity of 10 years at the time of purchase. *See* Exhibit D. This purchase was a *per se* violation of the Agreement and Guidelines, and in particular the maturity limits,  which specify that "all other floating rate instruments must have a Final Maturity not exceeding 2 years at the time of purchase. . . ." *See* Exhibit A, Appendix 1, Section F.   Moreover, JPMorgan elected to extend the maturity of this note in August 2007, at a time when Defendant knew or should have known that the Investment had become akin to junk.  No reasonably prudent investment manager would have extended the term of this note at a time when the investment had reached a level of risk associated with a non-investment grade bond.  Thus by extending the term of

CUSIP 524908SQ4, Defendant failed to act as a prudent fiduciary under the circumstances, violated ERISA, and caused substantial damages to the Plan and Class Plans.

## V.     Class Action Allegations

395.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all SLP participants that, pursuant to any SLP Agreements with JPMorgan, held an interest in any Collateral Account, including CashCo, that invested, directly or indirectly, in a Lehman FRN as of September 15, 2008, including but not limited to securities with the following CUSIP numbers: 52517PK83, 524908SQ4, and 52517PQ61 (the "Class").  Excluded from the Class are: (a) Defendant; (b) the subsidiaries and affiliates of Defendant; (c) any person or entity who is a partner, executive officer, director or controlling person of Defendant; (d) any entity in which Defendant has controlling interest; (e) Defendant's directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; and (f) the legal representatives, heirs, successors and assigns of any such excluded party.

396.    As of October 2009, the market value of the securities under Defendant's administration totaled approximately $5.1 trillion.  The total principle amount of the Lehman Notes is approximately $499 million.  Plaintiff believes that at least 85 SLP participants held Lehman Notes as of September 15, 2008 and suffered substantial losses herein detailed due to JPMorgan's imprudent and disloyal conduct.

397.    Plaintiff's claims are typical of the claims of the members of the Class in that, upon information and belief, all Class Members entered into identical or virtually identical Securities Lending Agreements with JPMorgan on behalf of Class Plans which held Collateral in the Collateral Account and sustained damages as a result of Defendant's wrongful conduct complained of herein.

398.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.  Plaintiff has no interests that are adverse or antagonistic to the Class.

399.   Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by any individual Class Plan may be relatively small, and Plaintiff seeks injunctive relief, the expense and burden of individual litigation make it impracticable for Class Members individually to seek redress for the wrongful conduct alleged herein.  Further, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and the Class Plans which would establish incompatible standards of conduct for the party opposing the Class.

400.   Defendant has acted on grounds generally applicable to the Class and the Class Plans with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

401.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are: (1) whether Defendant is a fiduciary; (2) whether Defendant violated its obligations set forth in the Agreement and the Guidelines; (3) whether Defendant violated its fiduciary duties of prudence and/or loyalty; (4) whether Defendant engaged in prohibited transactions in connection with Collateral investments; (5) whether the Plan and the Class Plans suffered any losses as a result of Defendant's actions; and (6) whether Plaintiff and the Class would suffer irreparable injury by the continuation of Defendant's conduct complained of herein.

402.     On information and belief, the names and addresses of those persons and entities that held the Investments are available from Defendant.  Notice may be provided to such Class Members via first class mail using techniques and a form of notice similar to those customarily used in class actions.

## VI.   FIRST CAUSE OF ACTION: VIOLATION OF ERISA §404 (29 U.S.C. §1104)

403.     Plaintiff repeats and realleges the allegations contained in paragraphs 1-402 as if fully set forth herein.

404.     At all relevant times, Defendant acted as a fiduciary of the Plan and the Class Plans concerning the Collateral within the meaning of ERISA §3(21)(A) (29 U.S.C. §1002(21)(A)) by exercising authority or control with respect to the management or disposition of the Collateral, a Plan asset.

405.     Defendant breached its fiduciary duties both of care and loyalty.

406.     Defendant had a duty of care to invest the Collateral for the benefit of the Plans prudently and with reasonable care based on the standards of a reasonably prudent fiduciary.

407.     To the extent that the Agreements or the Guidelines required Defendant to invest the Collateral imprudently, Defendant also had a duty under ERISA to disregard those requirements and invest the Collateral prudently and with reasonable care. Defendant could not blindly follow those requirements if doing so would cause harm to the Plans.

408.     Defendant had a duty to monitor the Collateral investments continuously to ensure that they were at all times prudent.  If a Collateral investment became imprudent, Defendant had a duty of care to act immediately to protect the Plans from any investment harm by, *inter alia*, liquidating the Collateral investment.

409.    Defendant breached the duty of care and prudence in that it failed to invest the Collateral in sufficiently safe and prudent investments as required by the Agreements, the Guidelines, Defendant's policies and procedures and the Collateral risk profile.  Instead, Defendant invested the Collateral in investments that were too risky given the investment profile of Collateral investments.

410.    Defendant also breached the duty of care and prudence in that it failed to monitor the Collateral investments to ensure they were at all times prudent in accordance with the Agreements, Guidelines, Defendant's policies and procedures, and the Collateral investment profile and, therefore, improperly maintained the imprudent Collateral investments.

411.    Based on the facts alleged above, no reasonably prudent fiduciary would have invested the Collateral in the Investments selected by Defendant in its complete and sole discretion under the Agreement, the Guidelines, Defendant's policies and procedures or reasonably known market conditions.  Further, based on the facts alleged above, no reasonably prudent fiduciary would have maintained the Investments.  Instead, a reasonably prudent fiduciary would have sold the Investments when they became risky as alleged above. Since Defendant had a duty to act as a reasonably prudent fiduciary, it knew or at the very least should have known the facts alleged above demonstrating that the Investments were not prudent and acted to protect the Plans.  Defendant breached its fiduciary duty when it failed to do so.

412.    Defendant's failure to invest the Collateral with reasonable care in a prudent manner constitutes, pursuant to ERISA §404(a)(1), a breach of Defendant's fiduciary duty of care and prudence.

413.   Defendant had a separate duty of loyalty to invest the Collateral solely in the exclusive interests of the Plans and their participants and beneficiaries and for the exclusive purpose of providing retirement benefits.

414.   As alleged above, Defendant's investment of Collateral in Lehman Notes was designed to increase profits earned by Defendant from securities lending in disregard of the risk of losses that could be suffered by the Plans in breach of the duty of loyalty.

415.   The Agreement and, in particular, the profit sharing provisions of the Agreement, do not in and of themselves violate ERISA.  However, Defendant disloyally placed its interests above the interests of the Plan by making unduly risky investments in the Lehman Notes in an attempt to make excessive profits and prop up Lehman to reduce Defendant's exposure to Lehman.  In other words, Defendant performed under the Agreement in a manner that breached its duty of loyalty.

416.   Defendant favored its own interests and failed to act in the exclusive interest of the Plans and their participants and beneficiaries and for the exclusive purpose of providing retirement benefits in gambling to make excessive profits without any reasonable regard to losses that could be suffered by the Plans.

417.   Defendant earned substantial fees and profits as a result of acting in its own self-interest.

418.   By employing an investment strategy that was highly risky to the Plans for its own benefit, Defendant breached the fiduciary duty of loyalty under ERISA §404(a)(1).

419.   Defendant is liable under ERISA §409, for its breaches of both the duty of care and duty of loyalty.  Section 409 provides:

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have

been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

420.    Defendant's breaches of the fiduciary duties of both care and loyalty caused losses to the Plan and the Class Plans when Lehman defaulted on the Investments and failed to make payments required under the terms of the notes.

421.    Defendant is liable under ERISA §502(a)(2) to restore to the Plans all losses due to Defendant's breaches of its fiduciary duties of both care and loyalty, as well as any profits that would have been earned by the Plans had the Collateral been prudently invested.

422.    The Plans face significant, irreparable harm if Defendant is permitted to continue to violate duties owed to the Plans.

423.    Further, the Plans are entitled to a declaration that Defendant's attempt to collect Collateral losses from the Plan, after losing the Plans' Collateral by its imprudent conduct in violation of Defendant's fiduciary duties is improper and the Plans are not required to fund the Collateral losses.

## VII.   SECOND CAUSE OF ACTION: VIOLATION OF ERISA §406 (29 U.S.C. §1106)

424.    Plaintiff repeats and realleges the allegations contained in paragraphs 1-402 as if fully set forth herein.

425.    The Collateral Investments in Lehman, both through the Cash Collateral Fund and directly, were Plan assets.

426.    At all relevant times, Defendant acted as a fiduciary concerning the Investments within the meaning of ERISA §3(21)(A) (29 U.S.C. §1002(21)(A)) by exercising authority or control concerning the management or disposition of these Plan assets.

427.    Defendant engaged in transactions and dealt with these Plan assets.  These dealings were in Defendant's own interest or for its own account, in two distinct ways, each of which violates ERISA §406.

428.    First, the transactions were in Defendant's interest in that Defendant imprudently invested the Collateral in risky Lehman Notes in order to earn excessive profits without any risk of loss for its own financial benefit and at the expense of the Plan.  By investing in risky investments like the Lehman Notes, Defendant increased its potential return as higher risk investments have a higher potential return.  Because Defendant did not share the risk of loss, which was borne solely by the Plan and the Class Plans, it took this gamble at the expense of the Plan and the Class Plans.  These imprudent investments were in Defendant's direct interest and for its direct benefit in that it received a share of any gains from the Investments.

429.    Second, the transactions were in Defendant's interest in that Defendant maintained the Collateral investments in the Lehman Notes as a means to support Lehman's liquidity in order to give itself the time and ability to reduce its own Lehman exposure.  As alleged above, Lehman was under significant financial stress throughout the Class Period.  By supporting Lehman through investment of the Collateral in the Lehman Notes, Defendant was able to keep Lehman afloat while liquidating its own investment in Lehman in its direct interest and for its direct benefit.  Although Defendant directly benefitted from these actions, they were at the expense of the Plan and the Class Plans.

430.     Consequently, Defendant's investments of the Plans' Collateral in Lehman Notes were prohibited transactions which violated ERISA §406.[105]

431.     By the acts, transactions and courses of conduct alleged herein, Defendant caused losses to the Plans when the Lehman Notes defaulted.

432.     Under ERISA §502(a)(2), Defendant is required to pay damages to the Plans.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, in Plaintiff's favor and in favor of the Class and against Defendant as follows:

(a)     Declaring that this action is properly maintainable as a class action, and certifying Plaintiff as class representative and Plaintiff's counsel as class counsel;

(b)     Declaring that Defendant's conduct complained of herein was in violation of Defendant's fiduciary duties;

(c)     Declaring that Defendant has engaged in prohibited transactions in violation of §406 of ERISA;

(d)     Declaring that Defendant's demand to collect Collateral losses from the Plan, is improper and the Plans are not required to fund the Collateral losses

(e)     Issuing an order, pursuant to ERISA §§409(a) and 502(a)(2), compelling disgorgement and/or restitution and all other remedial relief as the Court may deem appropriate;

(f)     Issuing an order enjoining Defendant from any further violations of its fiduciary obligations;

---

[105]     Plaintiff does not allege that the collateral Defendant obtained in its capacity as a clearing bank is a Plan asset or that it was acting in a fiduciary capacity when it made demands relating to that collateral.

(g)    Ordering Defendant to pay the Plans such damages as the Plans sustained as a result of Defendant's misconduct, including losses and lost profits and damages based on the profits Defendant earned from its improper investment of the Collateral;

(h)    Ordering an accounting;

(i)    Imposing a constructive trust, in favor of the Plans, upon any amounts by which Defendant was unjustly enriched at the expense of the Plans as a result of Defendant's breaches of fiduciary obligations and wrongful conduct;

(j)    Awarding attorney's fees pursuant to §502(g) of ERISA (29 U.S.C. §1132(g)) and/or the Common Fund Doctrine; and

(k)    Granting such other and further relief as this Court may deem just and proper.


