UNITED STATES DISTRICT COURT
 SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

THE BOARD OF TRUSTEES OF THE
OPERATING ENGINEERS PENSION
TRUST, on behalf of itself and all others
similarly situated,

                                              Plaintiff,

                           -v-

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION,

                                            Defendant.

--------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/27/13
```

09-Civ-9333 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

There are still those times when an action can be filed, three years tick by, and parties find themselves at the pleading stage, at the starting gate as it were, with horses that may or may not be pawing at the ground. Such a passage of time while remaining at the starting gate may signal its own form of success for one side or the other – or not. In any event, three years is simply too long for a case to be at the pleading stage.

However, in this case, that is precisely where the parties and this Court find themselves. This Opinion and Order, however, ends that long process. It is accompanied by a commitment from this Court, to whom this matter has been transferred, to proceed without additional delay to resolution of this action.

The instant lawsuit was originally commenced on November 9, 2009 (ECF No.1); an amended complaint was filed later that month (ECF No. 3); an initial

motion to dismiss was filed in January 2010 and was fully briefed in February 2010. (ECF No. 18.)  Thereafter, the parties agreed to a scheduling order pursuant to which the amended complaint was withdrawn in favor of a second amended complaint and a new briefing schedule was set for another motion to dismiss (the first motion was terminated as moot). The motion to dismiss the second amended complaint was fully briefed as of December 2010; that motion was decided on April 20, 2012.  (ECF No. 72.) Plaintiff was then given leave to file a third amended complaint ("TAC") – and did so on June 29, 2012. (ECF No. 81.) The TAC is the operative complaint before this Court.  Defendant moved to dismiss the TAC on August 3, 2012; that motion was fully briefed as of September 14, 2012, and is the subject of this Opinion and Order.

On December 12, 2012 this matter was transferred to the undersigned.  This Court scheduled oral argument for February 2013; at the parties' request it adjourned that argument to March 6, 2013.  For the reasons set forth below, the motion to dismiss is denied.  After more than three years, we now have the operative complaint in this action.

I.     BACKGROUND

On this motion to dismiss, the allegations set forth in the TAC are taken as true and all inferences construed in plaintiff's favor.

The Securities Lending Program Agreement and the Lehman Notes

Plaintiff, the Board of Trustees, on behalf of the Operating Engineers Pension Trust ("plaintiff" or "the Plan"), participated in a securities lending program ("SLP")

provided by JPMorgan Chase Bank, National Association ("defendant" or "JPM").[1] Plaintiff entered into a written securities lending agreement ("Agreement") with defendant on November 1, 2005. (TAC, Exh. A.) Pursuant to the Agreement, defendant provided investment management services to plaintiff and acted as its fiduciary under the Employee Retirement Income Security Act ("ERISA"). In addition, plaintiff loaned certain securities to defendant and defendant in turn loaned those securities to borrowers in return for cash collateral ("Collateral"). Defendant further invested the Collateral. (TAC ¶ 2.)

According to plaintiff, defendant JPM has entered into similar securities lending agreements with Plans across the country; it seeks to represent those additional plans in this litigation.[2]

The Agreement between plaintiff and defendant here requires that defendant invest the Collateral according to certain specified Guidelines.  The Guidelines provide, inter alia, that, at the time of purchase, fixed rate instruments must have a final maturity date that does not exceed one year and floating rate notes must have a maturity that does not exceed two years." (Id. ¶ 37.)  Plaintiff does not allege that defendant failed to abide by the Guidelines when it made its initial investments of Collateral; plaintiff does allege that in August 2007, after the initial investment, defendant made a further investment that violated the Guidelines by having a maturity date more than two years out. (Id. ¶ 394.)

---

[1] Securities lending is a program utilized by pension funds like plaintiff as a method to earn incremental income in order to offset custodial or management fees that are otherwise charged to the Plans. (Id. ¶ 17.)
[2] No motion for class certification has yet been made.