DATED:  June 28, 2012                ROBBINS GELLER RUDMAN
                                     & DOWD, LLP


                                     STEPHEN R. ASTLEY
                                     STEPHEN R. ASTLEY (*pro hac vice*)
                                     SABRINA E. TIRABASSI (*pro hac vice*)
                                     JESSE S. JOHNSON (*pro hac vice*)
                                     SHERI M. COVERMAN (*pro hac vice*)
                                     120 East Palmetto Park Road, Suite 500
                                     Boca Raton, FL  33432
                                     Telephone:  561/750-3000
                                     561/750-3364 (fax)
                                     sastley@rgrdlaw.com
                                     stirabassi@rgrdlaw.com
                                     jjohnson@rgrdlaw.com
                                     scoverman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  &amp; DOWD, LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

IZARD NOBEL, LLP
ROBERT A. IZARD (*pro hac vice*)
SETH KLEIN (*pro hac vice*)
29 South Main Street, Suite 215
West Hartford, CT  06107
Telephone:  860/493-6292
860/493-6290 (fax)

***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I, Stephen R. Astley, hereby certify that, on June 28, 2012, I caused a true and correct copy of the attached Third Amended Class Action Complaint to be: (i) filed by hand with the Clerk of the Court; and (ii) served by electronic mail to:

PAUL WEISS RIFKIND
WHARTON & GARRISON, LLP
Lewis R. Clayton
Jonathan H. Hurwitz
Samuel E. Bonderoff
1285 Avenue of the Americas
New York, New York 10019-6064

STEPHEN R. ASTLEY

# EXHIBIT A

# JPMorgan ⬡

SECURITIES LENDING AGREEMENT ("Lending Agreement"), dated as of November 1, 2005, between Operating Engineers Pension Trust ("Lender"), having its principal place of business at 100 East Corson Street, Pasadena, CA 91103, and JPMorgan Chase Bank, National Association ("Lending Agent"), having a principal place of business at 270 Park Avenue, New York, New York 10017-2070.

WHEREAS: Lending Agent has established a securities lending program, pursuant to which Agent serves as agent for purposes of lending the securities of its custody customers and of certain other lending clients which hold securities with third party custodians; and

WHEREAS: Lender desires to appoint Lending Agent as its agent for the purpose of lending securities held by Lender from time to time in one or more securities accounts with Amalgamated Bank ("Custodian"), as its custodian, and Lending Agent desires to act as such agent for Lender in accordance with the terms of this Lending Agreement.

NOW THEREFORE, it is hereby agreed as follows:

Section 1 - Definitions

Unless the context clearly requires otherwise, the following words shall have the meanings set forth below when used herein:

a) "Account(s)" shall mean the securities account(s) established and maintained by Custodian on behalf of Lender pursuant to a separate agreement ("Agreement for Custody"), between Custodian and Lender, which provides, inter alia, for the safekeeping of Securities received by Custodian from time to time on behalf of Lender.

b) "Affiliate" shall mean an entity controlling, controlled by, or under common control with, the applicable party or Custodian, as the case may be.

c) "Agreement for Custody" shall have the meaning assigned in the definition of Account.

d) "Authorized Investment" shall mean any type of instrument, security, participation or other property in which Cash Collateral may be invested or reinvested, as described in Section 5(e) hereof and Appendix 1 hereto (and as such Appendix may be amended from time to time by written agreement of the parties).

e) "Authorized Person" shall mean with respect to: (a) Lender, except to the extent that Lending Agent is advised to the contrary by Proper Instruction, any person who is authorized by Lender to give instructions to Lending Agent pursuant to Schedule 1 hereto and any mandates given to Lending Agent hereunder. An Authorized Person shall continue to be so until such time as Lending Agent receives Proper Instructions that any such person is no longer an Authorized Person.

f) "Borrower" shall mean an entity listed on Appendix 2 hereto other than any entity which Lending Agent shall have been instructed to delete from such list pursuant to Written Instructions and as such Appendix may be amended in accordance with Section 4(b) hereof.

g) "Business Day" shall have the meaning assigned in the applicable MSLA, including any applicable Addendum or Exhibit thereto and shall, include, as applicable, a New York Business Day and a Foreign Business Day.

h)   "Cash Collateral" shall mean fed funds and such U.S. and non-U.S. currencies as may be pledged by a Borrower in connection with a particular Loan.

i)   "Collateral" shall mean the types of collateral acceptable to Lender as set forth in Appendix 3 hereto, together with Cash Collateral.

j)   "Collateral Account" shall mean, as the case may be, an account maintained by Lending Agent with itself, with any Depository or with any Triparty Institution and designated as a Collateral Account for the purpose of holding any one or more of Collateral, Authorized Investments, and Proceeds in connection with Loans hereunder.

k)   "Collateral Amount" shall have the meaning assigned in Section 5(c) hereof.

l)   "Collateral Requirement" shall have the meaning assigned in Section 5(c) hereof.

m)   "Custodian" shall have the meaning assigned in Section 1(a) hereof.

n)   "Depository" shall mean: (i) The Depository Trust Company, and any other securities depository or clearing agency (and each of their respective successors and nominees) registered with the U.S. Securities and Exchange Commission or registered with or regulated by the applicable foreign equivalent thereof or otherwise able to act as a securities depository or clearing agency, (ii) any transnational depository, (iii) the Federal Reserve book-entry system for the receiving and delivering of U.S. Government Securities, and (iv) any other national system for the central handling of that country's government securities.

o)   "Distributions" shall have the meaning assigned in Section 3(b)(v) hereof.

p)   "Dollars" shall have the meaning assigned in Section 5(c) hereof.

q)   "Event of Default" shall have the meaning assigned in Section 5(f)(i) hereof.

r)   "Letter of Credit", to the extent acceptable to Lender as Collateral in accordance with Appendix 3 hereto, shall have the meaning assigned thereto in the applicable MSLA and be issued by a bank listed on Appendix 4 hereto (as such list may be amended by Lending Agent from time to time on notice to Lender to add one or more banks), other than a bank deleted from such list pursuant to Written Instruction or by Lending Agent; provided that, a Letter of Credit securing a given Loan shall not be issued by the Borrower or an Affiliate of the Borrower.

s)   "Loan" shall mean a loan of Securities hereunder and under the applicable MSLA.

t)   "Loan Fee" shall mean the amount payable by a Borrower to Lending Agent pursuant to the applicable MSLA in connection with Loans collateralized other than by Cash Collateral.

u)   "Losses" shall have the meaning assigned in Section 7(a)(i) hereof.

v)   "Market Value" shall have the meaning assigned in Section 7(c)(iii) hereof.

w)   "MSLA" shall mean a master securities lending agreement or securities borrowing agreement between Lending Agent and a Borrower, pursuant to which Lending Agent lends securities on behalf of its customers (including Lender) from time to time. A copy of Lending Agent's standard forms of MSLA, including (as applicable) the international addendum thereto, are annexed (i) as Appendix 5A in the case of borrowers located in the United States, and (ii) as Appendix 5B in the case of borrowers located outside the United States. (The location of each Borrower is indicated in Appendix 2.)

x) "Non-U.S. Securities" shall mean Securities other than "U.S. Securities" as defined below, and shall include Global Depositary Receipts.

y) "Operating Agreement" shall have the meaning assigned in Section 2(b) hereof.

z) "Oral Instructions" shall have the meaning assigned in Section 10 hereof.

aa) "Proceeds" shall mean interest, dividends and other payments and Distributions received by Lending Agent in connection with Authorized Investments.

bb) "Proper Instructions" shall mean Oral Instructions and Written Instructions.

cc) "PTE-99-34" shall mean Department of Labor Prohibited Transaction Exemption 1999-34, as granted to Bank on August 25, 1999.

dd) "PTE-02-30" shall mean Department of Labor Prohibited Transaction Exemption 2002-30, as granted to EquiLend Holdings LLC on June 3, 2002.

ee) "Rebate" shall mean the amount payable by Lending Agent on behalf of Lender to a Borrower in connection with Loans collateralized by Cash Collateral, which shall be a percentage of the Cash Collateral as agreed by the Borrower and Lending Agent.

ff) "Return Date" shall have the meaning assigned in Section 7(c)(i) hereof.

gg) "Securities" shall mean government securities (including U.S. Government Securities), equity securities, bonds, debentures, other corporate debt securities, notes, mortgages or other obligations, and any certificates, warrants or other instruments representing rights to receive, purchase, or subscribe for the same, or evidencing or representing any other rights or interests therein and held pursuant to the Agreement for Custody.

hh) "Term Loan" shall have the meaning assigned in Section 5(h) hereof.

ii) "Triparty Institution" shall mean a financial institution with which Lending Agent shall have previously entered a triparty agreement among itself, such Triparty Institution and a particular Borrower providing, among other things, for the holding of Collateral in a Collateral Account at such Triparty Institution in Lending Agent's name on behalf of Lending Agent's lending customers and for the substitution of Collateral; provided, however, that any substituted Collateral shall meet the then standards for acceptable Collateral set by Lending Agent.

jj) "U.S. Government Securities" shall mean book-entry securities issued by the U.S. Treasury (as defined in Subpart 0 of Treasury Department Circular No. 300 and any successor provisions) and any other securities issued or fully guaranteed by the United States government or any agency, instrumentality or establishment of the U.S. government, including, without limitation, securities commonly known as "Ginnie Maes," "Sally Maes," "Fannie Maes" and "Freddie Macs".

kk) "U.S. Securities" shall mean Securities issued by an issuer that is organized under the laws of the United States or any State thereof or that are otherwise traded in the United States, and shall include American Depositary Receipts.

ll) "Written Instructions" shall have the meaning assigned in Section 10 hereof.

Section 2 - Appointment. Authority

348039:v1                                    3

06-23-2009   03:03pm   From-LUCH LLP                    626 449 1882        T-870   P.013/035   F-819

(a) <u>Appointment</u>.  Lender hereby appoints Lending Agent as its agent to lend Securities in the Accounts on Lender's behalf on a fully disclosed basis to Borrowers from time to time in accordance with the terms hereof and on such terms and conditions and at such times as Lending Agent shall determine and Lending Agent may exercise all rights and powers provided under any MSLA as may be incidental thereto, and Lending Agent hereby accepts appointment as such agent and agrees to so act. Bank may delegate the performance of one or more duties assigned to it in this Lending Agreement to its Affiliate, Bank One Trust Company, N.A. ("BOTC"), but in such event Bank shall be liable to Lender for the performance by BOTC of each such delegated duty to the same extent as if Bank had performed such duty itself.

(b) <u>Direction to Custodian</u>.  In connection with the appointment of Lending Agent, Lender hereby agrees that it shall direct Custodian, whether pursuant to the operating agreement which lender, Lending Agent and Custodian shall execute on or after the date hereof ("Operating Agreement") or otherwise to: (1) provide Lending Agent with a report of Securities that are available for Loan and such other reports as Lending Agent may reasonably request from time to time in connection with the performance of its duties hereunder ; (2) provide Lending Agent with any password or software reasonably necessary for the delivery of such report and other information that may be reasonably necessary for Lending Agent to perform hereunder and under the Operating Agreement; and (3) accept the direction of Lending Agent with respect to those matters to be performed by Lending Agent under this Lending Agreement and the Operating Agreement that require the action/cooperation of Custodian; and (iv) afford to Lending Agent such rights with respect to the Accounts (including but not limited to granting to Lending Agent a power of attorney or such other document to authorize Lending Agent to issue instructions with respect to such Accounts) as Lending Agent may reasonably require to perform hereunder.  In respect of the foregoing, Lending Agent shall only transfer Securities to and from the Accounts in accordance with the terms hereof.

(c) <u>Conflict</u>.  In the event of any conflict or inconsistency between the Operating Agreement and the terms of this Lending Agreement, as between Lender and Lending Agent this Lending Agreement shall govern.

(d) <u>Cut-off times</u>.  When giving lending Instructions to Custodian, Lending Agent shall use reasonable efforts to adhere to the transaction cut off times as set out in the Operating Agreement.

(e) <u>Authority; Conflicts of Interest</u>.  Lender hereby authorizes and empowers Lending Agent to execute in Lender's name and on its behalf and at its risk all agreements and documents as may be necessary to carry out any of the powers herein granted to Lending Agent and, in that regard, Lender shall direct Custodian to afford such reasonable cooperation to Lending Agent as Lending Agent may request.  Lender grants Lending Agent the authority set forth herein notwithstanding its awareness that Lending Agent: (1) in its individual capacity or acting in a fiduciary capacity for other accounts, may have transactions with the same institutions to which Lending Agent may be lending Securities hereunder, which transactions may give rise to actual or potential conflict of interest situations; and (2) may use EquiLend, a securities lending platform in which Lending Agent has an equity interest (and therefore a financial interest in its success), to transact certain Loans with Borrowers that are EquiLend participants (it being understood that EquiLend will neither act as principal in, nor guarantee, any such Loan).  (A description of EquiLend, soliciting your consent to Bank's participation in EquiLend on your behalf, is annexed as Exhibit 1 hereto.)  Bank shall not be bound to: (i) account to Lender, to the maximum extent permitted under the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder, for any sum received or profit made by Bank for its own account or the account of any other person or (ii) disclose or refuse to disclose any information or take any other action if the same would or might in Lending Agent's judgment, made in good faith, constitute a breach of any law or regulation or be otherwise actionable with respect to Lending Agent; provided that, in circumstances mentioned in (ii) above, Lending Agent shall promptly inform Lender of the relevant facts (except where doing so would, or might in Lending Agent's judgment, made in good faith, constitute a breach of any law or regulation or be otherwise actionable as aforesaid).