The Agreement provides that investments are made for the account of and at the sole risk of the Lender (here, plaintiff or the Plan was the Lender). (Id. Exh. A at 7.)  Section 6 of the Agreement provides that Lending Agent (here, defendant JPM) "shall have no responsibility for any breach of any obligation of any Borrower under or in connection with any . . . Loan. Lending Agent shall have no responsibility for the accuracy or completeness or any information supplied by any Borrower." (Id. at 9.)  Section 7 provides that "Lending Agent shall not be liable for any costs, expenses, damages, losses, liabilities or claims . . . incurred by Lender, except those costs, expenses, damages, liabilities and claims arising out of negligence, bad faith or willful misconduct of Lending Agent." (Id. at 10.) Appendix 1 to the Agreement states that the Fund Objective is "to obtain an attractive yield on securities lending cash collateral by investing in eligible securities that satisfy these guidelines at the time of purchase." (Id. Appx. 1 at 1.) In the Miscellaneous section of Appendix 1 it states, "Lender hereby acknowledges that (i) the Fund is a bank collective fund; (ii) its interest in the Fund is not guaranteed or insured by Bank or any Affiliates or by the [FDIC] . . ." and "Lender should analyze these Guidelines regularly to determine their continued appropriateness, recognizing that all investments bear risk and that the return of principal in respect of Fund investments is not assured." (Id. Appx. 1 at 5.)

JPM described its SLP as based on "sound fundamentals: extensive risk management processes and controls and conservative investment practices." (Id. ¶ 25.) JPM further stated that "[n]o client has ever suffered a principal loss in [JPM's]

securities lending as a result of our discretionary actions" and "[l]osses in [JPM's] cash reinvestment programs are in general unlikely given that the investment guidelines are conservative." (Id. ¶ 26.)

As agent for the Plan, defendant was required to return the Collateral to borrowers upon termination of all loans of securities.  According to plaintiff, defendant therefore had a duty to invest the Collateral conservatively to preserve capital such that the Collateral would be available to be returned. (Id. ¶ 31.)

Plaintiff alleges that JPM did not share in any losses on Collateral investments (Id. ¶ 41), but did obtain a fee equal to 30-40% on the earnings derived from the investment (Id. ¶ 43.) According to plaintiff, this skewed defendant's incentives: its lack of downside risk would make it excessively willing to take on risk of loss of invested Collateral in the hope of a greater return on earnings derived from that investment. (Id. ¶ 428.)

Here, during the relevant time period, defendant invested the Collateral in two Lehman Bros. senior unsecured floating rate notes: one purchased in August 2006 (and extended for two years in August 2007), with an initial maturity date of August 22, 2008 and a final maturity date of August 22, 2016, and a second note purchased on December 26, 2006, with a maturity date of December 23, 2008. (Id. ¶ 3.) A third note was purchased a floating rate note with a maturity date of August 21, 2009. (Id.) All three of these notes (the "Lehman Notes") were held in an entity called CashCo when Lehman Brothers declared bankruptcy in September 2008. (Id. ¶ 4.)

<u>JPM's Groups and Committees</u>

Defendant JPM markets its securities lending service as having "access to the entire JPM franchise" which provides a "significant advantage to our trading and client teams, as well as our clients, when weathering challenging market conditions." (<u>Id.</u> ¶ 47.) Securities lending is a product within JPM's subdivision of Treasury & Security Services ("TSS"). (<u>Id.</u> ¶ 47.) James Wilson was the Chief Investment Officer for the group with responsibility for managing the investment of Collateral. He was also, at various times, the manager of the Cash Reinvestment Desk and the portfolio manager for CashCo, the entity into which JPM invested the Plan Collateral. (<u>Id.</u> ¶ 35.) Matthew Sarson was at various times either a portfolio manager at the Cash Reinvestment Desk or the manager of the New York Cash Reinvestment Desk. (<u>Id.</u> ¶ 35.)

The independent parts of the bank that work alongside securities lending are JPM's Asset and Wealth Management business, the Investment Bank, and the Broker/Dealer Division. (<u>Id.</u> ¶ 48.) According to JPM materials, "[r]isk management and oversight of securities lending activities, borrower credit review and approval, review and approval of issuers for investment of cash collateral and an end of day review of cash collateral investment activity are conducted by areas of the Bank separate and apart from Securities Lending." (<u>Id.</u> ¶ 49.)

JPMorgan Asset Management ("JPMAM") credit research group is JPM's investment management subsidiary that is staffed with, among others, professional analysts to approve issuers for the SLP. (<u>Id.</u> ¶ 50.) The JPMAM provides the SLP

with a Master Approved List ("Approved List") – from which all investments are purchased, including the two senior unsecured floating rate Lehman Bros. notes at issue in this suit (the "Lehman Notes"). (Id. ¶ 51.) On average, 2-4 names a month are added to or deleted from the Approved List. (Id.) The Cash Reinvestment Desk in the SLP selects investments from the Approved List.  According to Sarson, the Cash Reinvestment Desk would evaluate credit risk along with the JPMAM. (Id. ¶ 53.)