<u>Section 3 - Representations and Warranties</u>

348039;v1                                        4

(a) Representations of each party. Each party hereto represents and warrants to the other that: (i) it has the power to execute and deliver this Lending Agreement, to enter into the transactions contemplated hereby, and to perform its obligations hereunder; (ii) it has taken all necessary action to authorize such execution, delivery, and performance; (iii) this Lending Agreement constitutes a legal, valid, and binding obligation enforceable against it; and (iv) the execution, delivery, and performance by it of this Lending Agreement shall at all times comply with all applicable laws and regulations.

(b) Representations of Lender. Lender represents and warrants to Lending Agent that: (i) this Lending Agreement is, and each Loan shall be, legally and validly entered into, and does not and shall not violate any statute, regulation, rule, order or judgment binding on Lender, or any provision of Lender's charter or by-laws, or any agreement binding on Lender or affecting its property; (ii) the person executing this Lending Agreement and all Authorized Persons acting on behalf of Lender has and have been duly and properly authorized to do so; (iii) it is lending Securities as principal and shall not transfer, assign or encumber its interest in, or rights with respect to, any Securities available for Loan hereunder; (iv) it is the beneficial owner of all Securities or otherwise has the right to lend Securities; (v) it is entitled to receive all interest, dividends and other distributions (including, but not limited to, payments made by the depositary in connection with American Depositary Receipts and Global Depositary Receipts ) ("Distributions") made by the issuer with respect thereto; (vi) it is a "qualified investor" within the meaning of Section 3(a)(54) of the Securities Exchange Act of 1934, as amended; (vii) this Lending Agreement has been executed by a plan fiduciary independent of Lending Agent, Custodian and their respective Affiliates (the "Independent Fiduciary") who, by execution of this Lending Agreement, hereby authorizes payment by Lender of Lending Agent's Fee (as defined in Section 8 hereof) and the Custodian's Fee (as defined in Section 8 hereof), which authorization may be terminated by the Independent Fiduciary within five business days; and (viii) no Borrower or any of their Affiliates has discretionary authority or control with respect to the investment of the securities that are subject to this agreement or renders investment advice (within the meaning of 29 CFR 2510.3-21) with respect to such securities. Lender shall promptly identify to Lending Agent by notice, which notice may be oral, any Securities that are no longer subject to the representations contained in (b).

(c) Representations of Lender in respect of the MSLAs. Lender further represents and warrants to Lending Agent that the representations and warranties to be given by Lending Agent on Lender's behalf as set out in the MSLAs are true and will continue to be true at all times until termination of Lending Agent's authority to act as Lender's agent as provided in this Lending Agreement.

Section 4 - Borrowers

(a) MSLA. Lender hereby acknowledges receipt of the forms of MSLA and authorizes Lending Agent to lend Securities in the Account to Borrowers thereunder pursuant to an agreement substantially in the form thereof; it being understood and agreed, however, that Lending Agent may modify the MSLA without Lender's consent to comply with law or regulation.

(b) Borrowers. Securities may be lent to any Borrower listed in Appendix 2, as such Appendix may be updated from time to time to add new Borrowers and to delete entities that have ceased to be potential Borrowers. Lending Agent shall provide Lender with notice of each addition of a Borrower to such list. If Lender notifies Lending Agent in writing within five Business Days from the date of any such notice that it objects to a potential Borrower, no Loans of Securities shall be made to such potential Borrower. If Lender does not so object within such five Business Day period, each potential Borrower notified to Lender by Lending Agent shall be deemed acceptable to Lender.

Section 5 - Loans

(a) Securities to be lent. Lending opportunities. Loan initiation. All Securities of Lender held by Lending Agent that are issued, settled or traded in the markets that have been approved by Lending Agent from time to time for purposes of Lending Agent's discretionary securities lending program shall be subject to the terms hereof. Lending Agent shall seek to assure that Lender receives a fair allocation of lending opportunities

vis-à-vis other lenders, taking into account the demand for and availability of Securities, types of Collateral, eligibility of Borrowers, limitations on investments of Cash Collateral, tax treatment, and similar commercial factors. From time to time, Lending Agent may lend to Borrowers Securities held in the Account (except Securities that Lender has notified to Lending Agent are unavailable or Securities that are no longer subject to the representations set forth in Section 3) and shall deliver such Securities against receipt of Collateral in accordance with the applicable MSLA. Lending Agent shall have the right to decline to make any Loans to any Borrower and to discontinue lending to any Borrower in its sole discretion and without notice to Lender. With respect to Loans of U.S. Securities, at the inception of a Loan Lending Agent shall advise Custodian of the Loan, accept delivery of such Securities from Custodian and then transmit the same to Borrower. With respect to Loans of non-U.S. Securities, Lending Agent shall instruct Custodian to deliver the same directly to the Borrower thereof or, with respect to certain types of non-U.S. Securities as the same shall be identified in writing by Lending Agent to Lender and Custodian from time to time, instruct Custodian to make such other arrangements as the parties may agree in writing from time to time.

(b) Receipt of Collateral. Collateral substitution. For each Loan, Lending Agent shall receive and hold Letters of Credit received as Collateral and Lending Agent or a Triparty Institution shall receive and hold all other Collateral required by the applicable MSLA in a Collateral Account, and Lending Agent is hereby authorized and directed, without obtaining any further approval from Lender, to invest and reinvest all or substantially all Cash Collateral. A given Loan may be collateralized by more than one type of Collateral. Lending Agent shall credit, or where applicable shall have a Triparty Institution credit, all Collateral, Authorized Investments and Proceeds to a Collateral Account and Lending Agent shall mark its books and records to identify Lender's interest therein, it being understood, however, that all monies credited to a Collateral Account may for purposes of investment be commingled with cash collateral held for other lenders of securities on whose behalf Lending Agent may act. Lending Agent may, in its sole discretion, liquidate any Authorized Investment and credit the net proceeds to a Collateral Account. Lending Agent shall accept substitutions of Collateral in accordance with the applicable MSLA, and shall credit, or where applicable shall have a Triparty Institution credit, all such substitutions to a Collateral Account. With respect to non-U.S. Securities: (a) at the inception of a Loan, Lending Agent shall advise Custodian of Lending Agent's receipt of the applicable Collateral (which advice shall authorize Custodian to deliver the Securities to be lent to the Borrower); provided that, with respect to non-U.S. Securities, if any, as to which Custodian receives Collateral directly, no such notice from Lending Agent need be given.

(c) Mark to market procedures. (i) Lending Agent shall require initial Collateral for a Loan in an amount determined by applying the then applicable "Collateral Requirement" (as defined below) to the Market Value of the Security that is the subject of the Loan together with, in the case of fixed income Securities, any accrued but unpaid interest thereon. The "Collateral Requirement" with respect to a given Security shall be an amount equal to the then applicable percentage (currently 102% where securities and the collateral therefor are denominated in the same currency, and 105% for all other securities) of the Market Value of the Security which is the subject of a Loan as determined as of the close of trading on the preceding Business Day.

(ii)(A) With respect to each Loan of Securities denominated in U.S. dollars ("Dollars") or where the Securities on Loan and the Collateral therefor are denominated in the same currency if, and only if, the Market Value of the Collateral held by Lending Agent on behalf of Lender for such Loan on any Business Day is less than the Market Value of the Securities which are the subject of such Loan (together with accrued but unpaid interest in the case of fixed income Securities), Lending Agent shall demand on behalf of Lender that the Borrower, deliver additional Collateral in accordance with the applicable MSLA. Such additional Collateral demanded, together with the Collateral then held by Lending Agent on behalf of Lender for such Loan, shall be not less than the applicable Collateral Requirement. (B) With respect to all other loans of Securities (i.e. where the Security on Loan and the Collateral are in different currencies), if, and only if, the Market Value of the Collateral held in the aggregate for all Loans of a given Security to a given Borrower from all lenders (including Lender) falls below the aggregate amount ("Collateral Amount") determined by applying the applicable Collateral Requirement to all Loans of such Security (together with accrued but unpaid interest in the case of fixed income Securities), then Lending Agent shall demand on behalf of Lender that Borrower deliver additional Collateral in accordance with the applicable MSLA so as to meet the Collateral Amount. In respect of these Sections

06-23-2009   03:03pm   From-LUCH LLP                           626 449 1882          T-970   P.016/035   F-819

5(c)(ii)(A) and (B), additional Collateral shall not be demanded to the extent that a Collateral shortfall is on account of a diminution in the Market Value of Authorized Investments.

(iii) Where market convention does not permit marking to at least the amounts indicated above, the foregoing procedures shall to that extent not apply and marking shall be in accordance with such convention. As of the date hereof, the only conventions requiring such a deviation are that: (x) with respect to Securities such as U.S. Treasury strips and bills and agency discount notes, where the market functions so as to not allow for the sale of such Securities at greater than par, the Collateral Requirement shall equal the lesser of 100% of the par value of the Security or 102% of its Market Value; and (y) the Collateral Requirement for Loans of Japanese Government Securities made against Yen-denominated Collateral is 100%.  Lending Agent shall advise Lender of any other such deviations.  The Market Value of certain Securities (including, without limitation, U.S. Government Securities), whether on Loan or received as Collateral, may be determined on a same day basis by reference to recognized pricing services.

(iv) Lending Agent may from time to time establish de minimis guidelines with respect to Collateral pursuant to which a mark would not be made even where otherwise required hereunder.

(v) At the termination of a Loan of non-U.S. Securities, Lending Agent shall not release Collateral back to the Borrower until after having been notified by Custodian that the Securities on Loan have been returned; provided that, with respect to non-U.S. Securities, if any, as to which Lending Agent receives the Securities on Loan directly, no such notice by Custodian need be given.

(d) Changes in procedures applicable to Collateral.  The Collateral procedures set forth in Sections 5(b)-(c) above reflect Lending Agent's current practice and may be changed by Lending Agent from time to time based on general market conditions (including volatility of Securities on Loan and of securities Collateral), the Market Value of Securities on Loan to a given Borrower, and in accordance with general market practice and regulatory requirements.  Lending Agent shall notify Lender of material revisions to the foregoing procedures.

(e) Investment of Cash Collateral.  (i) Lending Agent is hereby authorized to invest and reinvest Cash Collateral in accordance with the investment guidelines annexed hereto as Appendix 1.   (ii) Authorized Investments are made for the account of, and at the sole risk of, Lender.  In that connection, Lender shall pay to Lending Agent on demand in cash an amount equal to any deficiency in the amount of Collateral available for return to a Borrower pursuant to the applicable MSLA.  Lending Agent is authorized to select brokers and dealers for the execution of trades in connection with the investment and reinvestment of Cash Collateral, which broker or dealer may be an Affiliate of Lending Agent provided that a competitive execution price is obtained.

(f)      Distributions and Voting Rights.

(i)  Lending Agent shall pay to Custodian on payable date for the benefit of Lender the amount of all cash Distributions (but for purposes of this Section 5(f) and of Section 7(b) hereof, the term "cash Distributions" shall not include any principal payment, whether paid upon the maturity of any debt Security or prior to its maturity) with respect to Securities on Loan over their record date, as provided in Exhibit 1 hereto, had such Securities not been on Loan over record date; provided, that with respect to Non-U.S. Securities, Lending Agent's obligation to credit the Account shall extend only to record dates (and Distributions made during the period of the relevant Loan) up to and including the date of any "Event of Default" (as defined in the applicable MSLA).  To the extent that cash Distributions are not delivered to Lending Agent by Borrower and Lending Agent has so credited the Account with such Distributions, Lending Agent shall be subrogated to Lender's rights against Borrower as provided in Section 7(d).  In connection with the foregoing, Lender shall promptly return any amount so credited upon oral or written notification from Lending Agent that such amount (a) has not been paid by the issuer of the Securities or the paying agent therefor (as applicable) in the ordinary course of business, (b) was incorrectly credited or (c) was not received from Custodian (in those cases, if any, where the same was to be received by Lending Agent from Custodian).  If Lender does not promptly return any amount upon such notification, Lending Agent shall be entitled, upon oral or written notification to Lender of the amount in question, to instruct Custodian to debit any such amount from the affected Account(s)

and remit the same to Lending Agent and Lender hereby agrees that it shall, promptly upon the execution of this Lending Agreement, issue a standing instruction to Custodian to accept any such duly authorized instructions from Lending Agent. In the event that Custodian fails to so deliver any such amount, until such time as Lending Agent has recovered the full amount of the same, Lending Agent (regardless of anything that may be provided to the contrary in Section 8 hereof) shall have the right to retain a fee equal to 100% of the earnings and Loan Fees on Loans made by the affected Account(s) as an offset against such amounts.