To become a Borrower in the securities lending program, JPM's Broker Dealer Services Division employs credit officers who evaluate risk exposure. (Id. ¶ 57.)  "The Broker/Dealer Division, which is responsible for managing the Bank's exposure to the broker/dealer community, determines securities lending credit limits and modifies them if and when appropriate." (Id. ¶ 57.)

JPM's Investment Bank provides the SLP with "insight into market flows and areas of both risk and opportunity." (Id. ¶ 61.) JPM's Investment Banking Credit is responsible for assessing ongoing aggregate credit risks for all products and services with brokers/dealers, including Lehman, and the resulting exposures arising from transactions or services performed globally, including those transactions related to the SLP. (Id. ¶ 62.)

Securities lending risk management is independent of the SLP itself and is performed by individuals within the Worldwide Securities Services ("WSS") and JPM "Risk Management". (Id. ¶ 63.) In addition, an "Institutional Investment Committee", that reports to the Board of JPM, is responsible for setting overall

policy and risk parameters for the investment of CashCo. (Id. ¶ 64.) This committee actively monitors investment exposure and market conditions to ensure that the Collateral is conservatively managed. (Id. ¶ 64.)

Plaintiff alleges that an officer for Investor Services and/or a Vice President of WSS Risk Management sits on the SLP trading floor and monitors daily trading activities. (Id. ¶ 65.)

JPM's Chief Risk Officer oversees general market risk. (Id. ¶ 66.)  A "Market Risk Group" within the Global Markets Division of JPM provides "[c]omprehensive market analysis . . . to assure sufficient risk measures have been established for the acceptance of collateral for the securities lending business." (Id. ¶ 67.) This team is also responsible for monitoring Collateral sufficiency on an ongoing basis, including for Lehman. (Id.)

Thus, the SLP operates through a collaborative effort – and did so with respect to the Lehman risk and Lehman Notes here. (Id. ¶ 68.)

In addition to these businesses, there were several committees responsible for assessing, monitoring and managing risk across all of JPM's businesses, including SLP. (Id. ¶ 69.) The WSS Risk Committee provides executive oversight for the WSS Global Risk Management program. (Id. ¶ 70.) The WSS Fiduciary Risk Committee ("FRISK"), also referred to as the T & SS Fiduciary Risk Committee (and formerly the Investor Services Fiduciary Risk Committee and the Institutional Investment Committee), is a subcommittee of the WSS Risk Committee. (Id. ¶ 71.) FRISK met regularly during the relevant times herein. (Id.)

The TSS Risk Committee also met regularly during the relevant times herein. (Id. ¶ 72.) This committee "[p]erform[ed] periodic detailed assessments of specific areas of risk concern," including for the SLP. (Id.)

All of these committees, along with a number of others, are alleged to have individuals whose responsibilities included overseeing risk and performance of the SLP. (See, e.g., id. ¶¶ 72-82.)  These committees are alleged to have had specific information reported to them, and discussed strategy with respect to the increasing risks associated with investments in Lehman, including the Lehman Notes. (See, e.g., id. ¶¶ 298-351.) The internal communications relating to the risks associated with Lehman exposure were not limited to the internal facing, clearing business of JPM – but are alleged to have encompassed a wide range of JPM's businesses. (Id.) Plaintiff alleges that while various actions were taken to reduce exposure to Lehman (in ways additional to clearing side and repo exposure), defendant failed to address the exposure presented by the Lehman Notes in the SLP. (See, e.g., id. ¶¶ 310-311.) Lehman was placed on a "vulnerable list." (Id. ¶ 311.)  Unsecured deals were not renewed. (Id.)  On June 4, 2008, Wilson and Sarson received emails stating, inter alia, that "Lehman rumors abound" and "Lehman and Merrill distressed." (Id. ¶ 314.)  Internal JPM emails suggested that it was not useful to watch rating agencies for information – since any rating trigger would occur only once a collapse had happened.  (Id. ¶ 315.)  In late June 2008, Sarson commented in an email, "Lehman ugly again." (Id. ¶ 321.)  In July 2008, members of the various committees referred to above sent an email outlining how to deal with a Lehman

crisis "so that it includes all TSS activity." (Id. ¶ 322.)  The outline suggested "Clarify options to mitigate, reduce or eliminate credit risk for all TSS activity in a crisis. . . .  Outline step by step plan to deal with a Lehman crisis within TSS . . ." (Id. ¶ 322.)  An internal email on July 9, 2008, identifies Lehman as one of the SLP's largest borrowers. (Id. ¶ 323.)  The Cash Reinvestment Desk received increasingly dire reports of Lehman's situation – and the duration of new Collateral investments was cut drastically. (Id. ¶ 324.)