(ii)   (A)   Any non-cash Distribution which is in the nature of a stock split or a stock dividend shall be added to the existing Loan to which such dividend relates as of the date such non-cash Distribution is payable and shall be subject to the provisions hereof and the applicable MSLA.  (B)   Any non-cash Distribution which is in the nature of warrants or rights to purchase shares made with respect to any Securities on Loan shall be deemed to be a new Loan made by Lender to Borrower (and shall be considered to constitute Securities on Loan) as of the date such non-cash Distribution is payable and shall be subject to the provisions hereof; provided that Lender may, by giving Lending Agent ten (10) Business Days' notice prior to the date of such non-cash Distribution (or such different amount of time as Lending Agent may from time to time require on advice to Lender), direct Lending Agent to request that the Borrower deliver such non-cash Distribution to Lending Agent pursuant to the applicable MSLA, in which case Lending Agent shall forward such non-cash Distribution to Custodian for credit to the Account.  (C)   If, despite (A) and (B) Lender requests that Lending Agent instruct the Borrower to deliver a non-cash Distribution on its payable date, and Borrower fails so to deliver the non-cash Distribution, the indemnity provisions and corresponding subrogation rights set forth in Section 7 shall apply.  Instructions with respect to voluntary corporate actions on Securities on Loan shall be handled as set forth in the Operating Agreement.  In connection with the foregoing, it is understood and agreed that Lender shall instruct Custodian to pay to Lending Agent sufficient subscription funds in relation to corporate action events instructed by Lender (as and when needed) and that where such funds are received after the applicable Lending Agent cut-off time, Lending Agent shall use reasonable efforts to subscribe on Lender's behalf, but shall have no obligation to advance funds for such purpose.  If, notwithstanding such reasonable efforts Lending Agent is unable to subscribe on Lender's behalf, Lending Agent shall promptly return the subscription funds to Custodian for the Lender's account.

(iii)   During the term of any Loan, Lending Agent shall permit the Securities on Loan to be transferred into the name of and be voted by the Borrower or others.  Lender shall not be entitled to participate in any dividend reinvestment program or to vote proxies with respect to Securities that are eligible for Loan (whether or not actually on Loan) as of the applicable record date for such Securities.

(g)   Advances, overdrafts and indebtedness.  Security Interest.  Lending Agent may, in its sole discretion, advance funds on behalf of Lender in order to pay to Borrowers any Rebates or to return to Borrowers Cash Collateral to which they are entitled pursuant to the applicable MSLA.  Lender shall repay Lending Agent on demand the amount of any advance or any other amount owed by Lender hereunder.  Any such advance shall bear interest at the rate customarily charged by Lending Agent for such advances at the time such advance is made.  In order to secure repayment of any advance or other indebtedness of Lender to Lending Agent arising hereunder, Lending Agent shall have a continuing lien and security interest in and to all assets now or hereafter held in the Account (and Lender shall take such steps as Lending Agent may require to perfect such interest, including directing Custodian to enter into an account control agreement in favor of Lending Agent) and any Collateral Account (to which Lender is entitled hereunder) and any other property at any time held by it for the benefit of Lender or in which Lender may have an interest which is then in Lending Agent's possession or control or in the possession or control of any third party acting on Lending Agent's behalf.  In this regard, Lending Agent shall be entitled to all the rights and remedies of a pledgee under common law and a secured party under the New York Uniform Commercial Code and/or any other applicable laws and/or regulations as then in effect.  (ii)   If, and to the extent, that Lending Agent credits sale proceeds to Custodian for the benefit of Lender, prior to trade settlement where the trade did not settle on account of a failure by a Borrower to return Securities on Loan in time to settle such trade, in addition to, and not in derogation of, any other rights that Lending Agent may then have under this Lending Agreement, Lending Agent need not deliver any such Security to Custodian upon its return by Borrower until such time as Custodian has returned to Lending Agent the amount of such advance.  If Custodian fails to do so within a reasonable time, Lending Agent shall

have the right to liquidate such Security and Lender shall then be liable to Lending Agent for the difference, if any, between the amount of the advance and the liquidation proceeds.

(h) Termination of a Loan. (i) Loans shall generally be terminable on demand. With the prior approval of Lender, however, Loans may be made on the basis of a reasonably anticipated termination date ("Term Loan") and without providing for the right of substitution of equivalent securities. Termination of a Term Loan prior to its anticipated termination date by either Lender or Borrower may result in the terminating party having to pay the non-terminating party damages based on the cost of obtaining a replacement loan. (ii) Lending Agent shall terminate any Loan of Securities to a Borrower as soon as practicable after: (A) receipt by Lending Agent of a notice of termination of the respective MSLA; (B) receipt by Lending Agent of Written Instructions directing it to terminate a Loan; (C) receipt by Lending Agent of Written Instructions instructing it to delete from Appendix 2 the Borrower to which such Loan was made; (D) receipt by Lending Agent of Written Instructions advising that the Security subject to a Loan is no longer subject to the representations contained in Section 3 hereof; (E) receipt by Lending Agent of notice advising that an Event of Default has occurred and is continuing beyond any applicable grace period; (F) whenever Lending Agent, in its sole discretion, elects to terminate such Loan other than a Term Loan; or (G) termination hereof. (iii) Lender acknowledges that: (1) termination hereof may result in the termination of certain Authorized Investments prior to their maturity which, in turn, may result in losses being realized in such Authorized Investments; and (2) any such losses shall be for the account and sole risk of Lender. (iv) In regard to a Loan being terminated, Lending Agent shall instruct the Borrower to return U.S. Securities to Lending Agent, and Lending Agent shall then deliver such Securities to Custodian. With respect to non-U.S. Securities, Lending Agent shall instruct the Borrower to return the same directly to Custodian; provided that, with respect to certain types of non-U.S. Securities as the same shall be identified by Lending Agent to Lender from time to time in writing, Lending Agent shall instruct the Borrower to deliver such Securities in accordance with Lending Agent's instructions.

(i) Sale of a Security on Loan. Lender shall advise Lending Agent of the sale of Securities on Loan no later than the sale date or such earlier date as may be specified in the Operating Agreement. Lending Agent shall not be liable for any failures occurring on a settlement date for sale of Securities if timely notice is not given by Lender as provided in the preceding sentence, and shall not be liable in any event (except as provided in Section 7) for failure of a Borrower to return Securities on Loan in a timely fashion.

(j) Recordkeeping and Reports. Lending Agent shall establish and maintain such records as are reasonably necessary to account for Loans that are made and the income derived therefrom. Lending Agent shall provide Lender with a monthly statement describing the Loans made during the preceding month, the investments made with cash collateral, and the income derived from Loans, during the period covered by such statement. (In connection with the foregoing, Securities constituting Authorized Investments shall be valued based on their amortized cost.) A party shall comply with reasonable requests of the other party for information necessary to the requester's performance of its duties hereunder.

Section 6 - Default by Borrower

(i) Lending Agent may assume (unless it has actual knowledge to the contrary) that any representations made by a Borrower in connection with any Loan are true, that no event which is or may become an Event of Default has occurred and that a Borrower has complied with its obligations under the applicable MSLA. Subject to Sections 5(f)(i)-(ii) and 7(b)-(c) hereof, Lending Agent shall have no responsibility for any breach of any obligation by any Borrower under or in connection with any MSLA or Loan. Lending Agent shall have no responsibility for the accuracy or completeness of any information supplied by any Borrower. Lending Agent shall not be liable as a result of taking or omitting to take any action, provided that Lending Agent shall have carried out its responsibilities hereunder in good faith. (ii) If any Borrower with respect to any Loan effected pursuant hereto and pursuant to the applicable MSLA fails to return any Securities on Loan when due thereunder for reasons other than relating to the solvency of the Borrower, Lending Agent shall take whatever action it deems appropriate in accordance with general market practice and Lending Agent's reasonable judgment, including, but not necessarily limited to, claiming compensation from such Borrower on behalf of Lender in the event a trade executed by Lender fails on account of such Borrower's failure timely to have

returned Securities on Loan or, where Lending Agent deems it necessary, such other action as may be permitted by the applicable MSLA.  (iii) If any Borrower with respect to any Loan effected pursuant hereto and pursuant to the applicable MSLA fails to return any Securities on Loan when due thereunder for reasons relating to the solvency of the Borrower, Lending Agent shall then, in addition to taking whatever action may be required by Section 7(c) hereof, take such action as its deems appropriate in accordance with Lending Agent's reasonable judgment under the applicable MSLA.

Section 7 - Liabilities.  Indemnification

(a)  Liabilities.  (i) Except as provided in Sections 5(f)(i)-(ii) and 7(b)-(c) hereof, Lending Agent shall not be liable for any costs, expenses, damages, losses, liabilities or claims (including attorneys' and accountants' fees) (collectively "Losses") incurred by Lender, except those costs, expenses, damages, liabilities and claims arising out of the negligence, bad faith or willful misconduct of Lending Agent.  Lending Agent shall have no obligation hereunder for Losses which are sustained or incurred by Lender by reason of any action or inaction by any pricing service, any Depository or a Triparty Institution or their respective successors or nominees.  In no event shall Lending Agent be liable for indirect or consequential Losses (including, but not limited to, lost profits and loss of business), arising hereunder or in connection herewith, even if previously informed of the possibility of such damages and regardless of the form of action.

(ii) Except for any costs or expenses incurred by Lending Agent in performing its obligations pursuant to Sections 5(f)(i)-(ii) and 7(b)-(c) hereof and ordinary operating expenses incurred by Lending Agent in providing services hereunder, Lender shall indemnify Lending Agent and hold it harmless from and against any and all Losses which Lending Agent may sustain or incur or which may be asserted against Lending Agent by reason of or as a result of any action taken or omitted by Lending Agent in connection with operating hereunder or under the Operating Agreement or in enforcing Lender's rights under the applicable MSLA, other than those Losses arising out of the negligence, bad faith or willful misconduct of Lending Agent.  The foregoing indemnity shall be a continuing obligation of Lender, its successors and assigns, notwithstanding the termination of any Loans hereunder or of this Lending Agreement.  Lending Agent may issue debit instructions against the Account for any amounts to which it is entitled hereunder, and Lender shall instruct Custodian to accept any such instructions.  Lender shall be entitled to an accounting of all amounts so debited.  Actions taken or omitted in reliance upon Proper Instructions, or upon any information, order, indenture, stock certificate, power of attorney, assignment, affidavit or other instrument reasonably believed by Lending Agent, in good faith, to be genuine or bearing the signature of a person or persons believed, in good faith, to be authorized to sign, countersign or execute the same, shall be conclusively presumed to have been taken or omitted in good faith.

(iii)  Lending Agent shall be entitled to rely on, and may act upon, the advice of reputable professional advisers in relation to matters of law, regulation or market practice (which may be professional advisers of Lender) and that relate to the provision of securities lending services, and shall not be liable to Lender for any action taken or omitted pursuant to such advice.

(iv) Lending Agent shall have no liability for Losses that Lender may suffer or incur, caused by an act of God, fire, flood, civil disturbance, war, terrorism, act of any governmental authority or other act or threat of any authority (de jure or de facto), legal constraint, malfunction of equipment or software (except to the extent such malfunction is primarily attributable to Lending Agent's negligence in maintaining the equipment or software), failure of or the effect of rules or operations of any external funds transfer system, inability to obtain or interruption of external communications facilities, inability to access collateral held at a Tri-Party Institution or Depository or any cause beyond the reasonable control of Lending Agent.

(b)  Indemnification of Lender in respect of Distributions.  If the Borrower in respect of any Loan effected pursuant hereto and pursuant to the applicable MSLA fails to deliver any non-cash Distributions with respect to Securities on Loan as and when requested to do so by Lending Agent as provided in Section 5(f)(ii)(C) hereof, Lending Agent shall with respect to: (x) U.S. Securities at its option, credit such non-cash Distribution or an amount equivalent thereto to the Account on the date it is due, and (y) Non-U.S. Securities, for any non-cash Distributions made during the period of the relevant Loan (up to and including the date of any Event of

Default) or for any non-cash Distributions for which the record date occurs on or before the date of any Event of Default, Lending Agent shall, at its option, either (i) purchase for the Account replacement securities (of an equal amount of the same issue, class, type or series as the Distribution) on the principal market in which such securities are traded or (ii) credit the Account with the Market Value in Dollars of such Distributions on the due date as determined by Lending Agent in good faith. The foregoing shall, subject to Sections 7(c)(iii) and 7(d) hereof, be at Lending Agent's expense.

(c) Indemnification of Lender in respect of Securities.