Plaintiff alleges that during the summer of 2008, individuals with responsibilities directly or indirectly relating to the SLP feared a Lehman crisis. (Id. ¶¶ 327, 329.) Some began to predict bankruptcy. (Id. ¶¶ 334, 337.)  The concerns continued to escalate; plaintiff alleges that JPM continued to reduce its exposure to Lehman across many areas of its business, but left the Lehman Notes untouched. (Id. ¶¶  344-348.)  Lehman declared bankruptcy on September 15, 2008.

<u>The Deterioration of the Lehman Notes</u>

The Securities Lending JPM Collateral Fund Investment Guidelines describe the Fund Objective as being designed to obtain an attractive yield by investing in eligible securities. (Id. Appx. 1 at 1.) According to deposition testimony of JPM's Wilson and Sarson, CashCo, into which the Plan's Collateral was invested (Id. ¶ 3), was managed as a Stable Value Portfolio, managed to ensure that the net asset value ("NAV") was always $1; the objective was to ensure that CashCo was "money good." (Id. ¶¶ 38, 39.)  To ensure that CashCo was "money good" and that each share could be bought and sold at $1, JPM had to ensure that the NAV of a share

never fell below $.995. (Id. ¶ 39.) According to CashCo's auditor, PriceWaterhouseCoopers, JPM had policy requiring that if the NAV of CashCo dropped to $.998, the JPM Fiduciary Risk Committee would be advised; and if the NAV dropped to $.995, action would be taken as CashCo would at that point no longer be able to trade at $1 per share. (Id. ¶ 39.) The details alleged in the TAC regarding these fund objectives and policies are not contained in the Agreement or its Appendix.

Plaintiff alleges that beginning in August 2007 and continuing into 2008, it became increasingly apparent, or should have become apparent, to defendant that the Lehman Notes had become extremely risky – akin to junk bonds. (Id. ¶ 4.) According to plaintiff, what were once acceptable investments for the Plan were no longer acceptable and defendant should have sold the Lehman Notes.

Plaintiff alleges that basic credit and financial analysis, along with publicly available information, should have made it clear to defendant that it was required to take action to mitigate the Plan's risk of loss associated with the Lehman Notes. (Id.) Defendant held onto the Lehman Notes owned by CashCo. (Id.) However, plaintiff alleges that defendant understood and acted on the risks associated with investments in Lehman Notes when acting on its own behalf. (Id. ¶ 5.)

Plaintiff alleges that a number of individuals associated with monitoring, overseeing and controlling the investment of Collateral in CashCo were provided with information that highlighted the increasing risks associated with owning Lehman Notes. (Id. ¶¶ 38, 298-383.)

<u>Analyses that Defendant Could Have Performed</u>

Plaintiff alleges that had defendant done a variety of analyses, it would have understood that the Lehman Notes had become unduly risky and no longer appropriate for the Plan. (<u>Id.</u> ¶ 89.) According to plaintiff, it has an expert who is prepared to testify regarding the types of analyses that a reasonably prudent fiduciary would have performed.  These analyses would have led defendant to conclude that the Lehman Notes had become "akin to junk", thereby compelling JPM to take action to mitigate the Plan's exposure to a Lehman default. (<u>Id.</u> ¶ 90.)