(i) U.S. Securities. If the Borrower in respect of any Loan of U.S. Securities effected pursuant hereto and pursuant to the applicable MSLA fails to return any Securities on Loan to Lending Agent for the Account when due thereunder, which is the date an Event of Default shall have occurred under the applicable MSLA (the "Return Date"), then Lending Agent shall, at its expense, but subject to Sections 7(c)(iii) and 7(d) hereof, deposit replacement Securities of the same issue, type, class and series to the Account, as soon as practicable. If Lending Agent is unable to obtain replacement Securities, Lending Agent shall, at its expense, but subject to Sections 7(c)(iii), 7(d) and 11 hereof, credit the Account in Dollars with the Market Value of such Securities on Loan on the credit date.

(ii) Non-U.S. Securities. If the Borrower in respect of any Loan of Non-U.S. Securities effected pursuant hereto and pursuant to the applicable MSLA fails to return any such Securities on Loan to Lending Agent for the Account on the Return Date, Lending Agent shall, at Lending Agent's sole election and at its expense, but subject to Sections 7(c)(iii), 7(d) and 11 hereof and to Lending Agent not being responsible to compensate Lender for any increase in the Market Value of such Non-U.S. Securities after the Return Date, as soon as practicable, either (x) deposit replacement Securities of the same issue, type, class and series to the Account as the Securities on Loan up to the Market Value of such Securities determined as of the Return Date or (y) credit the Account, in Dollars, with the Market Value of the Securities on Loan determined as of the Return Date.

(iii) Market Value; Loss in Value of Cash Collateral Investments and Letters of Credit. In connection with Sections 7(b) and 7(c)(i)-(ii) above, "Market Value" shall: (y) be determined by Lending Agent in accordance with the applicable MSLA, including the computation of Dollar equivalents where Securities on Loan and/or Collateral (and Proceeds) are denominated in a currency other than Dollars; and (z) in the case of fixed income Securities, include any accrued but unpaid interest thereon. If the Market Value of Authorized Investments on a credit date or a Return Date is less than that which is required to purchase replacement securities (and non-cash Distributions) or to credit the Account with the Market Value in Dollars of the Securities on Loan (and non-cash Distributions) as a result of a decrease in the Market Value of such Authorized Investments, Lending Agent shall not be responsible for that decrease and shall deposit replacement securities or credit the Account, with the Market Value of such Securities on Loan only to an amount net of the decrease in Market Value of Authorized Investments. With respect to and to the extent that a Loan is made against Letter of Credit Collateral, in the event of a default by both the issuer of the Letter of Credit and the Borrower, Lending Agent shall not be responsible for any resulting decrease in the Market Value of such Letter of Credit Collateral or have any obligation to either contribute to or otherwise provide for any resulting Collateral deficiency.

(d) Subrogation. If Lending Agent makes a payment or a purchase pursuant to Sections 5(f), 7(b) or 7(c) Lending Agent shall, to the extent of such payment or purchase, be subrogated to, and Lender shall assign and be deemed to have assigned to Lending Agent, all of its rights in, to and against the Borrower (and any guarantor thereof) in respect of such Loan, any Collateral pledged by the Borrower in respect of such Loan (including any Letters of Credit and the issuers thereof), and all proceeds of such Collateral. In the event that Lender receives or is credited with any payment, benefit or value from or on behalf of the Borrower in respect of rights to which Lending Agent is subrogated as provided herein, Lender shall promptly remit or pay to Lending Agent the same (or its Dollar equivalent).

Section 8. - Lending Agent/Custodian Compensation.

348039:v1                                      11

(i) In connection with each Loan hereunder, Lender hereby authorizes Lending Agent to retain a fee equal to: (A) 30% of earnings (less any Rebate paid by Lending Agent to a Borrower) derived from Authorized Investments in connection with Loans of U.S. Securities collateralized by cash; (B) 40% of earnings (less any Rebate paid by Lending Agent to a Borrower) derived from Authorized Investments in connection with Loans of Non-U.S. Securities collateralized by cash; (C) 30% of any Loan Fee paid or payable by the Borrower in connection with Loans of U.S. Securities not collateralized by cash; and (D) 40% of any Loan Fee paid or payable by the Borrower in connection with Loans of Non-U.S. Securities not collateralized by cash.  (ii) In connection with each Loan hereunder, Lender hereby authorizes Lending Agent to pay to Custodian on Lender's behalf a fee equal to: (A) 10% of earnings (less any Rebate paid by Lending Agent to a Borrower) derived from Authorized Investments in connection with Loans of U.S. Securities collateralized by cash; (B) 10% of earnings (less any Rebate paid by Lending Agent to a Borrower) derived from Authorized Investments in connection with Loans of Non-U.S. Securities collateralized by cash; (C) 10% of any Loan Fee paid or payable by the Borrower in connection with Loans of U.S. Securities not collateralized by cash; and (D)  10% of any Loan Fee paid or payable by the Borrower in connection with Loans of Non-U.S. Securities not collateralized by cash, which fee Lender has agreed to pay to the Custodian as compensation for the additional duties and services which Custodian has agreed to undertake and perform in connection with Lender's participation in the Securities Lending Program.  (iii) The fee payable to Lending Agent for services performed pursuant to Section 5(e) hereof shall be equal to 0% of the amount of the Cash Collateral used to make outstanding Authorized Investments. Fees shall be accrued or charged daily, as appropriate, and shall be payable monthly in arrears.  (iv) Lending Agent may retain its share of earnings under Section 8(i) and its earnings under 8(iii) hereof and shall credit Lender monthly with Lender's share of earnings (i.e., after deduction of Lending Agent's and Custodian's percentages) under Section 8(i) and (ii).

Section 9 - Taxes

(a) Tax Filings.   Lender shall be responsible for all filings, tax returns and reports on any Loans undertaken by Lending Agent on Lender's behalf which are to be made to any authority whether governmental or otherwise and for the payment of all unpaid calls, taxes (including, without limitation, any value added tax), imposts, levies or duties due on any principal or interest, or any other liability or payment arising out of or in connection with any Securities or any Collateral, and insofar as Lending Agent is under any obligation (whether of a governmental nature or otherwise) to pay the same on Lender's behalf, Lender shall instruct Custodian to deliver to Lending Agent sufficient funds in order for Lending Agent to do so and shall indemnify and hold harmless Lending Agent for any such amounts paid by Lending Agent and as to which Custodian fails to make such delivery.

(b) Tax Treatment.   Lender acknowledges that: (i) the tax treatment of the payments made by a Borrower to Lender in lieu of Distributions (including, by way of illustration and not of limitation, with respect to any dividends received deduction and amounts paid by the depositary on American Depositary Receipts and Global Depositary Receipts) may differ from the tax treatment of the Distribution to which such payments relate; and (ii) it has made its own determination as to the tax treatment of any Loan made pursuant hereto, of any in lieu of payments made by a Borrower and of any remuneration and any other amounts that may be received by it hereunder.

Section 10 - Instructions

(a)(i) Written Instructions.  "Written Instructions" shall mean written communications actually received by Lending Agent from an Authorized Person or from a person reasonably believed by Lending Agent to be an Authorized Person by letter, memorandum, telegram, cable, telex, telecopy facsimile, computer, video (CRT) terminal or other on-line system, or any other method reasonably acceptable to Lending Agent and whereby Lending Agent is able to verify with a reasonable degree of certainty the identity of the sender of such communications or which communications are transmitted with proper testing or authentication pursuant to terms and conditions which Lending Agent may specify. (ii) Oral Instructions. "Oral Instructions" shall mean oral communications actually received by Lending Agent from an Authorized Person or from a person

reasonably believed by Lending Agent to be an Authorized Person. Oral Instructions shall promptly thereafter be confirmed in writing by an Authorized Person (which confirmation may bear the facsimile signature of such Person), but Lender shall hold Lending Agent harmless for the failure of an Authorized Person to send such confirmation in writing, the failure of such confirmation to conform to the Oral Instructions received, or Lending Agent's failure to produce such confirmation at any subsequent time. Lender shall be responsible for safeguarding any testkeys, identification codes or other security devices which Lending Agent may make available to Lender or its Authorized Persons. (iii) Unless otherwise agreed, Lending Agent shall deliver lending Instructions to Custodian by SWIFT MT 54 ( x ) series, or, on an exceptional basis, SWIFT MT 599. To the extent that Lending Agent is unable to deliver lending instructions via SWIFT, Lender shall assure that Custodian shall accept lending Instructions via telefax.

(b) Continuing effect of Proper Instructions. Unless otherwise expressly provided, all Proper Instructions shall continue in full force and effect until canceled or superseded.

## Section 11 - Pricing Services

Lending Agent may use any pricing service referred to in an applicable MSLA and any other recognized pricing service (including itself and any of its Affiliates) in order to perform its valuation responsibilities with respect to Securities, Collateral and Authorized Investments, and Lender shall hold Lending Agent harmless from and against any loss or damage suffered or incurred as a result of errors or omissions of any such pricing service.

## Section 12 - Termination

This Lending Agreement may be terminated at any time by either party upon delivery to the other party of notice specifying the date of such termination, which shall be not less than 30 days after the date of receipt of such notice. Notwithstanding any such notice, this Lending Agreement shall continue in full force and effect with respect to all Loans outstanding on the termination date, which Loans shall, however, be terminated as soon as reasonably practicable.

## Section 13 - Miscellaneous

(a) Legal proceedings. Lending Agent may refrain from bringing any legal action or proceeding arising out of or in connection with any Loan until it shall have received such security as it may require for all costs, expenses (including legal fees) and liabilities which it shall or may expend or incur in relation thereto.

(b) Integration. Lending Agreement to Govern. Assignment. This Lending Agreement, together with the Operating Agreement, contains the complete agreement among the parties with respect to the subject matter hereof and supersede and replace any previously made proposals, representations, warranties or agreements with respect thereto by the parties. As between Lender and Lending Agent, in the event of any conflict between this Lending Agreement and the Operating Agreement, this Lending Agreement shall govern. This Lending Agreement shall be binding on each of the parties' successors and assigns, but neither party shall assign its rights and obligations under this Agreement without the prior written consent of the other, which consent shall not be unreasonably withheld.

(c) Notices. Unless expressly provided herein to the contrary, notices hereunder shall be in writing, and delivered by telecopier, overnight express mail, first-class postage prepaid, delivered personally or by receipted courier service. All such notices which are mailed shall be deemed delivered upon receipt. Notices shall be addressed as follows (or to such other address as a party may from time to time designate on notice duly given in accordance with this Section): notices to Lending Agent shall be addressed to it at 4 New York Plaza, New York, New York, 10004, Attention: Global Securities Lending; notices to be given to Lender shall be addressed to it at its offices at:

348039:v1                                13

06-23-2009   03:06pm   From-LUCH LLP                    626 449 1882         T-970   P.023/035   F-819

Operating Engineers Pension Trust
100 East Corson Street
Pasadena, CA 91103
Attention: Leo A. Majich, Fund Manager

(d) Amendments. Waiver.  This Lending Agreement may be modified only by a written amendment signed by both parties, and no waiver of any provision hereof shall be effective unless expressed in a writing signed by the party to be charged.

(e) Governing Law.  Consent to Jurisdiction.  Waiver of Jury Trial.  Waiver of Immunity.  THIS LENDING AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, without regard to the conflict of laws principles thereof other than the choice of law and forum provisions contained in New York General Obligations Law Sections 5-1401 and 5-1402, respectively, and shall be binding on Bank's and Lender's respective successors and permitted assigns. Bank and Lender each hereby consents to the jurisdiction of a state or federal court situated in New York City, New York in connection with any dispute arising hereunder and Lender hereby waives any claim of *forum non conveniens* to the extent that it may lawfully do so. Bank and Lender hereby voluntarily, irrevocably, and unconditionally waive any right to have a jury participate in resolving any dispute, whether arising in contract, tort, or otherwise, between them arising in connection with, related to, or incidental to the relationship established between the Bank and Lender in connection with this Agreement, or any other agreement or document executed or delivered in connection herewith or the transactions related hereto.  To the extent that in any jurisdiction Lender may now or hereafter be entitled to claim, for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, Lender irrevocably shall not claim, and it hereby waives, such immunity.

(f) Counterparts. Headings.  This Lending Agreement may be executed in several counterparts, each one of which shall constitute an original, and all collectively shall constitute but one instrument.  The headings of the Sections hereof are included for convenience of reference only and do not form part of this Lending Agreement.