Among the analyses that plaintiff asserts should have been performed, and the results of which its expert is prepared to testify, are the following: (1) options implied volatility analysis (<u>Id.</u> ¶¶ 92-95); (2) credit default swap analysis (<u>Id.</u> ¶¶ 96-102)[3]; (3) default probability implied by credit default swap prices (<u>Id.</u> ¶¶ 103-08); (4) default probability implied by floating rate note ("FRN") market prices (<u>Id.</u> ¶¶ 109-113); (5) equity pricing analysis (<u>Id.</u> ¶¶ 114-117); and (6) bond price analysis (<u>Id.</u> ¶¶ 118-121). [4]

In addition, plaintiff asserts that a reasonably prudent investor would have followed the credit analyses by various credit rating agencies. (<u>Id.</u> ¶¶ 122 et seq.) According to plaintiff, credit agency warnings and downgrades occurring during 2007 and prior to Lehman's bankruptcy in September 2008 should have alerted

---

[3] The Court notes that the Guidelines prohibit credit default swaps, but the documentation relating to CashCo allows such investment. It is unnecessary to this motion to resolve that difference.

[4] In various footnotes, plaintiff cites to external studies suggesting that these types of analyses are accepted in the industry.  (<u>See, e.g.</u>, fns. 44-46.)

JPM to the risk of continued investment in the Lehman Notes and the need to take action to mitigate the risk. (See, e.g., id. ¶¶ 132, 133, 140.)

## II.    LEGAL STANDARD

On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations, Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009), and draws all reasonable inferences in plaintiff's favor.  See Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir.2010).  To withstand dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  Thus, while "Rule 8 marks a notable and generous departure from hyper-technical, code-pleading regime of a prior era, [ ] it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  Id. at 1950.  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown-that the pleader is entitled to relief."  Id. (internal punctuation omitted); see also Fed. R. Civ. P. 8(a)(2).

It is beyond cavil that on a motion to dismiss the Court may not weight the evidence or choose between competing versions of the facts, other than to determine whether the basic requirements of Twombly and Iqbal have been met. Thus, while defendant may have the conviction, born of knowing its own business, that the facts as alleged in the TAC are unsupported by the evidence, or placed into proper

context could not lead to liability, those are factual presentations and determinations for another day.  The Court's role on a motion to dismiss is to determine whether the elements of a cause of action are supported by sufficient plausible facts – not whether those facts will be proven at trial.

III.    ELEMENTS OF THE ERISA CLAIMS

Plaintiff asserts two causes of action pursuant to ERISA.  Count I alleges a violation of defendant's duty of care under Section 404(a)(1), 29 U.S.C. § 1104(a)(1), by failing to act as a reasonably prudent fiduciary. Plaintiff claims that defendant failed to monitor the investment and imprudently maintained the investments and that a reasonably prudent investor would have sold the investments in the Lehman Notes.  (Id. ¶ 411.)  Plaintiff also claims that defendant breached its duty of loyalty by placing its own interests above those of the Plan by making an allegedly excessively risky investment in Lehman Notes in attempt to make excessive profits and "prop up" Lehman.

Section 404(a) imposes on ERISA plan fiduciaries the "prudent man" standard of care. 29 U.S.C. § 1104(a).  Section 404(a)(1) states that the fiduciary must discharge its duties "solely in the interest of the [ERISA plan] participants and beneficiaries, and must do so

> With the skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims.

29 U.S.C. § 1104(a)(1)(B); see also In re Citigroup ERISA Litig., 662 F.3d 128, 148 (2d Cir. 2011); Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006).  Prudence is

"measured according to the objective prudent person standard developed in the common law of trusts." Id. (quoting Katasaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984)).  This means that the fiduciary's obligations to the plan are the highest known to the law. Chao, 452 F.3d at 182 (quoting Donovan v. Bierwirth, 680 F.2d 263, 272 n. 8 (2d Cir. 1982), cert denied, 459 U.S. 1069 (1982)).

"If a fiduciary was aware of a risk to the fund, he may be liable for failing to investigate fully the means of protecting the fund from that risk." Id.  The proper inquiry is whether under the circumstances then prevailing – not as seen in hindsight – the prudent person standard was met.  29 U.S.C. § 1104(a)(1)(B); see also Chao, 452 F.3d at 182.  So long as the prudent person standard has been met, ERISA does not require that a particular course of action – and no other – be followed. See Chao, 452 F.3d at 182; Diduck v. Kaszycki & Sons Contractors, Inc., 874 F.2d 912, 917 (2d Cir. 1989). Appropriate exercise of the duty of care requires prudence, not prescience. See DeBruyne v. Equitable Life Assurance Society, 920 F.2d 457, 465 (7th Cir. 1990).  What the appropriate methods are depends on the character and aims of the particular plan – as well as the circumstances prevailing at the time. See Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 299 (5th Cir. 2000); In re Unisys Savings Plan Litig., 74 F.3d 420, 434 (3d Cir. 1995). However, a fiduciary who ignores changed circumstances that have increased risk of loss may be deemed imprudent. See Armstrong v. LaSalle Bank Nat'l Assoc., 446 F.3d 728, 734 (7th Cir. 2006)(remanding the case to the district court for an appropriate factual finding).