(g) Severability.  Any provisions hereof which may be determined by competent authority to be prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(h) PTE 99-34.  (i) Lender acknowledges that: (A) certain segments of "Global Capital Markets", "IS" and "SL" (each as defined herein) are, or may be deemed to be, the same legal entity; and (B) it has received a copy of Department of Labor PTE 99-34. (ii) Bank hereby represents to Lender that each and every Loan made to Global Capital Markets on behalf of Lender shall be at market rates and shall, in no event, be less favorable to Lender than a Loan of such Securities, made at the same time and under the same circumstances, to an unaffiliated borrower and shall be effectively at arm's length.  For purposes hereof, "Global Capital Markets" shall mean affiliates of JPMorgan Chase & Co. ("JPM") which are engaged in the capital markets line of business, "IS" shall mean JPM's Investor Services line of business, as operated through Bank and its Affiliates, and "SL" shall mean the Bank's Securities Lending division or any other similar division of Bank or U.S. Affiliates of JPM.  (iii) In addition to subsection (ii) of this Section 13(h), Bank hereby acknowledges its responsibility to perform all the other
obligations imposed on it by PTE 99-34.

(i) EXCLUSIVITY.  During the effectiveness of this Lending Agreement, Lender shall not enter into any other securities loan agreement with any other bank or securities broker/dealer whereby the other bank or broker/dealer is permitted to make loans on behalf of Lender of Securities held in the Accounts.

348039:v1                              14

IN WITNESS WHEREOF, the parties have executed this Lending Agreement as of the date first above-written.

OPERATING ENGINEERS
PENSION TRUST

By: _____
Name: Leo Majich
Title: Fund Manager

JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION

By: Steven E. Cutler
Name: Steven E. Cutler
Title: Senior Vice President

Custodian hereby agrees that it has provided or shall provide the Lender with all reasonably available information which the Custodian believes is necessary to determine whether the authorization granted to pay the Custodian's Fee should be made or renewed, and any other reasonably available information regarding the matter which the Lender may request.

AMALGAMATED BANK

By: _____
Name: Matt E Rees
Title: Sr. V.P.

348039:v1                                    15

## EXHIBIT 1

## EQUILEND DESCRIPTION AND CONSENT TO BANK'S PARTICIPATION ON LENDER'S BEHALF

In May 2001, Bank and a group of leading financial services firms joined to establish EquiLend Holdings LLC ("EquiLend"). EquiLend has developed a system that is designed to facilitate securities lending. The EquiLend platform is an open, global, standards-based system that allows borrowers and lenders of securities to transact with each other through a secure "hub." EquiLend is designed to eliminate the need for participants to maintain point-to-point connections between counterparties. While EquiLend operates an electronic platform ("Platform") for the negotiation of securities lending and borrowing transactions, it neither acts as a principal in any securities lending transaction nor guarantees any transaction executed through the Platform. As required by PTE 02-30, please be advised that Bank intends to use the Platform to transact securities loans on Lender's behalf with other EquiLend participants that are approved Borrowers. (A copy of PTE 02-30 has been furnished to Lender.)

The Platform is itself based on EquiLend's Securities Lending Markup Language™ (SLML™), an open-standards protocol created for the securities lending industry. The Platform (and SLML) are meant to enhance efficiency by replacing manually intensive processes, such as the use of faxes, phone calls, and back-office data handling with a more seamless, standards-based electronic system. By reducing the need for manual intervention, it is anticipated that the Platform will lower the risk of errors and failed transactions. Moreover, by aggregating transaction data in a central electronic location, EquiLend should be able to develop statistically significant benchmarks. EquiLend may also offer to (a) sell or license current and historical data relating to transactions using the Platform and (b) license to users tools that will permit use of the data provided to evaluate securities lending activities. These lending-related products may be offered to end users or to securities lending agents for the benefit of their clients. In an October 16, 2002 press release, EquiLend announced that it had facilitated more than $120 billion in lending transactions during the first three months of Platform operation and that the Platform then offered its participants daily access to more than $1 trillion in assets for borrowing.

Given that Bank and a number of other lending agent banks are equity owners of EquiLend, and therefore have a financial interest in its successful operation, EquiLend obtained PTE 02-30 from the U.S. Department of Labor to enable Bank (and other lending agents with an equity interest in EquiLend) to use the Platform to lend assets of ERISA plans (each a "Plan"). (A list of the other firms with an equity interest in EquiLend are set out at the end of this Exhibit.) Among other things, PTE 02-30 permits participation in the Platform by an equity owner of EquiLend in its capacity as a securities lending agent for a Plan, provided that certain conditions are met. (An equity owner acting in the capacity of a securities lending agent is frequently referred to herein and in PTE 02-30 as an "Owner Lending Agent".)

One of the conditions established by PTE 02-30 is that none of the fees imposed by EquiLend for securities lending transactions conducted through the use of the Platform at the direction of an Owner Lending Agent will be charged to the Plan. Consistent with that condition, no Plan will be charged any additional fee for loans made over the Platform; rather the relevant fees charged by EquiLend will be paid by Bank. Such fees are typically expected to include an initiation fee and an annual fee, payable by both lenders and borrowers, that will be structured on a tiered basis. (As an equity owner, however, Bank will not be required to pay the initiation fee. Pursuant to the fee structure, a participant at a given annual fee level will be entitled to a certain number of transactions, with excess transactions being subject to an additional charge. Participants paying the highest annual fee level will be entitled to an unlimited number of transactions; Bank expects to fall into the highest fee category.)

348039:v1

In addition, PTE 02-30 requires Bank, as an Owner Lending Agent, to: (a) provide prior written notice to a plan, which this Exhibit constitutes, of its intention to participate in EquiLend in connection with the lending of plan assets; and (b) obtain the prior written authorization of a plan fiduciary, that is independent of the Owner Lending Agent (the "Independent Fiduciary"), of the arrangement pursuant to which the Owner Lending Agent (in this case, Bank) will participate in the Platform on behalf of the Plan. By signing in the space provided below, Lender will have given such consent.

Consistent with the requirements of PTE 02-30, please note that at any time after Bank commences using the Platform, the Independent Fiduciary may, without penalty to the Plan, terminate use of the Platform for lending Lender's Securities by providing Bank with five business days' advance written notice of termination (or such lesser time as may be negotiated for such notice of termination by Lender and Bank). (Bank shall also provide an annual statement confirming that these arrangements may be terminated in accordance with such notice procedures.)

In connection with the foregoing, Bank has provided the Independent Fiduciary with such reasonably available information as it reasonably believes is necessary for the Independent Fiduciary to determine whether Bank's proposed use of the Platform on the Plan's behalf should be authorized. In addition, Bank shall provide any other reasonably available information that the Independent Fiduciary may reasonably request to make such determination.

******************************

The other equity owners of EquiLend are: Barclays California Corporation; Bear, Stearns Securities Corp.; LBI Group (a wholly-owned subsidiary of Lehman Brothers, Inc.); Merrill Lynch, Pierce, Fenner & Smith, Inc.; SSB Investments, Inc. (a wholly-owned subsidiary of State Street Corporation); Strategic Investments I, Inc. (a wholly-owned subsidiary of Morgan Stanley & Co.); The Goldman Sachs Group, Inc.; Northern Trust Corporation; and UBS (USA), Inc. Each owner has a 10% ownership interest.

ACCEPTED AND AGREED BY LENDER:

OPERATING ENGINEERS PENSION TRUST

By: _____

## Appendix 1

## SECURITIES LENDING
## JPMORGAN CHASE BANK CASH COLLATERAL FUND
## INVESTMENT GUIDELINES

**A.   FUND OBJECTIVE**

This short term, fixed income fund (the "Fund") is designed to obtain an attractive yield on securities lending cash collateral by investing in eligible securities that satisfy these guidelines, as applied at the time of purchase.

**B.   PERMISSIBLE INVESTMENTS**

**1.   Instruments:**

The Fund is permitted to purchase fixed-income instruments and other securities with debt-like characteristics, including (subject to the Prohibited Investments set forth in paragraph C):

| | |
|---|---|
| Asset Backed Securities | Master Notes |
| Bank Notes | Medium Term Notes |
| Banker's Acceptances | Promissory Notes |
| Certificates of Deposit | Repurchase Agreements |
| Commercial Paper | Time Deposits |
| Corporate Bonds | U.S. Government Securities |
| Corporate Notes | including Obligations of |
| Floating Rate Notes | the U.S. Treasury and |
| Floating Rate | Obligations of U.S. |
|    Certificates of Deposit | Government Agencies or |
| GICs and synthetic GICs | Instrumentalities |

**2.   Commingled Vehicles:**

In addition, for purposes of these guidelines, shares of a money market mutual fund (a "money market fund") registered with the Securities and Exchange Commission as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"):  (i) shall be an Eligible Security; (ii) shall be deemed to have a Final Maturity of one day for purposes of the Maturity Guidelines in paragraph F; and (iii) are not subject to the Concentration Guidelines in paragraph E or the Quality Guidelines in paragraph H.

**3.   Currency:**

U.S. dollar denominated securities only.

4.     **Limitation on foreign issuers:**

None, provided that they otherwise meet the criteria set forth in these guidelines.

**C.     PROHIBITED INVESTMENTS**

1.     Any securities issued by J.P. Morgan Chase & Co. or its affiliates.

2.     Equity securities other than equity securities such as owner trust certificates, that have predominantly debt characteristics, are not prohibited.

3.     Floating rate securities with an interest rate cap or collar, with the exception of those capped to comply with state usury laws.

4.     Floating rate securities the interest rate on which does not reset as a result of changes in one or more reference interest rates. Examples of prohibited floating rate securities are those whose interest rate reset is based on an index of commodities or equity securities.

5.     Futures contracts and options on futures contracts.

6.     Interest rate swap transactions where the Fund is a counterparty to the interest rate swap agreement.

7.     Mortgage pass-through certificates, collateralized mortgage obligations and real estate mortgage investment conduits (REMICs), where the underlying collateral is first mortgages on residential or commercial properties, except that Agency MBS (as defined below) will not be Prohibited Investments in connection with repurchase agreements as provided in paragraph G. Mortgage-backed securities where the underlying collateral is home equity loans are not Prohibited Investments.

8.     Any units of a common trust fund or collective trust fund of the type referred to in Section 3 (c) (3) or Section 3 (c) (11) of the 1940 Act.

9.     Any security which derives all or a portion of its value from another security or index (for example, structured notes, futures or swaps). Notwithstanding the foregoing, a security that is a permissible investment for a money market fund shall not be a prohibited investment under this paragraph C.9.

**D.     LIMITATIONS ON AMOUNTS INVESTED/CASH RESERVE;
PERMITTED BORROWING**

1.     The Fund will seek to be invested fully in Eligible Securities as of the close of business on each day.

2.    On a temporary basis, not to exceed seven days and solely for the purpose of liquidity, the Fund may enter into reverse repurchase agreements with respect to U.S. Government Securities. While any such reverse repurchase agreement is outstanding, the Fund shall not make additional term investments.

**E.    CONCENTRATION GUIDELINES**

1.    No more than 5% of the Fund's total assets, measured at the time of purchase, may be invested in the securities of a single issuer (other than U.S. Government Securities and Repurchase Agreements and the commingled vehicles identified in Paragraph B.2, as to which there is no limitation).

**F.    MATURITY GUIDELINES**

1.    Fixed rate instruments must have a final maturity at the time of purchase that does not exceed one year.

2.    The Fund's maximum dollar weighted average days to maturity may not exceed 90. For purposes of calculating the Fund's dollar weighted average days to maturity, the maturity of a given instrument shall be, in the case of: (i) a fixed rate instrument, the date noted on the face of the instrument as the date on which the principal amount must be paid; (ii) an instrument with an unconditional put or unconditional demand feature, the date on which the principal amount of the instrument can be recovered by demand; and (iii) a floating rate instrument, the next readjustment of the interest rate.

3.    Floating rate instruments which are U.S. Government Securities must have a Final Maturity not exceeding 5 years at the time of purchase and all other floating rate instruments must have a Final Maturity not exceeding 2 years at the time of purchase; provided that, if the maturity of a floating rate instrument is determined by reference to an unconditional put or unconditional demand feature, the period remaining between adjustments of the interest rate must not exceed the period specified in paragraph F.1.

4.    Final Maturity for purposes of these Guidelines means the date noted on the face of the instrument (or equivalent) as the date on which the principal amount must be paid.

5.    A repurchase agreement shall be deemed to have a maturity equal to the period remaining until the date on which the repurchase of the underlying securities is scheduled to occur or, where no date is specified but the agreement is subject to a demand for the repurchase of the securities, the notice period applicable to such demand.

6.    Adjustable rate mortgages shall have a maturity equal to the period remaining until the last principal payment is required to be paid by the terms of the underlying obligation.

7.      Shares of a money market mutual fund (a "money market fund") registered with the Securities and Exchange Commission as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act") shall be deemed to have a Final Maturity of one day.