In 2011, Judge Berman denied summary judgment to the Bank of New York Mellon Corp. ("BNYM") on a claim similar to that before this Court. The Bd. of Trustees of the Southern CA IBEW-NECA Defined Contribution Plan v. The Bank of New York Mellon Corp., 09 Civ. 6273, 2011 WL 6130831 (S.D.N.Y. Dec. 9, 2011). There, BNYM was sued by a pension plan that participated in BNYM's SLP. Collateral invested in connection with that SLP was also invested in Lehman floating rate notes. Id., at *1. BNYM alleged that plaintiff's ERISA claim was based on "Monday morning quarterbacking" and that the Lehman bankruptcy was a surprise to BNMY and plaintiff. Id. The court found that rarely will determination of whether a fiduciary has fulfilled its obligations under the prudent man standard be amenable to resolution on summary judgment. Id., at * 3. That case had, it is clear, already made it past the pleading stage.

Courts have interpreted the ERISA prudent man standard to require that a fiduciary do the following: (1) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters, and (3) exercise independent judgment when making investment decisions. See Bd. of Trustees of the Local 295/Local 851-IBT Employer Pension Fund v. Callan Assocs., Inc., 97 Civ. 1741, 1998 WL 289697, at *3 (S.D.N.Y. June 4, 1998) (citing U.S. v. Mason Tenders Dist Council of Greater New York, 909 F.Supp. 882, 886 (S.D.N.Y. 1995)). These inquiries are, in turn, measured against what is appropriate in the industry at a given point in time. See Callan, 1998 WL 289697, at * 3.

Duty of Loyalty

Count II alleges defendant violated its duty of loyalty in derogation of Section 406(b)(1) of ERISA, 29 U.S.C. § 1106(b)(1). Plaintiff asserts that defendant engaged in prohibited transactions by dealing in its own interests ahead of those of the Plan in connection with the Lehman Notes. Plaintiff alleges that the imprudent investments in the Lehman Notes were to provide defendant with the possibility of excessive profits at the expense (and based on risk) to the Plan. (TAC ¶ 428.) Plaintiff alleges that by supporting Lehman through investment of the Collateral in the Lehman Notes, defendant was able to keep Lehman afloat while liquidating its own investment. (Id. ¶ 429.)

ERISA identifies certain prohibited transactions between a plan and a fiduciary.  For instance, a plan fiduciary may not deal with assets of the plan in its own interest or for its own account. See 29 U.S.C. § 1106(b)(1)-(3); see also Bd. of Trustees of the AFTRA Retirement Fund v. JPMorgan Chase Bank, N.A., 806 F.Supp.2d 662, 681 (S.D.N.Y. 2011).

The Second Circuit has held that courts should interpret Section 406 broadly in favor of plan beneficiaries; a violation of this provision of ERISA may be demonstrated without a showing of bad faith or even in the presence of a reasonable transaction. See Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1213 (2d Cir. 1987); LaScala v. Scrufari, 330 F.Supp.2d 236, 253-54 (W.D.N.Y. 2004). The

presence of conflicting interests imposes on fiduciaries obligations to take actions to ensure that their duty of loyalty is not compromised. See Bussian, 223 F.3d at 299.

IV.    DISCUSSION

Plaintiff has set forth sufficient allegations to support a claim for breaches of both the duty of care and the duty of loyalty.

Duty of Care

At oral argument, defense counsel summarized the core of its various arguments by contending that plaintiff cannot state a claim unless it is plausible that a fact finder could determine that the only reasonable course of action for JPM to have undertaken was to sell the Lehman Notes and lock in  certain loss.  (Tr. of Oral Arg. at 16, 24 (Mar. 6, 2013)("you cannot say the fiduciary had an obligation to go out and sell and take the loss because there was no other reasonable course. And that is the question. Because if our course is reasonable and their course is reasonable, there is no case here.")) That, however, unduly truncates the appropriate legal analysis.