G.      **REPURCHASE AGREEMENTS (including term repurchase agreements, entered into using custodians deemed appropriate by Bank)**

1.      Permitted collateral:

Bills, bonds or notes issued by the United States Treasury, or other securities guaranteed as to principal and interest by the Government of the United States, its agencies, instrumentalities or establishments; mortgage-backed securities sponsored by agencies of the Government of the United States; corporate obligations of domestic and foreign issuers with a minimum rating of AA- by Standard & Poor's Corporation ("S&P") or Aa3 by Moody's Investor Services, Inc. ("Moody's"); asset-backed securities with a minimum rating of AAA by S&P or Aaa by Moody's; or money market instruments (including, but not limited to, certificates of deposit, bank notes, deposit notes, banker's acceptances and commercial paper issued by domestic issuers with a minimum rating of A-1 by S&P and P-1 by Moody's).

H.      **QUALITY GUIDELINES**

Except as otherwise provided with respect to repurchase agreement collateral in paragraph G:

1.      Specified Rating Categories at time of purchase:

    **Short-term:**  Short-term instruments must be rated any two of the following: A-1 by S&P, P-1 by Moody's, F-1 by Fitch Ratings.

    **Long-term:** Long-term instruments must be rated at least A- by S&P, A3 by Moody's, or A- by Fitch Ratings.

A security without its own rating will be considered to be rated if its issuer's comparable securities are rated with respect to: (i) a class of short-term debt obligations, in the case of short-term ratings, (ii) a class of long-term debt obligations, in the case of long-term ratings, or (iii) any security within the relevant class that is comparable in priority and security with the purchased security.

Long-term ratings will be used only if the security is not rated and no security of the same issuer that is comparable in priority with such security is rated.

2.   The Fund may not purchase Eligible Securities based on an NRSRO's rating where that NRSRO has announced publicly that it is examining the rating for a possible downgrade.   This limitation does not apply to eligible securities rated A-1+ by Standard & Poor's Corporation.

I    **MISCELLANEOUS**

1.   Lender hereby acknowledges that: (i) the Fund is a bank collective fund; (ii) its interest in the Fund is not guaranteed or insured by Bank or any Affiliate or by the Federal Deposit Insurance Corporation or any other government agency; (iii) its interest in the Fund shall consist of units; and (iv) Securities held in the Fund shall typically be valued based on their amortized cost, but Bank need not so value them.

2.   A copy of the Declaration of Trust for the Fund has been furnished to Lender for convenience of reference.

<div align="center">*     *     *</div>

*Lender should analyze these Guidelines regularly to determine their continued appropriateness, recognizing that all investments bear risk and that the return of principal in respect of Fund investments is not assured.*

## Appendix 2
## JPMorgan Chase Bank, N.A.
## Securities Lending
## Approved Borrowers

**Borrowers located in the U.S.**

- ABN AMRO Inc.
- ABN AMRO Bank N.V., New York Branch
- Alpine Associates
- Abbey National Securities Inc.
- Amaranth Securities LLC
- Banc of America Securities LLC
- Barclays Capital, Inc.
- Bear Stearns & Co., Inc.
- Bear Stearns Securities Corp
- Harris Nesbitt Corp.
- BNP Paribas Securities Corp.
- Cantor, Fitzgerald & Co.
- Cantor, Fitzgerald Securities
- Charles Schwab & Co Inc.
- CIBC World Markets Corp.
- Citadel Trading Group L.L.C.
- Citigroup Global Markets Inc.
- Commerzbank Capital Markets Corporation
- Countrywide Securities Corporation
- Credit Suisse First Boston LLC
- Daiwa Securities America Inc.
- Deutsche Bank Securities Inc.
- Dresdner Kleinwort Wasserstein Securities LLC
- Fimat USA, LLC
- First Clearing, LLC
- First Tennessee Bank National Association
- Fortis Securities, LLC
- G.X. Clarke & Co.
- Garban Corporates, LLC
- Garban LLC
- Goldman, Sachs & Co.
- Greenwich Capital Markets, Inc.
- HSBC Securities,(USA) Inc.
- HBK Global Securities L.P.
- ING Financial Markets LLC
- Janney Montgomery Scott LLC
- Jefferies & Company, Inc.
- KDC Merger Arbitrage Fund, L.P.
- LaBranche Financial Services, Inc.
- Lazard Capital Markets
- Legg Mason Wood Walker, Inc.
- Lehman Brothers Inc
- Man Securities Inc.
- Maple Securities USA Inc.
- Merrill Lynch Government Securities Inc.
- Merrill Lynch, Pierce, Fenner & Smith Inc.
- Millenco, L.P.

## Appendix 2
## JPMorgan Chase Bank, N.A.
## Securities Lending
## Approved Borrowers

- Mizuho Securities USA, Inc.
- Morgan Stanley & Co. Incorporated
- Morgan Stanley Securities Services, Inc.
- National Financial Services LLC
- Nomura Securities International, Inc.
- Paloma Securities L.L.C.
- Penson Financial Services, Inc.
- Pershing LLC
- Raymond James & Associates, Inc.
- RBC Dain Rauscher Incorporated
- RBC Capital Markets Corporation
- Refco Securities, LLC
- Sanford C Bernstein & Co Inc.
- SG Americas Securities, LLC
- Societe Generale, New York Branch
- Southwest Securities, Inc.
- Swiss American Securities Inc.
- Timber Hill LLC
- UBS Securities LLC
- Van Der Moolen Specialists USA, LLC
- Wachovia Bank, National Association
- Wachovia Capital Markets, LLC
- Westdeutsche Landesbank Girozentrale (NY Branch)
- Zions First National Bank

**73 Domestic Brokers**

Last updated: June 20, 2005

**Appendix 3**

# JPMorgan Chase Bank
# Securities Lending
# Acceptable Collateral

1)          CASH

2)          SECURITIES ISSUED BY THE US GOVERNMENT
            AND ITS AGENCIES

3)          LETTERS OF CREDIT

# Appendix 4

## JPMorgan Chase Bank
## Securities Lending
## Letter of Credit Banks

ABN AMRO Bank
Banco Santander Central Hispano S.A.
Bank of America NA
Bank of Montreal
Bank of New York
Bank One NA
Barclays Bank PLC
BNP Paribas
Canadian Imperial Bank of Commerce
Citibank, NA
Comerica Bank
Credit Suisse First Boston
Den Danske Bank A/S
Deutsche Bank AG
Deutsche Bank Trust Co. (formerly Bankers Trust Co.)
FleetBoston Financial Corp (formerly Fleet National Bank)
Fortis Bank NV SA
HSBC Bank PLC
HSBC Bank USA
Lloyds TSB Bank PLC
Mellon Financial (formerly Mellon Bank, N.A.)
PNC Bank, N.A.
Rabobank Nederland
Royal Bank of Canada
Royal Bank of Scotland PLC (formerly National Westminster Bank PLC)
Societe Generale
Svenska Handelsbanken
Toronto-Dominion Bank
UBS AG

1-13-04

# EXHIBIT B

**REDACTED**

# EXHIBIT C

# REDACTED

# EXHIBIT D

Corp  **DES**

## SECURITY DESCRIPTION     Page 1/ 1
LEHMAN BROS HLDG LEH 0 08/22/09        D E F A U L T E D

| ISSUER INFORMATION | IDENTIFIERS | |
|---|---|---|
| Name LEHMAN BROTHERS HOLDINGS | CUSIP      524908SQ4 | 1) Additional Sec Info |
| Type Finance-Invest Bnkr/Brkr | ISIN   US524908SQ44 | 2) Floating Rates |
| Market of Issue Domestic MTN | BB Number   EG7754880 | 3) ALLQ |
| SECURITY INFORMATION | RATINGS | 4) Corporate Actions |
| Country US      Currency USD | Moody's    WR | 5) Cds Spreads/RED Info |
| Collateral Type Sr Unsecured | Fitch      NR | 6) Ratings |
| Calc Typ( 130)** IN DEFAULT ** | DBRS       D | 7) Custom Notes |
| Maturity   8/22/2009 Series MTN* | Composite  NR | 8) Covenant/Default |
| NORMAL | ISSUE SIZE | 9) Identifiers |
| Coupon      0      Defaulted | Amt Issued/Outstanding | 10) Fees/Restrictions |
| QUARTLY      ACT/360 | USD    300,000.00 (M)/ | 11) Prospectus |
| Announcement Dt  8/17/06 | USD    300,000.00 (M) | 12) Sec. Specific News |
| Int. Accrual Dt  8/24/06 | Min Piece/Increment | 13) Involved Parties |
| 1st Settle Date  8/24/06 | 1,000.00/  1,000.00 | 14) Issuer Information |
| 1st Coupon Date 11/22/06 | Par Amount   1,000.00 | 15) Pricing Sources |
| Iss Pr  100.0000 | BOOK RUNNER/EXCHANGE | 16) MTN Drawdown |
| | LEH | 17) Related Securities |
| HAVE PROSPECTUS    DTC | NOT LISTED | 18) Issuer Web Page |
| | | 66) Send as Attachment |

CPN=FED FUNDS (OPEN)+12BP TO 8/08; RESET ANNLY @ +13BP. ENTIRE ISSUE TRNSF'D OUT
OF CUSIP 524908TU4 DUE TO HLDRS OPT NOT TO EXT MTY.

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U S  1 212 318 2000    Copyright 2009 Bloomberg Finance L.P
SN 779954 G593-342-0 29-Dec-2009 17 41:49

Filed Pursuant to Rule 424(b)(3)
Registration No 333-134553

**PRICING SUPPLEMENT NO. 21 dated August 17, 2006**
to Prospectus Supplement dated May 30, 2006
and Prospectus dated May 30, 2006

**LEHMAN BROTHERS HOLDINGS INC.**
**Medium-Term Notes, Series I**
**Floating Rate Extendible Notes**

This Pricing Supplement supplements the terms and conditions in, and incorporates by reference, the Prospectus, dated May 30, 2006, as supplemented by the Prospectus Supplement, dated May 30, 2006 (as so supplemented, together with all documents incorporated by reference therein, the "Prospectus"), and should be read in conjunction with the Prospectus. Unless otherwise defined in this Pricing Supplement, terms used herein have the same meanings as are given to them in the Prospectus

The notes will mature on August 22, 2008 (the "Initial Maturity Date"), unless the maturity date of all or any portion of the principal amount of the notes is extended on any election date in accordance with the procedures described below In no event will the maturity date of the notes be extended beyond August 22, 2016 (the "Final Maturity Date")

During a notice period for any Election Date (as defined under "Extension of Maturity" below) you may elect to extend the maturity of all or any portion of the principal amount of your notes so that the maturity of your notes will be extended to the Extended Maturity Date (as defined below) opposite that Election Date   The Election Dates and the corresponding Extended Maturity Dates are

| Election Date | Extended Maturity Date |
|---|---|
| November 2006 Election Date | November 2008 Extended Maturity Date |
| February 2007 Election Date | February 2009 Extended Maturity Date |
| May 2007 Election Date | May 2009 Extended Maturity Date |
| August 2007 Election Date | August 2009 Extended Maturity Date |
| November 2007 Election Date | November 2009 Extended Maturity Date |
| February 2008 Election Date | February 2010 Extended Maturity Date |
| May 2008 Election Date | May 2010 Extended Maturity Date |
| August 2008 Election Date | August 2010 Extended Maturity Date |
| November 2008 Election Date | November 2010 Extended Maturity Date |
| February 2009 Election Date | February 2011 Extended Maturity Date |
| May 2009 Election Date | May 2011 Extended Maturity Date |
| August 2009 Election Date | August 2011 Extended Maturity Date |
| November 2009 Election Date | November 2011 Extended Maturity Date |
| February 2010 Election Date | February 2012 Extended Maturity Date |
| May 2010 Election Date | May 2012 Extended Maturity Date |
| August 2010 Election Date | August 2012 Extended Maturity Date |
| November 2010 Election Date | November 2012 Extended Maturity Date |
| February 2011 Election Date | February 2013 Extended Maturity Date |
| May 2011 Election Date | May 2013 Extended Maturity Date |

| | |
|---|---|
| August 2011 Election Date | August 2013 Extended Maturity Date |
| November 2011 Election Date | November 2013 Extended Maturity Date |
| February 2012 Election Date | February 2014 Extended Maturity Date |
| May 2012 Election Date | May 2014 Extended Maturity Date |
| August 2012 Election Date | August 2014 Extended Maturity Date |
| November 2012 Election Date | November 2014 Extended Maturity Date |
| February 2013 Election Date | February 2015 Extended Maturity Date |
| May 2013 Election Date | May 2015 Extended Maturity Date |
| August 2013 Election Date | August 2015 Extended Maturity Date |
| November 2013 Election Date | November 2015 Extended Maturity Date |
| February 2014 Election Date | February 2016 Extended Maturity Date |
| May 2014 Election Date | May 2016 Extended Maturity Date |
| August 2014 Election Date | August 2016 Extended Maturity Date (the Final Maturity Date) |