First, it ignores that the TAC alleges in various places that appropriate investigation should have led defendant to the conclusion that the Lehman Notes were no longer appropriate investments, and that such investigation should have compelled action to "mitigate" the risk to the Plans.  Construed in plaintiff's favor, these allegations are sufficiently broad to encompass actions short of a sale.  So it is not true that there was a binary course before JPM – or now before the Court: sale or no sale.  The allegations suggest "other actions" as well.  How other actions may

have mitigated the risk, whether they could in fact have mitigated the risk, are questions left unanswered at the pleading stage. But they demonstrate that this binary choice is not the only legally cognizable path towards stating a claim.

Defendant's characterization of the issue also ignores that whether or not the prudent person standard has been met depends in part on whether an appropriate investigation and analysis by JPM was performed at various points in time, and as measured by the circumstances then prevailing. If JPM decided to hold (and not sell) the assets after a less than reasonable investigation, liability for a breach of the duty of care might still attach. This result is possible even if another fiduciary could escape liability by also deciding to hold the assets, but did so after it had performed each of the analyses suggested by plaintiff in its TAC (or others) and determined after careful consideration that holding the Notes continued to be the prudent course of action. In other words, how a fiduciary arrived at its determination is part of the inquiry as to whether it acted in a reasonably prudent manner – the objective inquiry as to "prudence" is not based solely on the path followed. Put another way, it is clear that plaintiff as well as many others holding Lehman Notes experienced loss when Lehman declared bankruptcy. However, whether an ERISA fiduciary can or should be held liable for such loss may depend entirely on whether it exercised prudence and care in arriving at its decision to "hold." One "hold" decision may have been based on careless imprudence, another may have been based on careful prudence. That the resulting loss is the same does not relieve the former of, nor condemn the latter to, liability.

According to the allegations in the TAC, CashCo was intended to follow a conservative investment strategy, that preservation of principal was primary. The law requires that prudence be based on whether the objectives of the investment strategy at issue were followed. That is more than simply whether the initial investment Guidelines were followed (a point which plaintiff does not contest except as to the Lehman Note acquired in 2007), it goes to what "prudence" means with respect to the Plan at issue. Plaintiff alleges that this conservative investment strategy meant that acting prudently required reducing risk as the chances of a Lehman default grew; that prudence meant that taking a gamble that Lehman would survive its then apparent crisis was not an appropriate strategy for CashCo.

The TAC also contains detailed factual allegations that, despite these investment objectives, when individuals within JPM whose positions connected them in some way to the SLP were exposed to information regarding increased risk exposure for Lehman investments, they failed to take appropriate action with respect to the Plan's investments.  The TAC alleges that a variety of information should have made it clear to defendant that sale or mitigation of risk with respect to the Lehman Notes was appropriate – but that neither was done.

Further, the TAC alleges that there were a number of specific analyses that defendant could have performed, and as to which plaintiff proposes to have an expert testify, that would have revealed that defendant should take action with respect to the Lehman Notes, but that, again, it did not.

The TAC also alleges specific facts in support of a claim that defendant took actions to reduce and/or mitigate its own risk exposure associated with Lehman investments, while failing to take similar action with respect to the Lehman Notes in CashCo.

These allegations – taken together – plausibly support a claim that defendant breached its duty of care to plaintiff.  Whether, following discovery, it will turn out that appropriate analyses were done, that due and specific deliberation was given, and that the "hold" strategy was carefully and prudently followed, remains to be seen.  At this stage, despite defendant's urging that this Court make such determinations now, it cannot. At this pleading stage – yes, still – this Court is constrained in terms of the type of determinations it may make.  Defendant asserts that it made analyses – and that this is demonstrated by virtue of the fact that some Lehman investments in CashCo were eliminated while the Notes were held; but that assumes that this Court can (1) determine that the decision  to eliminate one investment and hold another occurred after due deliberation – when there are no facts before it regarding the type of analysis in fact undertaken, (2) that there are not other reasonable explanations for the elimination of certain Lehman investments versus others (e.g., the type of return that defendant might obtain with one versus the other), and/or (3) that other, additional analyses should not also have been performed.

Defendant also urges this Court to examine the documents cited in the TAC and acknowledge that they "show" that defendant constantly monitored the SLP,

that defendant reasonably concluded that the Lehman Notes should not be sold, that JPM took prudent steps to reduce exposure to some Lehman-related losses, that other market participants similarly concluded that Lehman was unlikely to default, and that the fact that the Lehman Notes traded above 90 cents on the dollar until just prior to Lehman's bankruptcy demonstrates reflected a market view that default was unlikely. (See Def.'s Mem. of Law in Supp. of Mot. to Dismiss the Third Am. Compl., at 3.)  These points all miss the legal mark, however.