You may elect to extend the maturity date of all of your notes or of any portion thereof having a principal amount of $1,000 or any multiple of $1,000 in excess thereof  To make your election effective on any election date, you must deliver a notice of election during the notice period for that election date  The notice period for each election date is set forth below under "Extension of Maturity "  Your notice of extension must be delivered through the normal clearing system channels described in more detail below no later than 12 00 noon (New York City time) on the last Business Day in the notice period relating to the applicable election date  Any notice of election to extend the maturity date of the notes or any portion thereof will be revocable until 12 00 noon (New York City time) on the last Business Day in the notice period relating to the applicable election date, at which time such notice will become irrevocable

If, with respect to any election date, you do not make an election to extend the maturity date of all or any portion of the principal amount of your notes, the principal amount of the notes for which you have failed to make such an election will become due and payable on the Initial Maturity Date, or any later date to which the maturity date of your notes has previously been extended  The principal amount of the notes for which such election is not exercised will be represented by a note issued on such election date  The note so issued will have the same terms as the notes, except that it will not be extendible, will have separate CUSIP, ISIN and Common Code numbers and its maturity date will be the date that is the extended maturity date that corresponds to that election date or, if such date is not a Business Day, the next succeeding Business Day  The failure to elect to extend the maturity date of all or any portion of the notes will be irrevocable and will be binding upon any subsequent holder of such notes

The notes will be issued in registered global form and will remain on deposit with DTC as depository for the notes  Therefore, you must exercise the option to extend the maturity date of your notes through DTC  To ensure that DTC will receive timely notice of your election to extend the maturity date of all or a portion of your notes, so that it can deliver notice of your election to the Trustee prior to the close of business on the last Business Day in the notice period, you must instruct the direct or indirect participant through which you hold an interest in the notes to notify DTC of your election to extend the maturity date of your notes in accordance with the then applicable operating procedures of DTC

DTC must receive any notice of election, or any notice of revocation of a previous election, from its participants no later than 12 00 noon (New York City time) on the last Business Day in the

2

notice period for any election date  Different firms have different deadlines for accepting instructions from their customers  You should consult the direct or indirect participant through which you hold an interest in the notes to ascertain the deadline for ensuring that timely notice will be delivered to DTC  If the election date is not a Business Day, notice of your election to extend the maturity date of your notes, or to revoke your election, must be delivered to DTC by its participants no later than 12 00 noon (New York City time) on the first Business Day following the election date

CUSIP                              524908TU4  In the event that you do not elect to extend the maturity date of all or any portion of your notes, the principal amount of the notes for which you do not exercise such election will be assigned a new CUSIP number, as described above

ISIN                                US524908TU47  In the event that you do not elect to extend the maturity date of all or any portion of your notes, the principal amount of the notes for which you do not exercise such election will be assigned a new ISIN number, as described above

Common Code                  026571766  In the event that you do not elect to extend the maturity date of all or any portion of your notes, the principal amount of the notes for which you do not exercise such election will be assigned a new Common Code number, as described above

Specified Currency            Principal      U S  Dollars

                                       Interest       U S  Dollars

Principal Amount             $300,000,000

|  | Total | Per Note |
|---|---|---|
| Issue Price | $ 300,000,000 | 100 00% |
| Agents' Commission | $      750,000 | 0 25% |
| Proceeds to Lehman Brothers Holdings | $ 299,250,000 | 99 75% |

We may, without the consent of the holders of notes, issue additional notes similar to these notes in all respects except for the Issue Price, the Issue Date and the first Interest Payment Date and election date

Agents                           Lehman Brothers
                                       BNP Paribas
                                       LaSalle Capital Markets

Agents' Capacity              [X] As principal            [  ] As agent

3

[X]  The notes are being offered at a fixed initial public offering price equal to the Issue Price

[ ]  The notes are being offered at varying prices relating to prevailing market prices at the time of sale

| | |
|---|---|
| Trade Date | August 17, 2006 |
| Issue Date | August 24, 2006 |
| Initial Maturity Date | August 22, 2008 |
| Final Maturity Date | August 22, 2016, subject to Optional Redemption |
| Date From Which Interest Accrues | [X]  Issue Date<br>[ ]  Other _____  ____ |

[ ]        Fixed Rate Note

              Interest Rate per Annum

[X]        Floating Rate Note        [ ]   CD Rate
                                     [ ]   Commercial Paper Rate
                                     [ ]   Federal Funds (Effective) Rate
                                     [X]   Federal Funds (Open) Rate
                                     [ ]   LIBOR Telerate
                                     [ ]   LIBOR Reuters
                                     [ ]   EURIBOR
                                     [ ]   Treasury Rate  Constant Maturity [ ] Yes   [ ] No
                                     [ ]   Prime Rate
                                     [ ]   Eleventh District Cost of Funds Rate
                                     [ ]   Other _____  _____  ___

Spread

| For the Issue Date and Interest Reset Dates Occurring: | Spread |
|---|---|
| From and including the Issue Date to but excluding the August 22, 2007 Interest Reset Date | *plus* 0 12% |
| From and including the August 22, 2007 Interest Reset Date to but excluding the August 22, 2008 Interest Reset Date | *plus* 0 12% |
| From and including the August 22, 2008 Interest Reset Date to but excluding the August 22, 2009 Interest Reset Date | *plus* 0 13% |
| From and including the August 22, 2009 Interest Reset Date to but excluding the August 22, 2010 Interest Reset Date | *plus* 0 14% |

4

| | |
|---|---|
| From and including the August 22, 2010 Interest Reset Date to but excluding the August 22, 2011 Interest Reset Date | *plus 0 15%* |
| From and including the August 22, 2011 Interest Reset Date to but excluding the August 22, 2012 Interest Reset Date | *plus 0 16%* |
| From and including the August 22, 2012 Interest Reset Date to but excluding the August 22, 2013 Interest Reset Date | *plus 0 16%* |
| From and including the August 22, 2013 Interest Reset Date to but excluding the August 22, 2014 Interest Reset Date | *plus 0 16%* |
| From and including the August 22, 2014 Interest Reset Date to but excluding the August 22, 2015 Interest Reset Date | *plus 0 16%* |
| From and including the August 22, 2015 Interest Reset Date to and including the August 22, 2016 Final Maturity Date | *plus 0 16%* |

| | |
|---|---|
| Spread Multiplier | Not applicable |
| Maximum Rate | Not applicable |
| Minimum Rate | 0% |
| Interest Payment Dates | Quarterly, on each February 22, May 22, August 22 and November 22, commencing on November 22, 2006, provided that if such day is not a Business Day, then such day will be the following Business Day unless such day falls in the following month and is not a maturity date or date of redemption, in which case it will be the preceding Business Day, provided, further that the final Interest Payment Date for any notes shall be the applicable maturity date |
| Interest Determination Dates | Each Interest Reset Date |
| Interest Reset Dates | Each Business Day, commencing on August 24, 2006, provided that (a) the Federal Funds (Open) Rate in effect for any day that is not a Business Day shall be the Federal Funds (Open) Rate in effect for the prior Business Day and (b) the Federal Funds (Open) Rate in effect on the second Business Day preceding an Interest Payment Date shall remain in effect for all days following such day prior to such Interest Payment Date |

5

| | |
|---|---|
| Adjusted | [X] Yes  [ ] No |
| Extension of Maturity | The "Election Dates" shall be quarterly on each February 22, May 22, August 22 and November 22, commencing on November 22, 2006 to and including August 22, 2014, provided that if any such day is not a Business Day, then such Election Date will be the following Business Day  The notice period for each Election Date will begin on the tenth Business Day prior to the election date and end at 12 00 noon (New York City time) two Business Days immediately preceding the election date, provided that if the election date is not a Business Day, the notice period will be extended to 12 00 noon (New York City time) on the following Business Day |
| Extended Maturity Dates | Quarterly on February 22, May 22, August 22 and November 22, commencing with the Extended Maturity Date falling on November 22, 2008, provided that if any such day is not a Business Day, then such Extended Maturity Date will be the following Business Day |
| Calculation Agent | Citibank, N A |
| Optional Redemption | The notes may be redeemed on or after August 22, 2015 (or if such date is not a Business Day, on the next succeeding Business Day) at the option of Lehman Brothers Holdings Inc  in whole or in part at a price equal to 100% of the principal amount being redeemed upon not more than 60 days' nor less than 30 days' notice |
| Interest Accrual | Accrued interest will be computed by adding the Interest Factors calculated for each Interest Reset Date from the Settlement Date or from the last date to which interest has been paid or duly provided for up to but not including the day for which accrued interest is being calculated  The "Interest Factor" for any note for each such Interest Reset Date will be computed by multiplying the aggregate principal amount then outstanding of the note by the interest rate applicable to such Interest Reset Date and dividing the product thereof by 360 |
| Business Day | New York |
| Authorized Denominations | $1,000 and whole multiples of $1,000 |
| Form of Note | [X] Book-entry only (global)      [ ] Certificated |

6

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

Lehman Brothers Holdings Inc intends to treat the notes as variable rate debt instruments, as described under "Supplemental United States Federal Income Tax Consequences—Variable Rate Debt Instruments" in the Prospectus

Although there is no authority directly on point, Lehman Brothers Holdings Inc intends to treat the notes as having a term ending on the Final Maturity Date for tax purposes because of a holder's right to extend the term to such date Under such treatment, a holder's election to extend the maturity of the principal amount of the notes in accordance with the procedures described above would not be a taxable event to such holder for United States federal income tax purposes Also, even though the spread increases during the term of the notes, the amount of the increase is de minimis and, therefore, the notes will not constitute OID notes

By purchasing the notes, investors agree to report the United States federal income tax consequences of their ownership of the notes consistently with the foregoing treatment

Prospective investors should note that no assurance can be given that the Internal Revenue Service (the "IRS") will accept, or that the courts will uphold, the characterization and the treatment of the notes described above If the IRS were successful in asserting that the term of the notes ends on the Initial Maturity Date, an election to extend the maturity of the principal amount of the notes could constitute a taxable event for United States federal income tax purposes, and you would be required to recognize any gain, but not loss, inherent in the notes at such time upon the exercise of such election Prospective investors are urged to consult their tax advisors regarding the United States federal income tax consequences of investing in, and extending the maturity of, the notes

## SUPPLEMENTAL INFORMATION CONCERNING THE PLAN OF DISTRIBUTION

Lehman Brothers Holdings Inc has agreed to sell to the other agents set forth below (collectively, the "Agents"), and each of the Agents has agreed severally to purchase, the principal amounts of notes set forth opposite its name below

| Agents | Principal Amount of the notes |
|---|---|
| Lehman Brothers Inc | $ 294,000,000 |
| BNP Paribas SA | 3,000,000 |
| LaSalle Financial Services, Inc | 3,000,000 |
| Total | $ 300,000,000 |

The Agents are committed to take and pay for all of the notes, if any are taken The Agents propose to offer the notes initially at a public offering price equal to the Issue Price set forth above and may offer the notes to certain dealers at such price less a concession not in excess of

7

0 15% of the principal amount of the notes  The Agents may allow, and the dealers may reallow, a discount not in excess of 0 075% of the principal amount of the notes on sales to certain other dealers  After the initial public offering, the public offering price and other selling terms may from time to time be varied by the Agents

Lehman Brothers Holdings Inc  has agreed to indemnify the Agents against liabilities, including liabilities under the Securities Act of 1933, as amended, or to contribute to payments that the Agents may be required to make relating to these liabilities as described in the Prospectus  Lehman Brothers Holdings will pay certain expenses, expected to be approximately $75,000, associated with the offer and sale of the notes

Certain of the Agents may not be U S  registered broker-dealers and accordingly will not effect any sales within the United States except in compliance with applicable U S  laws and regulations, including the rules of the NASD

Certain of the Agents may make the securities available for distribution on the Internet through a proprietary website and/or a third-party system operated by Market Axess Corporation, an Internet-based communications technology provider  Market Axess Corporation is providing the system as a conduit for communications between such Agents and their customers and is not a party to this offering  Market Axess Corporation, a registered broker-dealer, will receive compensation from such Agents based on transactions that such Agents conduct through the system   Such Agents will make the securities available to their customers through the Internet distributions, whether made through a proprietary or third-party system, on the same terms as distributions made through other channels

It is expected that delivery of the notes will be made against payment therefor more than three business days following the date of this pricing supplement  Trades in the secondary market generally are required to settle in three business days unless the parties to any such trade expressly agree otherwise  Accordingly, purchasers who wish to trade the securities on any day prior to the third business day before the settlement date will be required to specify an alternative settlement cycle at the time of any such trade to prevent failed settlement

If the notes are sold in a market-making transaction after their initial sale, information about the purchase price and the date of the sale will be provided in a separate confirmation of sale

<div style="text-align: center;">8</div>