First, this Court cannot weigh the evidence on a motion to dismiss. While it can review certain documents attached to, or incorporated by reference in, the TAC, it cannot now make factual findings.  As counsel for JPM stated at oral argument on this motion, this Court can review those documents as part of its determination as to whether, under Twombly's plausibility standard, plaintiff has alleged sufficient facts to state a claim. That is undoubtedly so.  But to suggest that, given the breadth of the factual assertions, the additional reliance on deposition testimony, these documents can be used to dispense with the entirety of the claims here takes them (and what a court can do with Twombly) too far.

It may well be, for instance, that the SLP was continuously monitored, but perhaps the monitoring did not lead to appropriate and prudent action.  That is what plaintiff claims. Plaintiff alleges a series of facts supporting its assertion that defendant knew quite a lot regarding market conditions, but ignored those conditions when it came to actions with respect to the Lehman Notes in CashCo.

Taking another of defendant's points leaves us in a similar position: that other market participants may have concluded that Lehman would not default assumes (1) that JPM had concluded that Lehman would not default; in fact, the TAC alleges that JPM had concluded that Lehman was perilously close to, or likely to default – and had taken actions in accordance with that belief with respect to a number of other Lehman exposures. Again, plaintiff's claim is that JPM understood that Lehman was teetering on the edge – and, for its own account, bet that Lehman would default or at least protected itself if that occurred, but took no such actions with respect to the Lehman Notes. Similarly, that the market may have priced the Notes at 90 cents on the dollar just prior to Lehman's bankruptcy has two issues: (1) plaintiff alleges that once the price dipped below $1.00, consistent with the conservative investment objectives for CashCo, defendant should have taken steps to mitigate its risk; but additionally, the TAC alleges that the market may well have been more optimistic than JPM was internally, as shown by its efforts to reduce other exposures to Lehman.  And finally, of course, it is unclear to what extent any of the market participants who were buying and selling other Lehman Notes were ERISA fiduciaries managing to the same investment objectives as those at issue in this lawsuit. For all of these reasons, the documents recited in the TAC cannot – at this stage of the case – dispatch plaintiff's claims to the waste bin.[5]

The Court notes that both the Guidelines and Appendix 1 to the Guidelines refer to plaintiff as acknowledging that it was taking investment risk and that

---

[5] Plaintiff also asserts that defendant breached its duty of care by purchasing a Lehman Note in 2007 that was beyond the investment horizon set forth in the Guidelines. Because the Court finds that plaintiff has otherwise stated a claim, it need not separately address that set of allegations here.

returns were not guaranteed.  These agreements are not, however, a waiver of defendant's obligation to comply with the prudent person standard. To the extent that defendant is later found to have complied with its duty of care, then no separate action for breach of contract relating to the loss is likely to lie.  That is a different point altogether.  There may also be an evidentiary value to such statements – including as to the type of investment objectives to which defendant had in fact committed itself.  In light of the allegations in the TAC regarding conservative investment standards, any evidentiary value does not assist the Court on this motion to dismiss.

The TAC sufficiently alleges a breach of defendant JPM's duty of care under ERISA.

<u>Duty of Loyalty Claim</u>

Plaintiff also alleges sufficient facts to support a breach of the duty of loyalty by JPM. For instance, the TAC alleges that individuals involved with the SLP had information that should have led them to take action with respect to the Lehman Notes – instead, according to plaintiff, defendant gambled that the Lehman would survive when it was the Plan's investment at risk (and when JPM stood to obtain 30-40% of profits if the investment paid off, and risked nothing if it did not), while reducing or eliminating its own exposure when its own money was at risk. These facts, as set forth above, are sufficient to state a claim for a breach of the duty of loyalty.

V.     CONCLUSION

For the reasons set forth above, defendant's motion to dismiss the Third

Amended Complaint is denied.

The Court will hold a conference on April 10, 2013, at 11:00 a.m. to determine

what discovery remains necessary to resolve this case and to set a schedule for final

resolution.

The Clerk of Court is directed to terminate the motion at ECF No. 82.

Dated:        New York, New York
              March 27, 2013

_____
        KATHERINE B. FORREST
        United States District Judge